# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

AVI PUSATERI, SUSHI TOKYO INC.,
CHAIM MISHULOVIN, SUSHI TOKYO
MIAMI LLC, DAVID FELTON, BARRY
WILHELM, SHANNON WILHELM,
TRACY COLE, NELSON NJOROGE,
ANTOINE DOXON, TIEASE HOLMES,
DYONNESHA WOOLFOLK, and TROY
REECE on behalf of themselves and all
others similarly situated,

*Plaintiffs,*

v.

DIAGEO NORTH AMERICA, INC.,

*Defendant.*

Case No. 25 Civ. 2482

**ORAL ARGUMENT
REQUESTED**

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ................................................................................................. 6

    A.    Diageo's Tequila Making Process is Tightly Controlled and Highly Regulated ............................................................................................ 6

    B.    Plaintiffs' Baseless Challenge to the Verified 100% Agave Label ........................ 9

ARGUMENT ..................................................................................................... 11

I.    PLAINTIFFS LACK ARTICLE III STANDING ........................................................... 11

    A.    Plaintiffs Have Not Alleged A Particularized Injury In Fact ............................... 12

        1.    Plaintiffs fail to allege which—if any—of their own purchases were tested ................................................................................ 12

        2.    Plaintiffs fail to allege facts showing any "widespread" issue with Diageo's tequilas .......................................................................... 15

        3.    Plaintiffs who purchased their tequila after this lawsuit commenced cannot claim injury ............................................................... 19

    B.    Plaintiffs Lack Standing to Seek Injunctive and Declaratory Relief ................... 20

II.    PLAINTIFFS FAIL TO STATE A CLAIM .................................................................. 21

    A.    Plaintiffs Fail To Allege False and Misleading Representations ......................... 21

        1.    Plaintiffs' bare allegations fall far short of Rule 8's plausibility requirement ............................................................................ 22

        2.    Plaintiffs' own allegations undermine their theory ................................... 23

        3.    The purported testing method is not credibly alleged to be validated for tequila testing ................................................................ 27

        4.    Isolated, unverified numbers cannot support Plaintiffs' sweeping allegations ............................................................................ 28

    B.    Plaintiffs Fail To Allege Their Claims With the Requisite Particularity ............. 29

C.    Plaintiffs' Claims Are Barred by Safe Harbors Protecting Conduct that
      Complies with Federal Law ................................................................. 30

D.    Plaintiffs' Unjust Enrichment Claims Are Duplicative and Legally
      Deficient............................................................................................... 34

E.    Plaintiffs Fail To Plead Any Facts Justifying Tolling ........................... 35

CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Abidor v. Napolitano,*
990 F. Supp. 2d 260 (E.D.N.Y. 2013) ....................................................... 20

*AJ Energy LLC v. Woori Bank,*
829 F. App'x 533 (2d Cir. 2020) ............................................................. 26

*Aliano v. Fifth Generation,*
2015 WL 5675423 (N.D. Ill. Sept. 24, 2015) ........................................... 33

*Aliano v. WhistlePig, LLC,*
2015 WL 2399354 (N.D. Ill. May 18, 2015) ............................................. 33

*Ass'n Benefit Servs. v. Caremark Rx, Inc.,*
493 F.3d 841 (7th Cir. 2007) .................................................................. 21

*Atari Interactive, Inc. v. State Farm Mut. Auto. Ins. Co.,*
2024 WL 4343050 (N.D. Tex. Sept. 27, 2024) .......................................... 34

*Atik v. Welch Foods, Inc.,*
2016 WL 5678474 (E.D.N.Y. Sept. 30, 2016) ........................................... 20

*Barnes v. KOS, Inc.,*
2025 WL 1928027 (S.D.N.Y. July 14, 2025) ...................................... *passim*

*Barton v. Procter & Gamble Co.,*
766 F. Supp. 3d 1045 (S.D. Cal. 2025) ................................................... 28

*Bell v. Publix Super Mkts.,*
982 F.3d 468 (7th Cir. 2020) .................................................................. 21

*Berni v. Barilla S.p.A.,*
964 F.3d 141 (2d Cir. 2020) ............................................................ 20, 21

*Bermudez v. Colgate-Palmolive Co.,*
667 F. Supp. 3d 24 (S.D.N.Y. 2023) .................................................. 21, 26

*Berry v. Indianapolis Life Ins. Co.,*
608 F. Supp. 2d 785 (N.D. Tex. 2009) .................................................... 30

*Biczo v. Ferrara Candy,*
2023 WL 2572384 (N.D. Ill. Mar. 20, 2023) ........................................... 21

*Binder v. Michael Kors (USA), Inc.*,
2024 WL 3227943 (S.D.N.Y. June 28, 2024) ..................................................... 29

*Binder v. Premium Brands Opco LLC*,
2024 WL 2978506 (S.D.N.Y. June 11, 2024) ..................................................... 20

*Bowring v. Sapporo U.S.A., Inc.*,
234 F. Supp. 3d 386 (E.D.N.Y. 2017) ................................................................. 32

*Brown v. Coty, Inc.*,
2024 WL 894965 (S.D.N.Y. Mar. 1, 2024) ......................................................... 16

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ............................................................................. 30

*Campbell v. Freshbev LLC*,
322 F. Supp. 3d 330 (E.D.N.Y. 2018) ................................................................. 21

*Cascio v. Johnson & Johnson*,
2024 WL 693489 (N.D. Ga. Feb. 20, 2024) ....................................................... 28

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*,
433 F.3d 181 (2d Cir. 2005) ............................................................................... 11

*Chaudhri v. Lumileds LLC*,
2018 WL 6322623 (D.N.J. Dec. 3, 2018) ........................................................... 21

*CIH Int'l Holdings, LLC v. BT United States, LLC*,
821 F. Supp. 2d 604 (S.D.N.Y. 2011) ................................................................... 6

*Consejo Regulador Del Tequila A.C. v. S2F Online. Inc.*,
No. 25 Civ. 1129 (M.D. Fla. 2025) ..................................................................... 17

*Consigli & Assocs., LLC v. Maplewood Senior Living, LLC*,
2021 WL 4238162 (S.D.N.Y. July 29, 2021) ..................................................... 30

*Coyle v. JSL Mech., Inc.*,
2023 WL 5985273 (E.D. Pa. Sept. 14, 2023) ..................................................... 30

*Crosswell v. Martinez*,
120 F.4th 177 (5th Cir. 2024) (Texas) ............................................................... 21

*Cruz v. Anheuser-Busch*,
2015 WL 3561536 (C.D. Cal. June 3, 2015) ................................................. 32, 33

iv

*Davis v. Angelcare USA, LLC,*
  727 F. Supp. 3d 99 (D. Conn. 2024)........................................................... 21

*Davis v. Hain Celestial Grp., Inc.,*
  297 F. Supp. 3d 327 (E.D.N.Y. 2018) ......................................................... 20

*Deshawn E. by Charlotte E. v. Safir,*
  156 F.3d 340 (2d Cir. 1998).......................................................................... 20

*Esquibel v. Colgate-Palmolive Co.,*
  2025 WL 1785865 (S.D.N.Y. June 27, 2025) .................................... *passim*

*Fleury v. Gen. Motors,*
  654 F. Supp. 3d 724 (N.D. Ill. 2023) .......................................................... 21

*Francis v. Mead Johnson & Co.,*
  2010 WL 5313540 (D. Colo. Dec. 17, 2010)............................................... 35

*Gavilanes v. Gerber Prods. Co.,*
  2021 WL 5052896 (E.D.N.Y. Nov. 1, 2021) ............................................... 20

*Gregg v. Ameriprise Fin.,*
  245 A.3d 637 (Pa. 2021) (Pennsylvania) ................................................... 21

*Haschemie et al. v. Diageo N. Am. et al.,*
  No. 25 Civ. 23367 (S.D. Fla. 2025) ............................................................... 2

*HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.,*
  805 F. Supp. 2d 1115 (D. Colo. 2011)......................................................... 29

*Hicks v. L'Oreal U.S.A., Inc.,*
  2024 WL 4252498 (S.D.N.Y. Sept. 19, 2024)...................................... 15, 18

*Jackson v. Anheuser-Busch InBev SA/NV,*
  2021 WL 3666312 (S.D. Fla. Aug. 18, 2021)...................................... 32, 33

*Jackson v. Diageo N. Am. Inc.,*
  No. 25 Civ. 5654 (N.D. Cal. 2025) ................................................................ 2

*Jiaherb v. MTC Indus.,*
  2025 WL 2555514 (D.N.J. Sept. 5, 2025) ................................................... 27

*John v. Whole Foods Market Grp., Inc.,*
  858 F.3d 732 (2d Cir. 2017)........................................................................... 17

v

*Kandel v. Dr. Dennis Gross Skincare, LLC,*
    721 F. Supp. 3d 291 (S.D.N.Y. 2024) ............................................................ 34

*Kardovich v. Pfizer, Inc.,*
    97 F. Supp. 3d 131 (E.D.N.Y. 2015) ............................................................. 26

*Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron
    Workers Loc. 580,*
    140 F.4th 60 (2d Cir. 2025) ......................................................................... 11

*Kay v. Copper Cane, LLC,*
    549 F. Supp. 3d 1014 (N.D. Cal. 2021) ....................................................... 33

*Kell v. Lily's Sweets,*
    2024 WL 1116651 (S.D.N.Y. Mar. 13, 2024) ............................................. 18

*Klausner v. Annie's, Inc.,*
    581 F. Supp. 3d 538 (S.D.N.Y. 2022) ......................................................... 21

*Krystofiak v. BellRing Brands,*
    737 F. Supp. 3d 782 (N.D. Cal. 2024) ......................................................... 28

*Kyszenia v. Ricoh USA, Inc.,*
    583 F. Supp. 3d 350 (E.D.N.Y. 2022) ......................................................... 35

*L. Offs. of K.C. Okoli, P.C. v. BNB Bank, N.A.,*
    481 F. App'x 622 (2d Cir. 2012) ................................................................. 34

*Lewis v. Casey,*
    518 U.S. 343 (1996) ..................................................................................... 11

*Licul v. Volkswagen Grp. of Am., Inc.,*
    2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ............................................... 34

*Lurenz v. Coca-Cola Co.,*
    2025 WL 2773188 (S.D.N.Y. Sept. 29, 2025) ..................................... *passim*

*Luxco, Inc. v. Consejo Regulador Del Tequila, A.C.,*
    121 U.S.P.Q.2d 1477 (T.T.A.B. 2017) ........................................................... 8

*MacNaughten v. Young Living Essential Oils, LC,*
    575 F. Supp. 3d 315 (N.D.N.Y. 2021) ......................................................... 23

*MacNaughton v. Young Living Essential Oils, LC,*
    67 F.4th 89 (2d Cir. 2023) ........................................................................... 23

*Marcus v. AT & T Corp.*,
   938 F. Supp. 1158 (S.D.N.Y. 1996) ........................................................ 31

*Marrache v. Bacardi U.S.A., Inc.*,
   17 F.4th 1084 (11th Cir. 2021) (Florida) ............................................ 21, 35

*Myers v. Wakefern Food Corp.*,
   2022 WL 603000 (S.D.N.Y. Mar. 1, 2022) ............................................. 22

*New York v. Hendrickson Bros.*,
   840 F.2d 1065 (2d Cir. 1988) .................................................................. 35

*Nichols v. Wm. Wrigley Jr. Co.*,
   2011 WL 181458 (S.D. Fla. Jan. 19, 2011) ........................................... 21

*Noriega v. Abbott Lab'ys*,
   714 F. Supp. 3d 453 (S.D.N.Y. 2024) ................................................... 27

*O'Hara v. Diageo-Guinness, USA*,
   306 F. Supp. 3d 441 (D. Mass. 2018) ............................................... 32, 33

*Onaka v. Shiseido Ams. Corp.*,
   2023 WL 2663877 (S.D.N.Y. Mar. 28, 2023) ............................. 12, 14, 15

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d Cir. 1990) ...................................................................... 30

*Pineda v. Lacke Consumer Prods.*,
   2024 WL 5001928 (E.D. Pa. Dec. 5, 2024) ........................................... 16

*Pop v. LuliFama.com LLC*,
   145 F.4th 1285 (11th Cir. 2025) ............................................................ 29

*Prudential Ins. Co. of Am. Sales Pracs. Litig.*,
   975 F. Supp. 584 (D.N.J. 1996) ............................................................. 31

*Pye v. Fifth Gen.*,
   2015 WL 5634600 (N.D. Fla. Sept. 23, 2015) ...................................... 32

*Reich v. Genzyme Corp.*,
   2015 WL 13236347 (D. Colo. Aug. 14, 2015) ...................................... 21

*Renfro v. Champion Petfoods USA*,
   25 F.4th 1293 (10th Cir. 2022) .............................................................. 21

*Richardson v. N.Y. City Bd. of Educ.*,
711 F. App'x 11 (2d Cir. 2017) ................................................................. 6

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ................................................................... 30

*Santiful v. Wegmans Food Mkts.*,
2022 WL 268955 (S.D.N.Y. Jan. 28, 2022) ....................................... 22, 23

*Schwartzco Enters. LLC v. TMH Mgmt., LLC*,
60 F. Supp. 3d 331 (E.D.N.Y. 2014) ...................................................... 29

*Singleton v. Fifth Generation, Inc.*,
2016 WL 406295 (N.D.N.Y. Jan. 12, 2016) ....................................... 33, 34

*Slack v. Suburban Propane Partners, L.P.*,
2010 WL 3810870 (D.N.J. Sept. 21, 2010) ............................................. 22

*Soto v. GNC Holdings*,
2025 WL 662135 (N.D. Ill. Feb. 28, 2025) ....................................... 15, 19

*Steel Media Grp., LLC v. Lewis*,
2023 WL 1413043 (S.D. Fla. Jan. 6, 2023) ............................................. 35

*Sullivan v. Leor Energy*,
600 F.3d 542 (5th Cir. 2010) .................................................................. 21

*Thomas v. JPMorgan Chase & Co.*,
811 F. Supp. 2d 781 (S.D.N.Y. 2011) ..................................................... 29

*Todd v. Xoom Energy Maryland, LLC*,
2016 WL 727108 (D. Md. Feb. 22, 2016) ............................................... 22

*Turnipseed v. Simply Orange Juice Co.*,
2022 WL 657413 (S.D.N.Y. Mar. 4, 2022) ....................................... 23, 24

*Tyman v. Pfizer, Inc.*,
2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017) ........................................ 29

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
2009 WL 1456582 (E.D.N.Y. May 22, 2009) ......................................... 30

*Welch v. TD Ameritrade Holding Corp.*,
2009 WL 2356131 (S.D.N.Y. July 27, 2009) ......................................... 29

*Weinstein v. Rexall Sundown, Inc.*,
2024 WL 4250353 (E.D.N.Y. Aug. 26, 2024) ....................................................... 29

*Whitaker v. Herr Foods, Inc.*,
198 F. Supp. 3d 476 (E.D. Pa. 2016) ...................................................................... 21

*Wood v. Blue Diamond Growers*,
722 F. Supp. 3d 554 (D. Md. 2024) (Maryland) ............................................... 21, 29

## RULES AND REGULATIONS

United States–Mexico–Canada Agreement ("USMCA") Art.3.C.2(3) ....................... 32
*Norma Oficial Mexicana de Tequila* ("NOM") 4.1 ........................................... 8, 17
NOM 5.1.1. .................................................................................................. 7, 31
NOM 6.1.1.1. ........................................................................................... 7, 8, 17
NOM 6.5.2.2 ...................................................................................................... 7
27 U.S.C. § 205(e) ............................................................................................ 32
27 C.F.R. § 1.20 ................................................................................................. 9
27 C.F.R. § 5.3 ................................................................................................. 32
27 C.F.R. § 5.24 ................................................................................................. 9
27 C.F.R. § 5.25 ................................................................................................. 9
27 C.F.R. § 5.30(d) ........................................................................................ 9, 32
27 C.F.R. § 5.102 ............................................................................................... 9
27 C.F.R. § 5.148 .......................................................................................... 9, 32
27 C.F.R. § 13.21(a) ......................................................................................... 32
815 Ill. Comp. Stat. § 505/10b(1) ....................................................................... 31
Colo. Rev. Code § 6–1–106(1)(a) ....................................................................... 31
Fla. Stat. § 501.212(1) ...................................................................................... 31
New York's General Business Law ("GBL") § 349 ...................................... *passim*
GBL § 350 .............................................................................................. *passim*
Fed. R. Civ. P. 8 ..................................................................................... *passim*
Fed. R. Civ. P. 9(b) ................................................................................ *passim*
Fed. R. Civ. P. 12(b)(1) ................................................................................. 1, 35
Fed. R. Civ. P. 12(b)(6) ................................................................................. 1, 35
Fed. R. Civ. P. 44.1 ............................................................................................ 6

## OTHER AUTHORITIES

AFA, *Our Process*,
perma.cc/TV5H-NYCY ................................................................................. 17

Felisa Rogers, *Is that really tequila you're buying? Allegations of corruption raise serious questions*, Mezcalistas (Jan. 13, 2025), perma.cc/3JB4-HWUY .................................................. 8

CRT, *Agroservices*,
perma.cc/865T-E87Y .................................................................................................. 8

CRT, *Inspection Unit*,
perma.cc/6NRE-VZS9 ................................................................................................ 9

CRT, *Laboratory*,
perma.cc/Z9WF-CGM6 .............................................................................................. 9

Diageo Bar Acad. (2024), *Tequila: History and Production*,
perma.cc/Z4BG-GBBA ............................................................................................... 7

Diageo SEC Form 20-F ................................................................................................... 7

TTB, *Distilled Spirits Labeling*,
perma.cc/639M-777Y .................................................................................................. 9

Jorge Velazco, *Vinculan a proceso a dos extranjeros por falsificar y adulterar tequila*, Informador.mx, Aug. 15, 2025, https://perma.cc/9BRJ-Q46L ................................................ 17

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Diageo North America, Inc. ("Diageo") respectfully moves to dismiss Plaintiffs' Amended Complaint filed on September 12, 2025 (ECF 23 ("Amended Complaint," or "AC")).

## PRELIMINARY STATEMENT

This action is not about any credible, good-faith concern over consumer harm—Plaintiffs' claims are meritless. It is just the latest effort by self-interested actors seeking to use the federal courts' scarce resources to advance their personal agenda and make categorically false and disparaging accusations under cover of a publicly filed complaint. Led by Plaintiff Avi Pusateri, a repeat class action plaintiff who previously sued Diageo and routinely denigrates Diageo's products on social media (starting long before he brought this lawsuit), Plaintiffs attempt to manufacture a controversy from nothing more than rumor and conjecture. Their implausible theory that Diageo's 100% agave tequilas contain non-agave alcohol (they absurdly—and baselessly—allege that some Diageo tequilas contain as little as 2% agave-derived alcohol) rests entirely on vaguely described, unintelligible results from "tests" performed by someone else (never identified), somewhere else (never alleged), at some time (never disclosed), that have no credibly alleged applicability to tequila. Those mystery "tests" were purportedly done on only a handful of samples of Diageo's Casamigos and Don Julio brand tequilas, none of which Plaintiffs clearly allege were taken from the dozens of bottles they purchased. And they were "arranged" for Plaintiffs' counsel through a longtime industry antagonist who faces criminal indictment in Mexico and civil litigation in the United States for making and promoting false statements about tequila. From there, Plaintiffs fantastically allege that every bottle of tequila Diageo has sold for decades was not, as its label accurately states, "100% agave."

Tellingly, Plaintiffs do not—because they cannot—allege any flaw or vulnerability in Diageo's meticulous and rigorously monitored tequila-making process, any failure of internal

controls, any disclosure, investigation, or judicial finding, nor any whistleblower—among the hundreds if not thousands of people involved in making Casamigos and Don Julio tequilas—to support their claims. They allege no issue with the products' appearance, packaging, consistency, or taste. And none of the few sources they cite even mentions Diageo or its products. But that does not stop them from disparaging the credibility and careful work of everyone involved in making Diageo's tequilas, all based on some handful of vaguely and unintelligibly alleged "test" results arranged by some other collaborator, that someone else did somewhere else of some unidentified liquid on some indeterminate date.

The manufactured nature of this litigation is obvious. The same five Plaintiffs' lawyers pressing this case filed a nearly identical action in the Northern District of California two months after this one,[1] trafficking in the same flawed allegations and the same inadequately pled "testing." After Diageo moved to transfer that case to this Court under the first-to-file rule—a motion now fully briefed and pending—those same lawyers filed the Amended Complaint here, dramatically expanding the scope by adding 10 new plaintiffs, six new state subclasses, and a series of equally unsupported and implausible claims. By pursuing duplicative actions with overlapping putative classes in two federal courts on opposite coasts, Plaintiffs' counsel are hedging their bets that they can survive dismissal in one court or the other. But their gamble is bound to fail: the Amended Complaint—like its California counterpart—falls well short as a matter of law and should be dismissed in its entirety.

Diageo's Casamigos and Don Julio brand tequilas are made from 100% Blue Weber agave. From the moment agave is planted in the ground, through the growing and harvesting process, and during every step of Diageo's tightly controlled, state-of-the-art manufacturing process, the making

---

[1] *See Jackson v. Diageo N. Am. Inc.*, No. 25 Civ. 5654 (N.D. Cal. 2025) ("California Action"). In addition to the California Action, another copycat action was filed in Florida, *Haschemie et al. v. Diageo N. Am. et al.*, No. 25 Civ. 23367 (S.D. Fla. 2025) ("Florida Action"), which Diageo has moved to dismiss.

of Diageo's tequilas is closely tracked and monitored, with every batch being comprehensively sampled, evaluated, and tested multiple times in multiple ways—not only by Diageo itself, but also by the Consejo Regulador del Tequila (the "Tequila Regulatory Council," or "CRT"). The CRT is the only entity authorized by the Mexican government to regulate and validate the authenticity of tequila, which it does by strictly enforcing the standards prescribed in the *Norma Oficial Mexicana de Tequila* ("NOM"), the detailed Mexican regulatory scheme that governs every stage in the production of tequila. Through its comprehensive system of oversight and controls, the CRT verifies compliance and certifies the accuracy of the "100% agave" label on every bottle of Casamigos and Don Julio tequila produced by Diageo.

The unimpeachable integrity of Diageo's tequilas is a point of pride shared by the hundreds of people who ensure that every bottle of Casamigos and Don Julio is made from 100% Blue Weber agave. They include agave farmers who use drones and satellite imagery to track each agave and its photosynthesis rates across its years-long maturation cycle. They include truck drivers who transport harvested agave piñas from the field to the distillery in carefully monitored vehicles. They include distillery employees who weigh and calculate the sugar content and estimate liquid yield of each batch of agave delivered, before cutting and roasting, milling, fermenting, and distilling the agave (twice), aging, blending, and bottling it, all in a closed system and in strict accordance with the NOM. They include scientists who perform a battery of chemical, physical, and sensory tests at every stage of the production process. And they include independent CRT regulators, who manually count individual agave plants when they are planted, issue "passports," calculate the expected yield of each harvested batch, work on-site every day at Diageo's facilities, receive real-time reporting of the results of Diageo's tests, and conduct their own series of gas chromatography and other tests, confirming (among other things) that the sugar content and liquid yield are consistent with the many thousands of samples in its database.

Diageo does not rely (as Plaintiffs attempt to do) on a single incoherently alleged, unproven "test" to determine the agave content of its tequilas. Instead, Diageo relies on this robust, real-world version of multi-factor authentication that incorporates at least a dozen different layers of verification. From farm to shelf, Diageo's tequilas undergo one of the most careful, comprehensive, rigorous, and highly regulated production processes of any spirit in the world.

Plaintiffs' allegations to the contrary are facially implausible and deficiently pled. They essentially claim that the hundreds of people involved in the making of Casamigos and Don Julio tequilas—farmers, Diageo employees and scientists, independent government-authorized regulators and others—are lying and complicit in a massive, years-long consumer deception. But they allege no basis for that extraordinary accusation, which is pure fiction. Instead, the Amended Complaint rests on the thinnest of reeds: purported "testing" allegations that are non-sensical and insufficient as a matter of law. Their theory is the equivalent of someone claiming the earth is flat because he saw a "test" result somewhere that says his neighbor's backyard is level.

The Amended Complaint's implausibility is compounded by Plaintiffs' failure to plead even the most basic facts necessary to make their allegations credible. They attach no test results. They do not say who performed the testing, how much of what liquid was tested, where the samples came from, when the testing occurred, or what chain of custody—if any—was maintained. They invoke carbon isotope and "SNIF-NMR" testing without understanding it and omit that the method has never been scientifically validated for determining the alcohol source of tequila. They include only one of the three numbers typically associated with such tests (reporting values that make no sense according to their own sources) and withhold the other two. Although they allege "tests" of various tequila products that match those purchased by "some of the Plaintiffs," nowhere do Plaintiffs unambiguously allege the who, what, when, where, why, or how of any purported "test" of any bottle of Casamigos or Don Julio tequila that any of them actually purchased. Indeed, together,

Plaintiffs claim they purchased at least 73 different bottles of Diageo tequila over the course of more than two years. Yet they allege partial results from only five samples, without identifying which of the 73+ bottles—*if any*—those samples came from, and without alleging how many samples they took and/or tested, or whether any of those samples showed results consistent with 100% agave.

The Amended Complaint is a Bermuda Triangle of pleading: in one corner, Plaintiffs allege purchases of more than 73 bottles of tequila; in another, they vaguely allege—without any supporting allegations to establish plausibility—certain "testing"; and in the third, they allege partial and unintelligible results from five unidentified samples. Rather than draw any connecting lines, Plaintiffs fill the space in between with a swirl of conclusory allegations and baseless inferences. Courts in this Circuit demand far more and have routinely dismissed similarly deficient complaints. Because Plaintiffs' pleading relies on nothing more than rumor, speculation and conjecture, as well as improper inferential pleading, it fails at every turn.

*First*, Plaintiffs lack standing to bring their claims because they all fail to allege an injury in fact. Each Plaintiff must plead their own particularized injury traceable to Diageo's conduct, which they fail to do. They have not sufficiently alleged which, if any, of the 73+ bottles they purchased were the sources for the five samples they allege were tested, and they allege no plausible basis to extrapolate their insufficiently pled results more broadly. Plaintiffs also have no standing to bring claims for injunctive relief because, now that they are aware of the alleged "misrepresentation," they cannot claim to be harmed by it again in the future.

*Second*, Plaintiffs' "testing" allegations are implausible as a matter of law. Every cause of action in the Amended Complaint turns on the same defective premise: that Diageo's "100% agave" label is a misrepresentation when it is not. Plaintiffs do not—because they cannot—allege any deficiencies with Diageo's tightly controlled and highly regulated, state-of-the-art manufacturing

process, or even a whiff of any other kind of impropriety or misconduct. They rely solely on non-sensical and insufficiently pled "testing" allegations—five partial, unintelligible results from unknown samples, by someone they fail to identify, performed somewhere undisclosed at some indeterminate time. And Plaintiffs' counsel's inexplicable "estimates" of the percentage of agave in each sample are the definition of conclusory—they provide zero explanation, let alone any credibly alleged grounding that would render their claims plausible. Plaintiffs' theory of falsity thus depends on a series of inferential leaps so speculative that courts confronted with similar pseudo-scientific gambits have justifiably refused to credit them at the motion to dismiss stage.

In any event, Plaintiffs' claims are barred by the safe-harbor provisions built into the very statutes they invoke. Diageo's "100% agave" label fully complies with Mexico's NOM and U.S. law. These regulatory determinations are binding and carry the force of law, preventing attempts to relitigate them under state consumer-protections statutes. And Plaintiffs' unjust enrichment claims also fail, either because Plaintiffs may not plead them as an alternative to tort claims, or because they are duplicative of their statutory claims.

Having failed to adequately plead standing or any plausible claim, Plaintiffs' Amended Complaint should be dismissed in its entirety.

## BACKGROUND[2]

### A. Diageo's Tequila Making Process is Tightly Controlled and Highly Regulated

Defendant Diageo North America, Inc.'s business is the "production, importing, marketing, and distribution of premium drinks," including its Casamigos and Don Julio brand tequila products.

---

[2] Citations to "AC ¶ __" are to the Amended Complaint, and citations to "Ex. __" are to the exhibits attached to the Declaration of Timothy S. Martin ("Martin Decl."), which with one exception are public records subject to judicial notice. *See Richardson v. N.Y. City Bd. of Educ.*, 711 F. App'x 11, 13-14 (2d Cir. 2017) (summary order). Citations to "Sainz Decl. ¶ __" are to the Declaration of Hugo López Coll, of Sainz Abogados, S.C. ("Sainz Decl."), which the Court may consider on a motion to dismiss pursuant to Federal Rule of Civil Procedure 44.1, *see CIH Int'l Holdings, LLC v. BT United States, LLC*, 821 F. Supp. 2d 604, 608 n.1 (S.D.N.Y. 2011), and citations to "NOM __" are to Exhibit 1 to the Sainz Declaration, which is also subject to judicial notice under Rule 44.1, *id.*

Diageo SEC Form 20-F at 172, 200. By retail sales value, Diageo is the largest producer of tequila in the world. *Id.* at 1, 4. Pursuant to the NOM, Diageo's production facilities in Mexico produce only tequila, no other spirits. NOM 6.5.2.2; Sainz Decl. ¶ 35.

Mexican law requires tequila producers to comply with the NOM's detailed standards. AC ¶¶ 58-62; Sainz Decl. ¶¶ 11-14. The NOM permits only tequila that meets certain requirements to bear the label "100% agave." NOM 5.1.1.; Sainz Decl. ¶¶ 14-15, 42. The tequila-making process involves several steps. *See Tequila: History and Production*, Diageo Bar Acad. (2024), perma.cc/Z4BG-GBBA ("Tequila History"). First, agave is planted in one of five designated regions and then cultivated, typically for five to seven years. *Id.* Upon harvesting, the heart of the agave plant—the piña—is removed. *Id.* The piñas are then transported to a distillery and roasted to convert their starches to fermentable sugars. *Id.* After cooking, the softened piñas are shredded and juiced. *Id.* The extracted juice is then transferred to closed fermentation tanks, where yeast is added to convert the sugars into a low-alcohol liquid. *Id.* This step determines whether a tequila can be considered "100% agave"—if all of the sugar in the "fermentation" is from Blue Weber agave and the fermentation liquid is not "enhanced with sugars," the resulting tequila can qualify for the "100% agave" label. NOM 5.1.1.; Sainz Decl. ¶ 15.

After fermentation, the liquid is distilled twice. *See* Tequila History. Then, depending on the type of tequila being produced, the distilled liquid is aged in oak barrels. *Id.* Often, the barrels used to age tequila have been previously used for other types of spirits, like bourbon. *Id.* The amount of time the tequila is aged determines its classification as a blanco (unaged), joven (young), reposado (aged at least two months), añejo (aged at least one year), or extra añejo (aged at least three years). Finally, the tequila is bottled. *Id.* Under the NOM, "100% agave" tequila may be combined with certain additives to enhance or ensure consistent taste, color, aroma, or mouthfeel, so long as the additives do not exceed prescribed limits. NOM 6.1.1.1. The NOM also permits

"100% agave" tequila to be combined with certain other mellowing ingredients (or "*abocantes*"),

so long as *abocantes* do not make up more than 1% by weight before the tequila is bottled. *See* AC

¶ 59; NOM 4.1, 6.1.1.1. If a tequila does not meet the requirements for the "100% agave" label, it

still qualifies as tequila if no more than 49% of its "total reducing sugars" come from a source other

than Blue Weber Agave, but it cannot use the "100% agave" label. *See* AC ¶ 61.

The Mexican government has entrusted the CRT with verifying and certifying that tequila

producers strictly follow the NOM standards. *Id.* ¶ 58; Sainz Decl. ¶¶ 17-22. The CRT is "the only

body accredited and approved to evaluate the NOM." *Luxco, Inc. v. Consejo Regulador Del

Tequila, A.C.*, 121 U.S.P.Q.2d 1477 (T.T.A.B. 2017); Sainz Decl. ¶¶ 17-22. The CRT tracks tequila

during the entire manufacturing process, from plant to bottle, Sainz Decl. ¶¶ 22-43, making tequila

"one of the most closely regulated spirits on the planet." Felisa Rogers, *Is that really tequila you're

buying? Allegations of corruption raise serious questions*, Mezcalistas (Jan. 13, 2025),

perma.cc/3JB4-HWUY (cited at AC ¶ 32 n.31) ("Mezcalistas Art."). As Plaintiffs' own sources

acknowledge, the CRT has "implemented a stringent system of quality control" that "document[s]

every single agave planted (including GPS coordinates)," involves "an inspector [in] every

distillery," and requires every batch of tequila to be tested. *Id.*

From the farm in Mexico to the shelf in the United States, Diageo's tequila must pass the

review of three different regulators. The first is the CRT, which monitors and certifies compliance

with the NOM. Among other steps, the CRT registers and certifies each agave farm, tracks every

agave plant that is grown and harvested, and verifies the number and weight of agaves used. Sainz

Decl. ¶¶ 23-27; *see also* CRT, Agroservices, perma.cc/865T-E87Y. Before harvest, growers must

notify the CRT and obtain an Agave Transfer Passport—a document that records key harvest data

and authorizes the sale of agave to a certified distillery. Sainz Decl. ¶ 27. Each Diageo distillery

must also obtain annual certification from the CRT authorizing it to produce 100% agave tequila,

*see id.* ¶ 29, which Diageo has received every year, *see, e.g.*, Exs. 1-2. Every batch of 100% agave tequila destined for export must also qualify for and receive a Certificate of Authenticity for Exports of Tequila. *See* Sainz Decl. ¶¶ 38-40; *see, e.g.*, Exs. 3-4. Critically, throughout the production process, CRT inspectors take samples at multiple stages and perform laboratory testing to confirm compliance with the NOM. *See* Sainz Decl. ¶¶ 32-33, 36-37; *see also* CRT, Inspection Unit, perma.cc/6NRE-VZS9; CRT, Laboratory, perma.cc/Z9WF-CGM6.

In addition to the CRT's oversight, Diageo's tequila must also satisfy two layers of U.S. regulatory review before reaching consumers. First, Diageo must acquire from the Alcohol and Tobacco Tax and Trade Bureau ("TTB") a Federal Basic Importer's Permit and a Certificate of Label Approval ("COLA"). TTB, *Distilled Spirits Labeling*, perma.cc/639M-777Y; *see, e.g.*, Exs. 5-6. To issue a COLA, after the CRT approves the label, the TTB reviews and certifies that the product is "tequila" as defined under Mexican law and the NOM, ensuring that every label accurately reflects its certified origin and composition. *See* 27 C.F.R. §§ 5.102, 5.148; Sainz Decl. ¶¶ 38-42. Then, before any bottle may enter the country, U.S. Customs and Border Protection confirms that each shipment matches the CRT's Certificate of Authenticity for Exports of Tequila and that the CRT-approved labels affixed to the bottles correspond to the TTB-approved COLA. *See* 27 C.F.R. §§ 5.24, 5.30(d). Only upon passing these inspections may the product lawfully enter the United States market. *Id.* §§ 1.20, 5.24.

**B. Plaintiffs' Baseless Challenge to the Verified 100% Agave Label**

In May 2025, Plaintiffs Avi Pusateri, Chaim Mishulovin, and Sushi Tokyo Inc. ("Sushi Tokyo Brooklyn") filed this lawsuit against Diageo on behalf of themselves and two putative classes of individuals who purchased Casamigos and Don Julio brand tequilas in New York and New Jersey. *See* ECF 1. Plaintiffs did not challenge anything about Diageo's manufacturing process, but alleged, based on unspecified testing, that Casamigos and Don Julio are not made from

100% agave, contrary to their label. Plaintiffs claimed: (i) alleged violations of New York's General Business Law ("GBL") § 349, prohibiting deceptive business practices, and GBL § 350, prohibiting false advertising; (ii) alleged violations of the New Jersey Consumer Fraud Act ("NJCFA"), which similarly prohibits false advertising; and (iii) unjust enrichment. AC ¶¶ 49-96.

On September 12, 2025, Plaintiffs filed the Amended Complaint, which added 10 new Plaintiffs from six different states (Florida, Colorado, Maryland, Pennsylvania, Illinois, and Texas), AC ¶¶ 15-27, six new statutory consumer fraud claims under those six states' laws, *id*. ¶¶ 130-81, and one unjust enrichment claim on behalf of all Plaintiffs, *id.* ¶¶ 182-88.

In support of their claims, Plaintiffs point to a handful of blog posts describing recent events involving some agave growers, which include speculative, unsubstantiated statements from protesters and others that unnamed tequila producers are "mixing cane alcohol into tequila" that is then "sold as 100% agave." AC ¶¶ 32-35. None of these reports, however, even mentions Casamigos, Don Julio, or Diageo, let alone suggests that Diageo has engaged in any misconduct. The Complaint refers to various Mexican, U.S., and state regulations, *id.* ¶¶ 62-66, but Plaintiffs do not explain which regulations were violated, or how.

Plaintiffs assert that they first "began investigating" Diageo in 2024 after "initial laboratory testing arranged through the" Additive Free Alliance ("AFA") "indicated Diageo's tequila was adulterated." *Id.* ¶ 38. Plaintiffs vaguely allege that they subsequently commissioned testing and that there was "subsequent independent testing," *id.*, though they provide no information at all about either. Several paragraphs later, Plaintiffs allege that "analysis" was performed on samples of products purchased by "*some* of the Plaintiffs," *id.* ¶ 46, and that the results fell outside the typical range for 100% agave tequila and closer to the range associated with alcohol derived from plants such as corn or sugarcane. *Id*. ¶ 43, 47. Plaintiffs do not clarify whether this "analysis" represents a new round of testing, or one of the previous instances of wholly unexplained testing alleged in

paragraph 38. It is also entirely unclear whether the samples tested were from bottles actually purchased by Plaintiffs or just from the same line of products purchased by Plaintiffs. Plaintiffs then purport to derive—without providing any methodology or explanation—the percentage of "agave-derived ethanol" in each sample, *id.* ¶ 47, before summarily asserting that "all of Diageo's tequilas" are adulterated. *Id*. ¶ 50.

They do not, however, attach any of the purported results or provide any meaningful information about the purported testing—who conducted it, when or where it was performed, how many bottles or what volumes of liquid were tested, the chain of custody of the samples tested, or whether the samples tested came from any of the 73+ bottles allegedly purchased by the Plaintiffs, AC ¶¶ 11-27, and if so, from which of those bottles.

Plaintiffs allege that they "paid super-premium prices for Casamigos and Don Julio tequila," and that but for the "100% agave" label they "would not have bought Diageo's Product or would have paid less." *Id*. ¶¶ 7-8. And they allege that they "intend to purchase" Diageo's products again "with the assurance" that Diageo's representations "are accurate." *Id.* ¶ 54. Plaintiffs seek damages, a declaratory judgment, and injunctive relief. *Id.* at 37.

## ARGUMENT

## I. PLAINTIFFS LACK ARTICLE III STANDING

The Amended Complaint must be dismissed because Plaintiffs have failed to plead the most basic constitutional requirement for proceeding in federal court: Article III standing. To establish standing, a plaintiff must show (1) an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) a "causal connection between the injury and the conduct complained of"; and (3) a likelihood that "the injury will be redressed by a favorable decision." *Karkare ex rel. JN v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers Loc. 580*, 140 F.4th 60, 64 (2d Cir. 2025). Standing is not "dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6

(1996). Each claim requires its own showing of standing, and each plaintiff seeking to represent a class "must allege and show that they *personally* have been injured, not that injury has been suffered by other[s]." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 199 (2d Cir. 2005) (emphasis added). As explained below, Plaintiffs fall far short for two independent reasons: (1) they have failed to adequately allege which (if any) of them suffered particularized injury based on their own purchases; and (2) they have failed to plead any real, imminent risk of future harm sufficient to support injunctive relief.

### A.     Plaintiffs Have Not Alleged A Particularized Injury In Fact

To begin, Plaintiffs lack standing because they fail to adequately allege that any of them personally suffered a particularized injury. The law in this Circuit is clear that plaintiffs must "allege and show that *they personally* have been injured," by alleging that they "either purchased adulterated products or that [adulteration] was so widespread" that it likely affected the specific tequila bottles that Plaintiffs purchased. *Barnes v. KOS, Inc.*, 2025 WL 1928027, at *3-4 (S.D.N.Y. July 14, 2025) (emphasis added); *see also Onaka v. Shiseido Ams. Corp.*, 2023 WL 2663877, at *4 (S.D.N.Y. Mar. 28, 2023) (a "sheer possibility" that one of the named plaintiffs purchased a mislabeled product is not a cognizable injury-in-fact). Plaintiffs do neither.

#### 1.   Plaintiffs fail to allege which—if any—of their own purchases were tested

When "rely[ing] on testing to support allegations of misbranding," as Plaintiffs do here, the "direct route" to pleading injury is "to test their own purchases." *Barnes*, 2025 WL 1928027, at *4 (quoting *Onaka*, 2023 WL 2663877, at *2) (quotations omitted). The Amended Complaint does not take that route. It is wholly unclear which—if any—of the "actual physical [p]roducts" that Plaintiffs themselves bought were ever tested to provide the five partial results recited in paragraph 47, making it impossible to determine which—if any—of the Plaintiffs have standing to pursue these claims. *Lurenz v. Coca-Cola Co.*, 2025 WL 2773188, at *4 (S.D.N.Y. Sept. 29, 2025) (no

standing where plaintiff "fail[ed] to establish that the products tested were the *actual physical Products he had purchased*") (emphasis in original); *see also Barnes*, 2025 WL 1928027, at *4-6.

The problem is one of Plaintiffs' own making, with an Amended Complaint that refers vaguely to "testing" without revealing *which* test was conducted on *which* bottles purchased by *which* Plaintiffs, yielding *which* results. *See* AC ¶ 38.[3] Plaintiffs claim in their pre-motion letter that they "allege where and when they purchased the bottles they tested." ECF 27 at 2. But that misrepresents their pleading. Nowhere do Plaintiffs identify, as they are required to do, which "actual physical" bottles were specifically tested. *See Lurenz*, 2025 WL 2773188, at *4. Plaintiffs allegedly purchased at least 73 different bottles of Diageo tequila over the course of more than two years. AC ¶¶ 11-27. Yet they allege only partial results for *five* unidentified samples, *id.* at 47, without specifying *which* of the 73+ bottles—*if any*—they drew samples from, let alone by whom, or when, where, or how they were tested. As a result, it is impossible to know which—if any— Plaintiffs have standing.

The failure to allege any meaningful information about the purported testing—including, but not limited to, which Plaintiff's specific bottles (if any) were sampled and tested—is fatal to their claims. Plaintiffs allege partial results for only five of the eight Diageo tequilas they claim to have purchased: Casamigos Blanco, Casamigos Reposado, Casamigos Añejo, Don Julio Reposado, and Don Julio 1942. AC ¶ 47. Three Plaintiffs—Barry Wilhelm, Shannon Wilhelm, and Tracy Cole—bought entirely different tequilas that were never tested. *See id.* ¶¶ 17, 18, 19, 20, 21 (Don Julio Blanco and Don Julio 70 Cristalino). For these three Plaintiffs, the Amended Complaint contains no allegation—credible or otherwise—that their bottles were ever tested, let alone that any test produced results inconsistent with 100% agave. They therefore cannot plausibly claim injury

---

[3] Plaintiffs allege "initial" testing "arranged through the AFA" at some unspecified time in 2024; "further testing" "arranged" by Plaintiffs' counsel; "additional" testing by "AFA's independently contracted" company; then so-called "subsequent independent" testing by an unknown party. AC ¶ 38.

or deception, and they lack standing to proceed. *See Esquibel v. Colgate-Palmolive Co.*, 2025 WL 1785865, at *3 (S.D.N.Y. June 27, 2025) (dismissing claims brought by plaintiffs who "did not test the bottles they purchased themselves" and rejecting a "systemic contamination" theory based on four unverified samples).

As for the remaining Plaintiffs who allegedly purchased one of the five products for which purported results are alleged, the Amended Complaint still fails to establish who—if anyone—bought the *actual physical bottle* that was supposedly tested, as the law requires. *Lurenz*, 2025 WL 2773188, at *4. Take Casamigos Blanco as an example: five Plaintiffs are alleged to have purchased that product, *id.* ¶¶ 11, 12, 13, 15, 16, yet the Amended Complaint provides a single "test" result for one unidentified Casamigos Blanco sample. Nothing in the pleading indicates whether that sample came from Avi Pusateri's bottle purchased in Brooklyn in July 2023, from Sushi Tokyo Miami's bottle purchased in Florida nearly two years later, on May 12, 2025—*after* this lawsuit was already filed—or from any of the three bottles Sushi Tokyo Brooklyn allegedly purchased on Long Island between April and December 2024. *See id.* ¶¶ 11, 15, 12. Nor do Plaintiffs allege whether the sample came from Chaim Misulovin's New Jersey purchase in the summer of 2024, David Felton's Florida purchase in the spring of 2025, or, just as plausibly, from no Plaintiff's purchase at all. *Id.* ¶¶ 13, 16. The Amended Complaint offers no way to tell—and Article III standing cannot rest on the "sheer possibility" that one of the named Plaintiffs happened to buy the bottle that was allegedly tested. *Onaka*, 2023 WL 2663877, at *4.

The same problem pervades the rest of the allegations. Plaintiffs allege only a single test result for the other four products—Casamigos Reposado (purchased by four Plaintiffs), Casamigos Añejo (three Plaintiffs), Don Julio Reposado (five Plaintiffs), and Don Julio 1942 (three Plaintiffs). AC ¶¶ 12–16, 22, 24–27. The pleading fails to connect any of those results to any individual

Plaintiff's purchase. Without that link, none of the Plaintiffs can show that their bottles were even among those allegedly tested, let alone that they suffered a particularized injury.

2. *Plaintiffs fail to allege facts showing any "widespread" issue with Diageo's tequilas*

Having failed to plausibly allege injury from their own purchases, Plaintiffs can proceed only if they plead facts showing that adulteration was so pervasive it necessarily affected *all* Diageo tequilas. *Barnes*, 2025 WL 1928027, at *4. To do so, they must establish a "meaningful link" between the results of their alleged testing and the specific bottles they purchased. *Hicks v. L'Oreal U.S.A., Inc.*, 2024 WL 4252498, at *10 (S.D.N.Y. Sept. 19, 2024); *see also Barnes*, 2025 WL 1928027, at *5. That link requires concrete factual allegations demonstrating temporal proximity (that the testing occurred close in time to the purchases), geographic proximity (that the samples tested were drawn from the same distribution channel or region), sufficient sample size (that the testing was broad enough to be representative), and product matching (that the tested bottles were the same type, lot, or production batch as those purchased). *See Barnes*, 2025 WL 1928027, at *5 (requiring "a geographic connection between [Plaintiffs'] purchase[s]" and the products that were tested); *Onaka*, 2023 WL 2663877, at *4 (allegations deficient for failure "to state when Plaintiffs' independent testing was conducted"); *Esquibel*, 2025 WL 1785865, at *3 (requiring that the testing involve "more than a small number" of samples and finding four to be insufficient).

Plaintiffs' allegations come nowhere close to meeting this pleading threshold. The Amended Complaint offers no facts establishing any temporal or geographic proximity between the reported test results and Plaintiffs' purchases. As explained above, it is impossible to tell whether the alleged Casamigos Blanco "test" result came from Avi Pusateri's July 2023 purchase in Brooklyn, or instead from the shipment received by Sushi Tokyo Miami nearly two years later in Florida, or from none of the bottles Plaintiffs purchased. Plaintiffs' "sparse factual allegations make

it equally plausible" that their isolated test results were "false positive[s]." *Barnes*, 2025 WL 1928027, at *4 (quotations and citations omitted).

Although Plaintiffs list the dates of their alleged 73+ tequila purchases, AC ¶¶ 11-27, they never allege when the *five samples* were obtained or tested, "leaving the reader to speculate about whether days, months, or years intervened between the testing and Plaintiffs' purchases." *Soto v. GNC Holdings*, 2025 WL 662135, at *3 (N.D. Ill. Feb. 28, 2025). They likewise omit any "identifying information—such as SKU numbers or lot codes—that would indicate where the *tested* products were purchased or obtained," nor do they identify the company, the tester's qualifications, or even the number of bottles tested. *Barnes*, 2025 WL 1928027, at *6 (emphasis added); AC ¶¶ 55-62. These omissions matter: without that information, it is impossible to know whether the purported results reflect a widespread issue, an isolated anomaly, or nothing at all. "[T]he Court cannot know if all tested [samples] tested positive . . . or if a single [sample] tested positive, while every other tested [sample] showed no signs" of adulteration. *Brown v. Coty, Inc.*, 2024 WL 894965, at *4 (S.D.N.Y. Mar. 1, 2024); *see also Pineda v. Lacke Consumer Prods.*, 2024 WL 5001928, at *4-5 (E.D. Pa. Dec. 5, 2024) (standing allegations insufficient to justify extrapolation of test results where they were "incredibly vague as to the details surrounding the testing").

Indeed, a plausible reading of the Amended Complaint is that *none* of the Plaintiffs' 73+ bottles was ever sampled or tested. It is equally plausible that *all* 73+ bottles were sampled and tested, and only five samples came back with inconsistent results which have been disingenuously cherry-picked—as if, in an election with 73 precincts, Plaintiffs polled only five, examined a single ballot in each, and then declared Dewey defeats Truman.

Plaintiffs try to paper over these pleading gaps by asserting that their allegations were "confirmed" by both AFA laboratory testing and "subsequent independent testing." AC ¶ 38. That assertion collapses under scrutiny. The Amended Complaint provides no details—literally none—

about which Diageo products were subsequently tested, when that testing occurred, where the samples came from, how many were analyzed, or how many (if any) showed results inconsistent with 100% agave.[4]  This is a far cry from *John v. Whole Foods Market Group, Inc.*, where the Second Circuit found standing based on a detailed government investigation that aligned with the plaintiff's own purchases—conducted by a neutral regulatory body, during the same timeframe and at the very stores the plaintiff patronized, and that found "pervasive" mislabeling across dozens of samples. 858 F.3d 732, 734-37 (2d Cir. 2017). Plaintiffs here allege nothing remotely comparable: no neutral investigation, no defined timeframe, and no evidence of anything "pervasive."

Worse still, the Plaintiffs' reliance on the AFA is not just misplaced—it's misleading. AC ¶¶ 38, 40. The AFA is comprised of Grover and Scarlet Sanschagrin, self-styled "tequila activists" who promote certain brands made without additives that are expressly permitted under the NOM. NOM 4.1, 6.1.1.1. The presence or absence of permitted additives has absolutely nothing to do with whether tequila is made from 100% agave and is not what this dispute is about. The Sanschagrins have been criminally indicted in Mexico, *see* Jorge Velazco, *Vinculan a proceso a dos extranjeros por falsificar y adulterar tequila*, Informador.mx, Aug. 15, 2025, https://perma.cc/9BRJ-Q46L, and have been sued in the United States over their making and spreading of false statements about tequila. *Consejo Regulador Del Tequila A.C. v. S2F Online. Inc.*, No. 25 Civ. 1129 (M.D. Fla. 2025), ECF 1. The AFA, moreover, conducts no testing of its own—let alone the NMR or SNIF-NMR testing alleged in the Amended Complaint. It operates no laboratory and employs no scientists. Rather, it claims to "use" an unnamed "lab located in Europe," and says "[w]e do not

---

[4] Plaintiffs, again rewriting their pleading, assert in their pre-motion letter that "*every* sample" from both the AFA and Plaintiffs has shown adulteration. ECF 27 at 2 (emphasis in original). But the Amended Complaint does not say anything close to that about the purported testing arranged through the AFA. AC ¶ 38 (alleging only that undated testing "arranged" by the AFA on an unknown number of unidentified products "indicated Diageo's tequila was adulterated"). And even if the Amended Complaint *did* make such a categorical allegation (which it does not), that would not solve the many other deficiencies in the pleading.

disclose or publish any lab tests without prior approval from the brand" whose products were tested, raising serious questions regarding the validity of what, if anything, Plaintiffs may have obtained from the AFA, not to mention its use in this litigation. *See* AFA, *Our Process*, perma.cc/TV5H-NYCY. In short, contrary to Plaintiffs' claims, there is no such thing as "AFA laboratory testing" nor any "independent testing *done by* the AFA." ECF 27 at 3 (emphasis added).

Plaintiffs assert that their purported test results "implicate all of Diageo's tequilas" because "its entire tequila line relies on the same adulterated base spirit." AC ¶ 50. That sweeping claim finds *no* support in the pleadings or science. For starters, it is flatly contradicted by Plaintiffs' own allegations, which—without any explanation of methodology—claim that one sample allegedly contained only 2% agave-derived ethanol while another contained 55%. *Id.* ¶ 47. If all Diageo tequilas truly "relied on the same adulterated base spirit," such extreme variation between samples would be not just implausible, it would be impossible.

Nor do Plaintiffs allege any facts suggesting that all Casamigos and Don Julio variants share a common formulation, manufacturing process, or source material. To plausibly extrapolate from their purported results, Plaintiffs would need to allege testing that was both accurate and representative. *Barnes*, 2025 WL 1928027, at *4. They do neither. The Amended Complaint lacks any factual basis for generalizing across brands, product lines, or batches; instead, their "sparse factual allegations make it equally plausible that their isolated results were false positive[s], . . . an isolated incident of contamination," or ordinary organic variation attributable to any number of factors. *Id.* (citation and quotations omitted); *see also Esquibel*, 2025 WL 1785865, at *3 (contrasting plaintiffs' "four samples" with "eighty total products" in one case and "thirty-two total samples" in another); *Kell v. Lily's Sweets*, 2024 WL 1116651, at *4 (S.D.N.Y. Mar. 13, 2024) (finding it "impermissible conjecture to extrapolate" from testing "just two or three samples"). Because Plaintiffs do not plausibly allege a "meaningful link" between the results of their alleged

testing and the specific bottles they purchased, *Hicks*, 2024 WL 4252498, at *10, they lack Article III standing to bring these meritless claims.

   *3. Plaintiffs who purchased their tequila after this lawsuit commenced cannot claim injury*

   Even setting aside the numerous standing deficiencies already discussed, the Amended Complaint fails for an additional reason: several Plaintiffs purchased their tequila *after* this lawsuit was filed. The only specific purchases alleged for Plaintiffs Sushi Tokyo Miami and Dyonnesha Woolfolk, AC ¶¶ 15, 25, occurred after the original complaint was filed on May 5, 2025—well after the alleged "adulteration" claims became public.[5] Having purchased Diageo's products with full knowledge of the allegations, these Plaintiffs cannot plausibly claim that they were deceived or suffered any injury arising from the challenged statements.

   That conclusion is especially unavoidable for Sushi Tokyo Miami. Its sister restaurant, Sushi Tokyo Brooklyn, was one of the original Plaintiffs that filed the initial complaint on May 5, 2025. Yet the Amended Complaint alleges that Sushi Tokyo Miami purchased Diageo's tequilas in Florida *after* its Brooklyn affiliate publicly accused Diageo of the very misconduct now at issue. AC ¶ 15. The claim that Sushi Tokyo Miami could have been misled under those circumstances is not just implausible—it is impossible to take seriously.[6]

   Courts have repeatedly rejected attempts to create standing through post-filing purchases. As one court put it, consumers such as Plaintiffs are "'either very foolish or attempting to purchase a lawsuit.'" *Soto*, 2025 WL 662135, at *3; *see also Lurenz*, 2025 WL 2773188, at *5 ("A plaintiff that self-inflicts his alleged injury solely to manufacture standing for litigation does not have

---

[5] For Plaintiff Troy Reece, the Amended Complaint alleges only that Reece purchased Casamigos and Don Julio on some unspecified date "around May 2025." AC ¶ 26. Insofar as Reece's alleged purchases occurred in the 26 days of May after the filing of this lawsuit, Reece also lacks standing.

[6] Notably, even after filing these claims on May 5, 2025, Sushi Tokyo's Brooklyn location was still selling Casamigos tequila as of June 2, 2025—hardly the conduct of a party that truly believes its own allegations of "fraud." *See* Martin Decl., Ex. 7.

standing."). Plaintiffs' post-filing purchases are a textbook example of the latter. Their attempt to manufacture standing should be rejected.

### B. Plaintiffs Lack Standing to Seek Injunctive and Declaratory Relief

Plaintiffs' requests for injunctive and declaratory relief fail because their own allegations foreclose any plausible risk of future harm. "The prospective-orientation of the analysis is critical: to maintain an action for injunctive relief, a plaintiff 'cannot rely on past injury . . . but must show a likelihood that he . . . will be injured in the future.'" *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147-48 (2d Cir. 2020) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). The same requirement applies to declaratory relief. *See Abidor v. Napolitano*, 990 F. Supp. 2d 260, 272 (E.D.N.Y. 2013).

Courts therefore deny injunctive standing in consumer fraud cases once a plaintiff becomes aware of the alleged misrepresentation, because awareness itself precludes any real risk of being deceived again. *See, e.g.*, *Binder v. Premium Brands Opco LLC*, 2024 WL 2978506, at *3 (S.D.N.Y. June 11, 2024) ("[W]here plaintiffs are aware of the allegedly deceptive pricing practices that they challenge, it undercuts any inference that they will be deceived by those practices again in the future."); *Gavilanes v. Gerber Prods. Co.*, 2021 WL 5052896, at *5 (E.D.N.Y. Nov. 1, 2021) (explaining that "recognition of deception in advertising" "precludes injunctive relief"); *Davis v. Hain Celestial Grp., Inc.*, 297 F. Supp. 3d 327, 339 (E.D.N.Y. 2018) ("To the extent that plaintiff was deceived by defendants' products, he is now aware of the truth and will not be harmed again in the same way . . . [he] therefore lacks standing to seek an injunction.").

Here, Plaintiffs expressly allege that they now know (so they claim) that Diageo's tequilas are not 100% agave. AC ¶ 7. Having pled that knowledge, they cannot plausibly claim any continuing risk of deception and therefore lack standing to pursue injunctive or declaratory relief.

Nor can Plaintiffs create standing by alleging that they "intend to purchase Diageo's Product again when they can do so with the assurance that the representations of Diageo's Product are accurate." AC ¶ 54. That allegation confirms the opposite of what Article III requires: it concedes that Plaintiffs will not purchase again unless and until they are convinced the labels are truthful, so there is no imminent threat of injury. Courts have rejected such self-defeating allegations as insufficient to establish standing. *See Atik v. Welch Foods, Inc.*, 2016 WL 5678474, at \*6 (E.D.N.Y. Sept. 30, 2016) (no standing to seek injunctive relief where plaintiffs alleged that "they would resume purchasing the Products in the future but only if the representations on the Products' labels were 'truthful and non-deceptive'").[7]

Because Plaintiffs are aware of the alleged misrepresentation, they face no imminent or continuing harm. Their requests for injunctive and declaratory relief must therefore be dismissed.

## II.   PLAINTIFFS FAIL TO STATE A CLAIM

### A.   Plaintiffs Fail To Allege False and Misleading Representations

All of Plaintiffs' claims fail because they never plausibly allege that Diageo's regulator-approved statement—that its Casamigos and Don Julio tequilas are "100% agave"—is false or misleading.

To state a claim under any of the statutory consumer protection laws invoked here, Plaintiffs must adequately allege an "unfair," or "deceptive," act or practice, or a "misleading" statement or "misrepresentation." *See Bell v. Publix Super Mkts.*, 982 F.3d 468, 475 (7th Cir. 2020) (noting such laws are "interpreted for the most part interchangeably").[8] The same is true for their unjust

---

[7] Although some older decisions in this Circuit suggested otherwise, *see, e.g.*, *Campbell v. Freshbev LLC*, 322 F. Supp. 3d 330, 337-38 (E.D.N.Y. 2018), those cases' reasoning no longer applies following the Second Circuit's decision in *Berni*. 964 F.3d at 147-49, 163; *see also see Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99, 163 (D. Conn. 2024).

[8] *See also Renfro v. Champion Petfoods USA*, 25 F.4th 1293, 1301 (10th Cir. 2022) (Colorado); *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (Florida); *Fleury v. Gen. Motors*, 654 F. Supp. 3d 724,731-32 (N.D. Ill. 2023) (Illinois); *Crosswell v. Martinez*, 120 F.4th 177, 188 (5th Cir. 2024) (Texas); *Gregg v. Ameriprise Fin.*, 245 A.3d 637, 646 (Pa. 2021) (Pennsylvania); *Wood v. Blue Diamond Growers*, 722 F. Supp. 3d 554, 564 (D. Md. 2024)

enrichment claim, *see* AC ¶ 184, which fails if the "100% agave" statement's falsity is insufficiently pled. *See Klausner v. Annie's, Inc.*, 581 F. Supp. 3d 538, 551-52 (S.D.N.Y. 2022); *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007).[9] Thus, all 10 causes of action rise or fall on a single premise: that Diageo falsely labels its tequilas as "100% agave." Yet the Amended Complaint offers no facts supporting that claim, while Plaintiffs ask this Court to infer from threadbare allegations that Diageo has adulterated millions of bottles of tequila over many years. That leap is implausible—the Amended Complaint should be dismissed.

### 1. Plaintiffs' bare allegations fall far short of Rule 8's plausibility requirement

Plaintiffs allege no facts about Diageo's tequila manufacturing process—nothing about how the agave is sourced, how it is cooked, fermented, distilled, aged, or bottled, when or how any supposed adulteration occurred, or how such adulteration could have escaped detection by internal quality controls, independent regulators, distributors, or consumers. Instead, all 10 of Plaintiffs' claims are based solely on five undecipherable purported results. Plaintiffs' entire theory of fraud hinges on the assertion that they tested "five Diageo tequila products labeled '100% Agave'"—a sample size that would not pass muster at a middle school science fair—and on the conclusory statement that those alleged tests "showed that the alcohol in these products came from non-agave sources such as corn or sugarcane." AC ¶ 47.

The deficiencies do not end there. Plaintiffs fail to provide even the most basic information about the purported testing on which their case depends. They do not attach test results or identify when and where the samples were obtained, who conducted the testing, what qualifications those

---

(Maryland); *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 36 (S.D.N.Y. 2023) (New York); *Chaudhri v. Lumileds LLC*, 2018 WL 6322623, at *6 (D.N.J. Dec. 3, 2018) (New Jersey).

[9] *See also Biczo v. Ferrara Candy*, 2023 WL 2572384, at *4 (N.D. Ill. Mar. 20, 2023); *Reich v. Genzyme Corp.*, 2015 WL 13236347, at *11 (D. Colo. Aug. 14, 2015), *adopted*, 2015 WL 5842418 (D. Colo. Oct. 7, 2015); *Sullivan v. Leor Energy*, 600 F.3d 542, 550 (5th Cir. 2010); *Whitaker v. Herr Foods*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016); *Nichols v. Wm. Wrigley Jr.*, 2011 WL 181458, at *5 (S.D. Fla. Jan. 19, 2011); *Slack v. Suburban Propane Partners, L.P.*, 2010 WL 3810870, at *6 (D.N.J. Sept. 21, 2010); *Todd v. Xoom Energy Md.*, 2016 WL 727108, at *8 (D. Md. Feb. 22, 2016).

individuals had, how they did it, or whether any chain of custody was maintained. AC ¶¶ 46-49. The failure to plead those basic facts is fatal to their claims. *See Myers v. Wakefern Food Corp.*, 2022 WL 603000, at *4 (S.D.N.Y. Mar. 1, 2022) (testing allegations inadequate for failure to allege "the specific date, time, or place of the testing, who conducted the testing, the qualifications of the testers, etc."); *Santiful v. Wegmans Food Mkts.*, 2022 WL 268955, at *4 (S.D.N.Y. Jan. 28, 2022) (dismissing claims because plaintiff's "lab analysis contains no information as to the testing methodology, the date, time, or place of the testing, who conducted the testing, and what the exact product tested was"); *Turnipseed v. Simply Orange Juice Co.*, 2022 WL 657413, at *4 (S.D.N.Y. Mar. 4, 2022) (similar).

Plaintiffs' reliance in their pre-motion letter on *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89 (2d Cir. 2023), in which the Second Circuit reversed the district court's decision that the challenged statements were non-actionable puffery, only underscores how far short their pleading falls. ECF 27 at 1. In *MacNaughton*, the plaintiff supported her allegations with three peer-reviewed studies, a government research report by the Department of Veterans Affairs, a prior FDA warning letter, and findings from a recognized industry adjudicatory body that was upheld on appeal. *MacNaughten v. Young Living Essential Oils, LC*, 575 F. Supp. 3d 315, 323-24 (N.D.N.Y. 2021). Here, by contrast, Plaintiffs rely entirely on an unidentified laboratory and a handful of unexplained numbers that do not align with their cited studies—"a proffered lab analysis . . . [w]ithout any information about the alleged lab analysis." *Santiful*, 2022 WL 268955 at *4. Such thin, unsubstantiated, opaque allegations do not come close to stating a claim.

### 2. Plaintiffs' own allegations undermine their theory

Even setting aside those broader pleading failures, the limited information Plaintiffs do provide about their purported "testing" not only fails to support their theory, it undermines it. Their description of "Nuclear Magnetic Resonance" ("NMR") testing—apparently referring, based on

their own citation (AC ¶ 43), to Site-Specific Natural Isotopic Fractionation ("SNIF-NMR"), a specialized subtype of NMR testing—simply does not add up.

Starting with the Carbon-13 ($\delta^{13}C$) values, Plaintiffs allege that "[e]thanol made from Blue Weber agave, a CAM plant, shows a distinct isotope signature compared to cheaper feedstocks like corn or sugarcane." *Id.* ¶ 42. Plaintiffs then allege that their purported testing of five samples produced the following $\delta^{13}C$ values:

**Fig. 1: Alleged Test Results (AC ¶ 47)**

| $\delta^{13}C$ Value | Product |
| --- | --- |
| -11.0‰ | Casamigos Blanco |
| -12.2‰ | Casamigos Reposado |
| -13.4‰ | Casamigos Añejo |
| -10.5‰ | Don Julio Reposado |
| -11.2‰ | Don Julio 1942 Añejo |

From these five numbers, Plaintiffs leap to the conclusion that none of the samples come "close to the threshold for ethanol derived entirely from agave sugars." *Id.* ¶ 47. But they never "substantiate how exactly the alleged findings from the purported lab test" lead to that conclusion. *Turnipseed*, 2022 WL 657413, at *4. Their only purported basis for their interpretation is their assertion that $\delta^{13}C(CH_2)$ values for "agave-derived ethanol" should fall between "-7.0‰ to -9.0‰," a range they attribute to a 2010 study, AC ¶ 43, and that "$CH_2$ values below -10.0‰ are likely indicative of non-agave origin," *id.* ¶ 44. But not only do the studies they cite not say this, there is a complete mismatch between the values Plaintiffs allege and the values used as the benchmarks in the studies.

First, it is entirely unclear which numbers Plaintiffs are relying on. They allege $\delta^{13}C$ values for their samples but use $\delta^{13}C(CH_2)$ benchmarks to interpret them[10]—without ever specifying what

---

[10] The first measure ($\delta^{13}C$) reflects the global isotopic ratio of ethanol in the sample, while the second ($\delta^{13}C(CH_2)$) measures the isotopic ratio at a single site within the ethanol molecule—the $CH_2$ position. Because global $\delta^{13}C$ values are far easier and more common to analyze, researchers have developed much more data identifying the typical range of global $\delta^{13}C$ values for 100% agave tequilas. *See* 2021 Eurofins Study at 1320. Both studies Plaintiffs cite examined global $\delta^{13}C$ values together with site-specific comparisons between the $CH_2$ and $CH_3$ positions—information Plaintiffs notably fail to provide. *See* 2010 Eurofins Study at 11583; 2021 Eurofins Study at 1320.

they are actually reporting ($\delta^{13}C$, $\delta^{13}C(CH_2)$, or $\delta^{13}C(CH_3)$). AC ¶¶ 43-44, 47. Indeed, Plaintiffs alternate throughout their pleading, without understanding what they are presenting to the Court, between using "$\delta^{13}C$" and "$\delta^{13}C(CH_2)$" (or simply "$CH_2$"). But those values are not interchangeable; Plaintiffs themselves acknowledge that $\delta^{13}C$ can be measured "at both the $CH_2$ and $CH_3$ positions," and the studies they rely on also report global $\delta^{13}C$ values, yet Plaintiffs provide no clarity as to which values were allegedly tested, and which values they are purporting to allege. *Id.* ¶ 44. Even if this confusion were a mere typo, it underscores what this case truly is: not a careful, data-driven effort to vindicate consumer rights, but a rushed pleading built on bad science and worse proofreading.

Second, and even more problematic—neither study says what Plaintiffs present to the Court. The 2010 Eurofins Study never establishes any numeric threshold for what constitutes "authentic" tequila; indeed, the study makes clear that it is reporting only initial results, noting that the explanations are "not yet fully elucidated," are just "hypothesized," and "[f]urther works are in progress to understand this behavior." 2010 Eurofins Study at 11583. The study does not propose a specific numerical range for agave-derived ethanol—indeed, the range claimed by Plaintiffs would be inconsistent with even the results from the initial testing in the study. *Compare* AC ¶ 43 (alleging -7.0‰ to -9.0‰ $\delta^{13}C(CH_2)$ range) *with* 2010 Eurofins Study at 11583 (graph showing $\delta^{13}C(CH_2)$ range between approximately -5.5‰ and -9‰). The 2021 Eurofins Study also does not establish a definitive numeric threshold for what constitutes "100% agave spirit" AC ¶ 37, create a "precise benchmark," or state that an alcohol with a $\delta^{13}C(CH_2)$ value below -10‰ is certain to have non-agave sources, *id.* ¶ 44. It comes nowhere close to taking the next step to conclude that a $\delta^{13}C(CH_2)$ value below -10‰ proves the presence of corn or sugarcane-derived alcohol. *Contra id.* ¶ 44. Moreover, the authors did not rely on $\delta^{13}C(CH_2)$ values alone; they analyzed *both* the $\delta^{13}C(CH_2)$ *and* the $\delta^{13}C(CH_3)$ positions. 2010 Eurofins Study at 11583-84 (CAM plants are

distinguishable from $C_4$ plants "by [their] very strong impoverishment of the $CH_3$ site as compared to the $CH_2$ one"); 2021 Eurofins Study at 1320. Plaintiffs' decision to extract a single numerical value and convert that into an "authenticity test" for tequila is contrary to the very studies they cite and is legally insufficient to state a claim.

Through some unexplained mathematical magic, Plaintiffs then calculate "estimates" of how much agave-derived ethanol each sample allegedly contained:

**Fig. 1:  Alleged Test Results (AC ¶ 47)**

| Alleged % of Agave-Derived Ethanol | Product |
|---|---|
| 45% estimated agave-derived ethanol | Casamigos Blanco |
| 24% estimated agave-derived ethanol | Casamigos Reposado |
| 2% estimated agave-derived ethanol | Casamigos Añejo |
| 10.5% estimated agave-derived ethanol | Don Julio Reposado |
| 11.2% estimated agave-derived ethanol | Don Julio 1942 Añejo |

AC ¶ 47. There is no factual or scientific basis for these numbers. Neither of the studies Plaintiffs cite provides any methodology for converting a single reading into a percentage of agave-derived ethanol, underscoring the implausibility of Plaintiffs' allegations.[11]

Courts routinely reject this kind of gap-filling. Plaintiffs cannot cherry-pick a handful of data points, misread studies, and then ask the Court to take their conclusions on faith. As courts in this Circuit and others have made clear, when a plaintiff "has chosen to use scientific studies in an effort to raise plausible inferences that marketing is deceptive, and the studies cited do not support [its] claims, the plaintiff has not plausibly pleaded [those] claims." *Bermudez*, 667 F. Supp. 3d at 37 (citations and quotations omitted). And where "plaintiffs point to scientific evidence that they

---

[11] Beyond that, for this scale of alleged adulteration, Diageo, which sells millions of cases of tequila each year, AC ¶¶ 28-29, would need to sneak millions of liters of non-agave alcohol into its facilities routinely. It would be impossible to do this undetected and it would require massive capital expenditures and other efforts which defy common sense. *See AJ Energy LLC v. Woori Bank*, 829 F. App'x 533, 534 (2d Cir. 2020) (noting that courts need not "suspend common sense when analyzing [a] complaint" and affirming dismissal of claims "where the only support allegedly documenting two multi-billion-euro transfers consisted of suspect exhibits that were internally inconsistent and defied common sense").

allege actually disproves a product's claims, such a stark disconnect between the scientific studies and the claims made about [the product]'s benefits is fatal to plaintiffs' complaint." *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 138 (E.D.N.Y. 2015).

Because Plaintiffs' testing allegations are "facially insubstantial or implausible," this Court does not have to "resolv[e] factual disputes and/or mak[e] scientific assessments." *Noriega v. Abbott Lab'ys*, 714 F. Supp. 3d 453, 459-60 (S.D.N.Y. 2024). They fail to allege a plausible basis for their sweeping accusations, and the Amended Complaint should be dismissed for failure to state a claim.

### 3. *The purported testing method is not credibly alleged to be validated for tequila testing*

Even putting Plaintiffs' misreading of the science aside, the SNIF-NMR method they invoke is not an accepted or validated test for determining whether tequila is made from 100% agave. It has never been adopted by the tequila industry, endorsed by any regulator (including the CRT), or recognized by any independent scientific authority for tequila testing. *Cf.* Sainz Decl. ¶ 37 (listing approved testing methods and noting that SNIF-NMR "is not contemplated by the regulations"). It is sold by a single company—Eurofins—the same entity that authored the two studies Plaintiffs cite. AC ¶¶ 40, 43-44. No court has ever accepted SNIF-NMR as a reliable tool for detecting tequila adulteration, and when similar attempts have been made in other industries, courts have rejected them as deviations from accepted standards. *Cf. Jiaherb v. MTC Indus.*, 2025 WL 2555514, at *16 (D.N.J. Sept. 5, 2025) (declining to credit plaintiff's reliance on NMR testing where it was not industry standard and not required by relevant regulations). Even Plaintiffs' own sources concede that SNIF-NMR testing can only "*potentially* confirm if tequila has been adulterated with cane alcohol." Mezcalistas Art. (emphasis added).

In short, Plaintiffs hinge their entire case on a proprietary method that is not alleged to be industry standard nor accepted by any regulator or independent authority, not scientifically

validated, and that, by their own admission, shows at best "potential." That is nowhere near sufficient to state a claim.

### 4. Isolated, unverified numbers cannot support Plaintiffs' sweeping allegations

Despite these fundamental defects, Plaintiffs ask the Court to make one final—and untenable—leap of faith and assume that these five purported "test" results somehow condemn "all of Diageo's tequilas." AC ¶ 50. Specifically, they demand that the Court treat their results from five samples as proof that every Casamigos and Don Julio expression—spanning decades of production, multiple distilleries, and countless batches—is adulterated with non-agave alcohol.

Courts have uniformly rejected such speculative extrapolation. In *Esquibel v. Colgate-Palmolive Co.*, the court held that "four samples in total" was "insufficient to support an inference that the Product was so widely contaminated that any purchase, from any source, in the last two years could plausibly have been affected." 2025 WL 1785865, at *4. Chief Judge Swain contrasted that deficient sample size with the 80 samples tested in *John v. Whole Foods Market*, where the Second Circuit found the allegations sufficient to plead "pervasive" mislabeling. *Id.* Other courts have reached the same conclusion in analogous contexts, refusing to infer product-wide contamination from limited or unverified testing. *See e.g.*, *Cascio v. Johnson & Johnson*, 2024 WL 693489, at *3 (N.D. Ga. Feb. 20, 2024) (refusing to infer that "any of the sunscreens used by" the plaintiff "were among the samples that contained benzene" absent facts showing "how many samples contained benzene, how many samples were tested, or what product lines or batches contained benzene"); *Krystofiak v. BellRing Brands*, 737 F. Supp. 3d 782, 793-94 (N.D. Cal. 2024) (declining to extrapolate lead content from a few tested flavors to untested ones); *Barton v. Procter & Gamble Co.*, 766 F. Supp. 3d 1045, 1061-62 (S.D. Cal. 2025) (dismissing claims where plaintiffs offered no basis to extrapolate results from one product size to others). The same common-sense principle applies here. Plaintiffs cannot transform five isolated numbers—none of which are linked

to any of the 73+ bottles allegedly purchased—into a sweeping indictment of every Casamigos and Don Julio tequila.[12]

### B. Plaintiffs Fail To Allege Their Claims With the Requisite Particularity

The defects in Plaintiffs' pleading are especially acute given that Rule 9(b)'s heightened standard governs all but two of their claims. The Amended Complaint rests entirely on a single alleged course of deceptive conduct—Diageo's supposed misrepresentation that its tequilas are "100% agave." When plaintiffs allege "false factual representations in labeling and marketing" the "gravamen of plaintiffs' complaint is plainly fraud" and the heightened pleading standard of Rule 9(b) applies. *Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *8 (S.D.N.Y. Dec. 27, 2017), *adopted*, 2018 WL 481890 (S.D.N.Y. Jan. 18, 2018) (citations and quotations omitted); *Weinstein v. Rexall Sundown, Inc.*, 2024 WL 4250353, at *6 (E.D.N.Y. Aug. 26, 2024) (applying 9(b) requirements to claims under various state consumer protection laws); *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 355 (E.D.N.Y. 2014) (if the claim is "rooted in fraud," "Rule 9(b) applies irrespective of the formal styling of the claim"). Aside from the two GBL claims, all of Plaintiffs' other statutory claims and common law claim are subject to the heightened requirement of Rule 9(b). *See Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *24 n.13 (S.D.N.Y. July 27, 2009); *Binder v. Michael Kors (USA), Inc.*, 2024 WL 3227943, at *9 (S.D.N.Y. June 28, 2024) (applying heightened 9(b) pleading standard to out-of-state consumer protection statutes consistent with the courts in those states interpreting their own statutes).[13]

---

[12] Plaintiffs' failure to test any additional Casamigos or Don Julio products—something plainly within their control— and their demand that the Court impute five partial results to every Casamigos and Don Julio tequila ever sold, all but gives away the game. If Plaintiffs' anonymous lab tester could truly detect "whether ethanol in a tequila sample truly comes from agave," AC ¶ 45, one would expect at least a handful of corroborating results across other bottles or batches, especially from among the 73+ bottles Plaintiffs allege they purchased over two years. Their decision not to test, or not to allege more test results, speaks volumes and strongly suggests that Plaintiffs are cherry-picking results for their claims while concealing others.

[13] *See also Thomas v. JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 794 (S.D.N.Y. 2011); *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1295 (11th Cir. 2025); *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1120-21 (D. Colo. 2011); *Blue Diamond Growers*, 722 F. Supp. 3d at 564; *Camasta v. Jos. A. Bank Clothiers, Inc.*,

Rule 9(b) imposes a heightened pleading standard designed to "prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (internal citations omitted). It requires that plaintiffs state "the circumstances constituting fraud" "with particularity." *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *U.S. ex rel. Polansky v. Pfizer, Inc.*, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (internal citations omitted). They "cannot rest on their say-so that these statements are fraudulent; they must explain *why*." *Rombach*, 355 F.3d at 175 (emphasis added).

As described above, Plaintiffs' allegations fall well short of Rule 8's plausibility standard and thus necessarily fail Rule 9(b)'s heightened pleading standard. *See Consigli & Assocs., LLC v. Maplewood Senior Living, LLC*, 2021 WL 4238162, at *2 n.2 (S.D.N.Y. July 29, 2021) ("[T]he Complaint does not meet the lower pleading standard of Rule 8 and so necessarily fails to meet the higher pleading standard of Rule 9(b)."). Because Plaintiffs have not pled their claims with the requisite particularity—or even minimal plausibility—all of their claims must be dismissed.

### C. Plaintiffs' Claims Are Barred by Safe Harbors Protecting Conduct that Complies with Federal Law

Plaintiffs' claims under GBL § 349 (Count I), GBL § 350 (Count II), NJCFA (Count III), FDUTPA (Count IV), CCPA (Count V), and ICFA (Count VIII), all fail for a separate, dispositive reason: each statute contains a safe-harbor provision that protects conduct expressly authorized by law. Because Diageo's "100% agave" labeling complies with binding federal regulations and international law, Plaintiffs' claims under these statutes fail as a matter of law.

---

761 F.3d 732, 737 (7th Cir. 2014); *Berry v. Indianapolis Life Ins. Co.*, 608 F. Supp. 2d 785, 800 (N.D. Tex. 2009); *Coyle v. JSL Mech., Inc.*, 2023 WL 5985273, at *3-4 (E.D. Pa. Sept. 14, 2023).

Those statutes—like many others nationwide—exempt conduct that conforms to the determinations of federal regulators. The principle is straightforward: state consumer protection laws cannot be used to undermine or relitigate decisions already reviewed and approved by federal agencies.[14]

Diageo's use of "100% agave" fully complies with the interlocking regulatory regimes of Mexico and the United States. As discussed above (*see supra* at 6-9), and in the Amended Complaint, AC ¶¶ 55-66, Mexico closely regulates tequila through a comprehensive set of legal requirements (the NOM) that every tequila producer must follow. The NOM defines 100% agave tequila as "a product whose fermentation may not be enhanced with sugars other than those obtained from the tequilana weber blue variety Agave." AC ¶ 60; NOM 5.1.1. To ensure compliance with the NOM, the CRT has "implemented a stringent system of quality control" that "document[s] every single agave planted," involves "an inspector [in] every distillery," and requires every batch of tequila to be tested. *See* Mezcalistas Art; Sainz Decl. ¶¶ 21, 25-28, 32-38. Only products that are inspected and approved by the CRT may be labeled as "100% agave." Sainz Decl. ¶¶ 15-16, 28-43.

The United States, in turn, has recognized tequila as a "distinctive product of Mexico" and enforces Mexico's standards pursuant to the United States–Mexico–Canada Agreement ("USMCA"). Accordingly, federal law prohibits the sale of any product as "Tequila" unless it "has been manufactured in Mexico in accordance with the laws and regulations of Mexico governing

---

[14] *See* GBL § 349(d) ("In any such action it shall be a complete defense that the act or practice . . . complies with the rules and regulations of, and the statutes administered by . . . the United States . . . or the federal courts."); GBL § 350-d ("In any such action it shall be a complete defense that the advertisement is subject to and complies with the rules and regulations of, and the statutes administered by the Federal Trade Commission or any official department, division, commission or agency of the state of New York."); *Marcus v. AT & T Corp.*, 938 F. Supp. 1158, 1173 (S.D.N.Y. 1996), *aff'd*, 138 F.3d 46 (2d Cir. 1998); *see also In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 975 F. Supp. 584, 618-19 (D.N.J. 1996) (dismissing NJCFA claims where "plaintiffs allege conduct that falls directly within the scope of [] industry regulations"); Fla. Stat. § 501.212(1) (FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law"); Colo. Rev. Code § 6–1–106(1)(a) (CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal [] agency"); 815 Ill. Comp. Stat. § 505/10b(1) (ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority").

the manufacture of Tequila." USMCA Art.3.C.2(3); 27 C.F.R. § 5.148(b). The Treasury Secretary, through the TTB, regulates the importation and labeling of tequila under the Federal Alcohol Administration Act, 27 U.S.C. § 205(e), and its implementing regulations, 27 C.F.R. Part 5. Those regulations prohibit the importation of tequila unless both (1) the CRT has determined it was produced in compliance with the NOM and approved it for export, *see* 27 C.F.R. § 5.30(d); Sainz Decl. ¶¶ 38-43, and (2) the TTB has approved the product's label by issuing a COLA, *see* 27 U.S.C. § 205(e); *see also* 27 C.F.R. §§ 5.25, 5.3. The TTB only grants approval of a label upon making a determination that the submission "complies with applicable laws and regulations." 27 C.F.R. § 13.21(a).[15] In short, the CRT closely regulates tequila production in Mexico and determines whether a tequila satisfies the NOM's definition of "100% agave," and the United States—by law— defers to and adopts that decision when issuing a COLA and permitting importation. AC ¶¶ 55-66. The TTB has issued COLAs to Diageo for both Don Julio and Casamigos tequilas, confirming that they comply with the NOM and U.S. law and authorizing them to be imported and sold in this country as "100% agave" tequila. *See* Exs. 5-6.[16]

That federal approval carries binding legal effect. And federal courts have repeatedly held that when an alcoholic beverage label receives federal approval through the TTB, it is entitled to safe harbor protection. *See O'Hara v. Diageo-Guinness, USA*, 306 F. Supp. 3d 441, 464 (D. Mass. 2018); *Pye v. Fifth Gen.*, 2015 WL 5634600, at *4 (N.D. Fla. Sept. 23, 2015) (TTB-approved vodka label triggered FDUTPA safe harbor). As one court explained, "[t]he Secretary of the Treasury delegated its rulemaking authority to the TTB, which in turn promulgated a series of regulations

---

[15] As part of the COLA process, an importer must certify the "liquor's designation" as tequila made in Mexico in accordance with Mexican law. 27 C.F.R. § 5.148(b)(1).

[16] Courts routinely take judicial notice of COLAs in cases involving representations on alcohol labels. *See, e.g.*, *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 389 (E.D.N.Y. 2017) (COLAs "are suitable for judicial notice"); *Jackson v. Anheuser-Busch InBev SA/NV*, 2021 WL 3666312, at *14 n.7 (S.D. Fla. Aug. 18, 2021) (taking judicial notice of COLAs when ruling on motion to dismiss); *Cruz v. Anheuser-Busch*, 2015 WL 3561536, at *4 n.10 (C.D. Cal. June 3, 2015).

within the alcoholic-beverage industry. This delegation renders TTB's regulations with the exclusive effect of federal law." *Cruz*, 2015 WL 3561536, at *6. Thus, "receiving COLAs" from the TTB confirms that products "are permitted under federal law" and protects against liability under "the safe harbor doctrine." *Id.* Federal courts applying this principle across the country have reached the same conclusion. *See Jackson*, 2021 WL 3666312, at *14 (COLA approval "sufficient to trigger applicable safe harbor provisions"); *O'Hara*, 306 F. Supp. 3d at 464 (same); *Aliano v. Fifth Generation*, 2015 WL 5675423, at *4 (N.D. Ill. Sept. 24, 2015) (same under Illinois law). In short, when a label receives TTB approval, courts hold that the language is specifically permitted under federal law and therefore protected from claims under state consumer statutes.

The Court should follow these decisions, rather than the handful of out-of-District cases that question whether a COLA is sufficient to invoke a safe harbor when the disputed statement on the label was never defined or subject to regulatory scrutiny. These decisions are not only not binding, but they rest on reasoning that has no application here. *See Kay v. Copper Cane, LLC*, 549 F. Supp. 3d 1014, 1022 (N.D. Cal. 2021) (no evidence that TTB specifically reviewed or verified the challenged label claim); *Aliano v. WhistlePig, LLC*, 2015 WL 2399354, at *8 (N.D. Ill. May 18, 2015) (same, where TTB has not "established criteria for evaluating the term" at issue). Diageo's "100% agave" representation is defined by the NOM and subject to rigorous verification by the CRT, which inspects every distillery, tests every batch, and documents each agave plant from field to bottle. *See supra* at 6-9.

This regulatory context distinguishes, *Singleton v. Fifth Generation, Inc.*, 2016 WL 406295, at *8 (N.D.N.Y. Jan. 12, 2016), which Plaintiffs wrongly cite for the claim that safe harbor defenses cannot be resolved on a motion to dismiss, ECF 27 at 3. Not so. The court in *Singleton* declined to dismiss a GBL claim because, unlike here, the term "handmade" was not defined by regulation and there were disputed issues of fact about "whether the TTB investigated or ruled upon the

representations" about Tito's vodka. *Singleton*, 2016 WL 406295, at *7-8 (acknowledging that courts regularly dismiss consumer fraud claims on safe harbor grounds when regulations "directly on point" govern the representation made (citing *L. Offs. of K.C. Okoli, P.C. v. BNB Bank, N.A.*, 481 F. App'x 622, 626 (2d Cir. 2012)). That reasoning is far afield from this case, given the binational regulatory and investigatory regime governing "100% agave" tequila.

Because Diageo's labeling complies with this integrated Mexican–U.S. regulatory framework, its conduct falls squarely within the statutory safe harbors.

### D. Plaintiffs' Unjust Enrichment Claims Are Duplicative and Legally Deficient.

Plaintiffs' unjust-enrichment claims fail for multiple, independent reasons. The Amended Complaint is best read as raising eight such claims under the laws of New York, New Jersey, Florida, Colorado, Maryland, Pennsylvania, Illinois, and Texas—but each fails as a matter of law.

*First*, the unjust enrichment claims fail because Plaintiffs have not adequately alleged any underlying misrepresentation from which Diageo benefitted. *See supra* at 21-30.

*Second*, Texas does not recognize standalone unjust enrichment claims in this context. *Atari Interactive, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2024 WL 4343050, at *5 (N.D. Tex. Sept. 27, 2024) (dismissing unjust enrichment claim because "unjust enrichment is not an independent cause of action under Texas law").

*Third*, even where unjust enrichment is recognized, it cannot duplicate statutory consumer protection claims under New York, Florida, and Colorado law. *See, e.g.*, *Kandel v. Dr. Dennis Gross Skincare, LLC*, 721 F. Supp. 3d 291, 306 (S.D.N.Y. 2024) (holding that plaintiff "failed to sufficiently plead her claim for unjust enrichment under New York law" because it was "duplicative" of all her other claims, including GBL §§ 349 and 350 claims); *Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *8 (S.D. Fla. Dec. 5, 2013). (dismissing unjust enrichment

claim as duplicative of FDUTPA claim); *Francis v. Mead Johnson & Co.*, 2010 WL 5313540, at *9 (D. Colo. Dec. 17, 2010) (dismissing unjust enrichment claim as duplicative of CCPA claim).

*Fourth*, Plaintiffs fail to allege the absence of an adequate legal remedy, a prerequisite for equitable relief in Florida. *See* AC ¶¶ 101-07. *See, e.g.*, *Steel Media Grp., LLC v. Lewis*, 2023 WL 1413043, at *11 (S.D. Fla. Jan. 6, 2023) ("Because, according to the allegations in the Complaint, an adequate remedy exists at law, Plaintiff has not adequately stated a claim upon which relief may be granted for unjust enrichment."), *adopted*, 2023 WL 1332832 (S.D. Fla. Jan. 31, 2023).

*Fifth*, Plaintiffs Sushi Tokyo Miami and David Felton do not allege that they conferred any *direct* benefit on Diageo, as required under Florida law. They admit that they purchased Diageo tequilas from retailers and restaurants, not from Diageo itself. AC ¶¶ 15 n. 10, 16 n. 11. At most, that establishes an indirect benefit, which is insufficient as a matter of law. *Marrache*, 17 F.4th at 1102. Because Plaintiffs' unjust enrichment claims are duplicative, improperly pled, and unsupported by the requisite elements, they should be dismissed in their entirety.

### E. Plaintiffs Fail To Plead Any Facts Justifying Tolling

Finally, Plaintiffs' conclusory tolling allegations are deficient because they do not allege any specific, affirmative act of concealment by Diageo that prevented them from discovering the supposed facts underlying their claims. *See Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 362 (E.D.N.Y. 2022) ("conclusory allegation[s] of fraudulent concealment" are not enough).[17]

### CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6).

---

[17] Contrary to the suggestion in their pre-motion letter, Plaintiffs' assertion that Diageo "knowingly engaged in misleading marketing and advertising"—*i.e.*, a restatement of their claim that the product is misrepresented—does not come close. ECF 27 at 2 n.2; *cf. New York v. Hendrickson Bros.*, 840 F.2d 1065, 1084 (2d Cir. 1988) (relying on allegations that defendants took specific, identified affirmative acts—removing incriminating ledgers, shredding documents, and agreeing to give false grand-jury testimony—to prevent discovery of alleged bid-rigging scheme).

Dated: October 31, 2025
New York, New York

Respectfully submitted,

*/s/ Timothy S. Martin*
TIMOTHY S. MARTIN
tmartin@kaplanmartin.com
CHRISTOPHER R. LE CONEY
cleconey@kaplanmartin.com
TASHA N. THOMPSON
tthompson@kaplanmartin.com
KAPLAN MARTIN LLP
1133 Avenue of the Americas, Suite 1500
New York, New York 10036
Telephone: (212) 315-9500

*Counsel for Defendant Diageo North
America, Inc.*