**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

AVI PUSATERI, SUSHI TOKYO INC.,
CHAIM MISHULOVIN, SUSHI TOKYO
MIAMI LLC, DAVID FELTON, BARRY
WILHELM, SHANNON WILHELM, TRACY
COLE, NELSON NJOROGE, ANTOINE
DOXON, TIEASE HOLMES, DYONNESHA
WOOLFOLK, and TROY REECE on behalf of
themselves and all others similarly situated,

                    Plaintiffs,

     v.

DIAGEO NORTH AMERICA, INC.,

                    Defendant.

Case No.: 1:25-cv-02482-LDH-CHK

**PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION
TO DISMISS THE AMENDED
COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................. 1

DIAGEO'S "BACKGROUND" FACTS ............................................................. 4

I.   DIAGEO'S RULE 44.1 DECLARATION IMPROPERLY SEEKS
     FACTUAL DETERMINATIONS AND CANNOT BE CONSIDERED
     ON A MOTION TO DISMISS ............................................................... 4

II.  THE COURT SHOULD DECLINE DIAGEO'S REQUEST FOR
     JUDICIAL NOTICE IN ITS ENTIRETY ........................................... 5

ARGUMENT ..................................................................................................... 6

I.   PLAINTIFFS PLAUSIBLY ALLEGE THEY PAID A PREMIUM FOR
     ADULTERATED TEQUILA, ESTABLISHING ARTICLE III
     STANDING. ............................................................................................. 6

     A.   Plaintiffs Plausibly Allege a Concrete and Particularized Injury-In-
          Fact. .............................................................................................. 7

     B.   Plaintiffs Have Shown Widespread and Systematic Adulteration,
          Confirmed by Third-Party Testing and Press Reports. .................. 8

     C.   Plaintiffs' Claims Can Proceed Even If They Purchased Diageo
          Tequila After May 2025 ............................................................... 13

     D.   Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief. ... 14

II.  PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS UNDER
     STATE CONSUMER PROTECTION LAWS AND FOR UNJUST
     ENRICHMENT ..................................................................................... 16

     A.   Plaintiffs' Amended Complaint Satisfies Rule 8's Plausibility
          Standard and Alleges Diageo's Tequila Is Falsely Labeled and
          Marketed. .................................................................................... 16

     B.   Diageo's Attacks on Plaintiffs' Testing Raise Factual Disputes and
          Cannot Support Dismissal. ........................................................... 19

          1.   Plaintiffs allege a "scientifically validated, peer-reviewed"
               method for detecting tequila adulteration. ......................... 19

          2.   Diageo's critique of the SNIF-NMR studies goes to its
               weight, not plausibility, and therefore does not warrant
               dismissal. ...................................................................... 21

3.      Diageo's extrapolation argument fails because Plaintiffs challenge a uniform misrepresentation, not a batch-specific defect. ................................................................................. 24

C.      Plaintiffs' Allegations Satisfy Rule 9(b). ............................................. 25

D.      Diageo's Safe Harbor Defense Fails. ................................................... 27

1.      COLAs do not have the force of law and therefore cannot create safe harbor. ...................................................... 27

2.      Safe harbor requires agency approval of the specific claim—which Diageo lacks. ..................................... 29

3.      Diageo's safe harbor theory raises factual disputes that cannot be resolved at the pleading stage. .................................. 31

E.      Plaintiffs' Unjust Enrichment Claims Are Legally Viable and Factually Supported. ................................................... 31

F.      Diageo's False Tequila Marketing and Labels Justify Tolling. ............................ 33

CONCLUSION ................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AJ Energy LLC v. Woori Bank*,
    829 F. App'x 533 (2d Cir. 2020) ............................................................17

*Aliano v. Fifth Generation, Inc.*,
    2015 WL 5675423 (N.D. Ill. Sept. 24, 2015) ........................................29

*Aliano v. WhistlePig, LLC*,
    2015 WL 2399354 (N.D. Ill. May 18, 2015) ..................................14, 30

*Axon v. Florida's Nat. Growers, Inc.*,
    813 F. App'x 701 (2d Cir. 2020) ......................................................7, 14

*Banks v. Consumer Home Mortg., Inc.*,
    2003 WL 21251584 (E.D.N.Y. Mar. 28, 2003) .....................................31

*Barnes v. KOS, Inc.*,
    2025 WL 1928027 (S.D.N.Y. July 14, 2025) ........................................12

*Barton v. Pret A Manger (USA) Ltd.*,
    535 F. Supp. 3d 225 (S.D.N.Y. 2021) ...................................................22

*Barton v. Procter & Gamble Co.*,
    766 F. Supp. 3d 1045 (S.D. Cal. 2025) .................................................25

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................17

*Bermudez v. Colgate-Palmolive Co.*,
    667 F. Supp. 3d 24 (S.D.N.Y. 2023) .....................................................23

*Berni v. Barilla S.p.A.*,
    964 F.3d 141 (2d Cir. 2020) ..................................................................15

*Binder v. Michael Kors (USA)*,
    2024 WL 3227943 (S.D.N.Y. June 28, 2024) .......................................27

*Binder v. Premium Brands Opco LLC*,
    2024 WL 2978506 (S.D.N.Y. June 11, 2024) .......................................14

*Brown v. Coty, Inc.*,
    2024 WL 894965 (S.D.N.Y. Mar. 1, 2024) ...........................................12

*Campbell v. Freshbev LLC*,
    322 F. Supp. 3d 330 (E.D.N.Y. 2018) ..................................................14

*Carver v. City of New York*,
621 F.3d 221 (2d Cir. 2010)............................................................9

*Cascio v. Johnson & Johnson*,
2024 WL 693489 (N.D. Ga. Feb. 20, 2024) ...............................25

*Casio v. Vineyard Vines, LLC*,
2021 WL 466039 (E.D.N.Y. Feb. 9, 2021)....................................6

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)............................................................9

*Clinger v. Edgewell Pers. Care Brands, LLC*,
2023 WL 2477499 (D. Conn. Mar. 13, 2023) ..............................9

*Colpitts v. Blue Diamond Growers*,
527 F. Supp. 3d 562 (S.D.N.Y. 2021)............................................7

*Cornett v. Northrop Grumman Corp.*,
2020 WL 59794 (E.D.N.Y. Jan 6, 2020) .......................................6

*Cruz v. Anheuser-Busch, LLC*,
2015 WL 3561536 (C.D. Cal. June 3, 2015) ..........................29, 30

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) .......................................................15

*DeCoursey v. Murad, LLC*,
673 F. Supp. 3d 194 (N.D.N.Y. 2023).........................................14

*E. Coast Advanced Plastic Surgery, LLC v. Cigna Health & Life Ins. Co.*,
2025 WL 2371537 (S.D.N.Y. Aug. 14, 2025) .............................32

*Eidelman v. Sun Prods. Corp.*,
2022 WL 1929250 (2d. Cir. June 6, 2022) ............................6, 8, 31

*Equal Emp. Opportunity Comm'n v. 98 Starr Rd. Operating Co.*,
LLC, 682 F. Supp. 3d 414 (D. Vt. 2023) .....................................8

*Esquibel v. Colgate-Palmolive Co.*,
2025 WL 1785865 (S.D.N.Y. June 27, 2025) .....................12, 24, 25

*Frey v. Bekins Van Lines, Inc.*,
748 F. Supp. 2d 176 (E.D.N.Y. 2010) .........................................31

*Greene v. Gerber Prods. Co.*,
262 F. Supp. 3d 38 (E.D.N.Y. 2017) ...........................................26

*HFGL Lt. v. Alex Lyon & Son Sales Mgrs. & Auctioneers, Inc.*,
264 F.R.D. 146 (D.N.J. 2009) ................................................................5

*Hicks v. L'Oréal U.S.A., Inc.*,
2024 WL 4252498 (S.D.N.Y. Sept. 19, 2024) .....................................12

*Hofmann v. Fifth Generation, Inc.*,
2015 WL 7430801 (S.D. Cal. Nov. 20, 2015) .................................28, 29

*Hughes v. Ester C Co.*,
930 F. Supp. 2d 439 (E.D.N.Y. 2013) .......................................20, 23, 32

*Jackson v. Anheuser-Busch InBev SA/NV, LLC*,
2021 WL 3666312 (S.D. Fla. Aug. 18, 2021) .......................................29

*Jiaherb v. MTC Industries*,
2025 WL 2555514 (D.N.J. Sept. 5, 2025) .............................................21

*John v. Whole Foods Mkt. Grp., Inc.*,
858 F.3d 732 (2d Cir. 2017) ......................................................... *passim*

*Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*,
742 F.3d 42 (2d Cir. 2014) ....................................................................19

*Kardovich v. Pfizer, Inc.*,
97 F. Supp. 3d 131 (E.D.N.Y. 2015) .....................................................23

*Kay v. Copper Cane, LLC*,
549 F. Supp. 3d 1014 (N.D. Cal. 2021) ...........................................28, 29

*Kell v. Lily's Sweets*,
2024 WL 1116651 (S.D.N.Y. Mar. 13, 2024) .......................................12

*Krystofiak v. BellRing Brands, Inc.*,
737 F. Supp. 3d 782 (N.D. Cal. 2024) ...................................................25

*Kurtz v. Kimberly-Clark Corp.*,
321 F.R.D. 482 (E.D.N.Y. 2017) ..........................................................15

*Kyszenia v. Ricoh USA, Inc.*,
583 F. Supp. 3d 350 (E.D.N.Y. 2022) ...................................................34

*Lesh v. Cable News Network, Inc.*,
767 F. Supp. 3d 33 (S.D.N.Y. 2025) .......................................................6

*Levy v. Hu Prods. LLC*,
2024 WL 897495 (S.D.N.Y. Mar. 1, 2024) ........................................7, 34

*Lurenz v. Coca-Cola Co.*,
2025 WL 2773188 (S.D.N.Y. Sept. 29, 2025).................................................................12, 13

*MacNaughton v. Young Living Essential Oils, LC*,
67 F.4th 89 (2d Cir. 2023) ................................................................... *passim*

*Morales v. Kimberly-Clark Corp.*,
2020 WL 2766050 (S.D.N.Y. May 27, 2020) ........................................................14

*Myers v. Wakefern Food Corp.*,
2022 WL 603000 (S.D.N.Y. Mar. 1, 2022) ....................................................17, 18

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
710 F.3d 71 (2d Cir. 2013)..................................................................................13

*Nkansah v. Kleinbard LLC*,
2021 WL 1238892 (E.D. Pa. Apr. 1, 2021) ..........................................................5

*Noriega v. Abbott Laboratories*,
714 F. Supp. 3d 453 (S.D.N.Y. 2024)............................................................22, 23

*In re Nurture Baby Food Litig.*,
2025 WL 918927 (S.D.N.Y. Mar. 26, 2025) .........................................................9

*O'Hara v. Diageo-Guinness, USA*,
306 F. Supp. 3d 441 (D. Mass. 2018) .................................................................29

*Onaka v. Shiseido Ams. Corp.*,
2023 WL 2663877 (S.D.N.Y. Mar. 28, 2023) .....................................................12

*Ouaknine v. MacFarlane*,
897 F.2d 75 (2d Cir. 1990)..................................................................................26

*Patane v. Nestle Waters N. Am., Inc.*,
761 F. Supp. 3d 424 (D. Conn. 2024)..................................................................27

*PDV USA, Inc. v. Interamerican Consulting Inc.*,
2021 WL 2581569 (S.D.N.Y. June 22, 2021) .......................................................9

*Pineda v. Lack Consumer Prods.*,
2024 WL 5001928 (E.D. Pa. Dec. 5, 2024)..........................................................11

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
2009 WL 1456582 (E.D.N.Y. May 22, 2009) .......................................................26

*Prime Hydration LLC v. Garcia*,
2025 WL 963361 (N.D. Tex. Mar. 31, 2025) .......................................................32

*Pye v. Fifth Gen.*,
   2015 WL 5634600 (N.D. Fla. Sept. 23, 2015) ........................................................ 29

*Quinn v. Walgreen Co.*,
   958 F. Supp. 2d 533 (S.D.N.Y. 2013) .......................................................... 22, 24

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................ 26

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) .................................................................... 9

*Samele v. Zucker*,
   324 F. Supp. 3d 313 (E.D.N.Y. 2018) .......................................................... 16

*Santiful v. Wegmans Food Markets, Inc.*,
   2022 WL 268955 (S.D.N.Y. Jan. 28, 2022) ................................................ 17, 18

*Scholder v. Sioux Honey Ass'n Coop.*,
   2022 WL 125742 (E.D.N.Y. Jan. 13, 2022) .................................................... 32

*Schwartzco Enters. LLC v. TMH Mgmt., LLC*,
   60 F. Supp. 3d 331 (E.D.N.Y. 2014) ......................................................... 26

*Shalikar v. Asahi Beer U.S.A., Inc.*,
   2017 WL 9362139 (C.D. Cal. Oct. 16, 2017) ........................................ 27, 28, 29

*Singleton v. Fifth Generation, Inc.*,
   2016 WL 406295 (N.D.N.Y. Jan. 12, 2016) ................................................ 28, 30

*Soto v. GNC Holdings*,
   2025 WL 662135 (N.D. Ill. Feb. 28, 2025) ................................................ 11, 13

*State Farm Mut. Auto. Ins. Co. v. Spine Centers of Am., Inc.*,
   2025 WL 885216 (M.D. Fla. Mar. 21, 2025) .................................................. 33

*State of New York v. Hendrickson Bros.*,
   840 F.2d 1065 (2d Cir. 1988) ................................................................ 33

*Turnipseed v. Simply Orange Juice Co.*,
   2022 WL 657413 (S.D.N.Y. Mar. 4, 2022) ................................................ 17, 18

*Tyman v. Pfizer, Inc.*,
   2017 WL 6988936 (S.D.N.Y. Dec. 27, 2017) .................................................. 26

*United States v. Mead*,
   533 U.S. 218 (2001) ..................................................................... 28, 29

*Weinstein v. Rexall Sundown, Inc.*,
    2024 WL 4250353 (E.D.N.Y. Aug. 26, 2024) ..........................................................................26

*Welch v. TD Ameritrade Holding Corp.*,
    2009 WL 2356131 (S.D.N.Y. July 27, 2009) ..........................................................................26

*Winans v. Ornua Foods N. Am. Inc.*,
    731 F. Supp. 3d 422 (E.D.N.Y. 2024) ...................................................................................32

*Zarfati v. Artsana USA, Inc.*,
    2025 WL 373081 (S.D. Fla. Jan. 15, 2025) ..........................................................................33

## Other Authorities

27 C.F.R. § 5.143 ............................................................................................................................30

27 C.F.R. § 5.148 ............................................................................................................................30

# PRELIMINARY STATEMENT

Plaintiffs paid a premium for Casamigos and Don Julio tequila bottles falsely labeled and marketed by Defendant Diageo North America, Inc. ("Diageo") as made from "100% Agave." Plaintiffs now seek compensation for their purchases of these adulterated tequila products and to stop Diageo's ongoing misconduct. Amended Complaint, ECF No. 23.[1] Plaintiffs' goal is simple: transparency and accountability in the tequila industry, where opacity and corruption enable fraud.

Rather than engage with Plaintiffs' well-pled allegations—as Rule 12(b)(6) demands—Diageo's motion to dismiss (ECF No. 30) asks the Court to invert the pleading standard, disregard detailed factual allegations of adulteration, and instead credit Diageo's own preferred narrative. To get there, Diageo relies on contrived, misleading attacks on Plaintiffs' scientific testing that bear on the *weight* of the evidence, not the *plausibility* of Plaintiffs' claims—precisely the type of merits dispute courts refuse to entertain at this stage. Diageo further compounds these errors by attaching improper factual materials through a Rule 44.1 declaration and an overbroad request for judicial notice. Once these improper materials are disregarded, the sufficiency of Plaintiffs' claims is clear.

To this end, Plaintiffs plausibly allege that all of Diageo's tequilas are adulterated with non-agave ethanol. Those allegations are supported by multiple laboratory tests and detailed reporting of widespread tequila adulteration and corruption within Mexico's Tequila Regulatory Council ("CRT"). Plaintiffs' allegations, which directly contradict Diageo's claim that its tequila

---

[1] Citations to "AC ¶ __" are to the Amended Complaint, and citations to "Ex. __" are to the exhibits attached to the Declaration of Plaintiffs' Counsel ("Plaintiffs Decl."). Citations to Diageo's Memorandum of Law in Support of Defendant's Motion to Dismiss the Amended Complaint, ECF No. 30-1, are to "Mem."

is made from 100% Blue Weber agave, easily establish Article III standing and satisfy Rules 8 and 9.

Diageo's purported "safe harbor" defense does nothing to change that conclusion. Contrary to Diageo's motion, Certificates of Label Approval ("COLAs") are not a certification of ingredient purity, and courts repeatedly hold that TTB label approval cannot defeat well-pled allegations of misrepresentation at the pleading stage. As such, the safe harbor defense fails.

Failed defenses aside, Diageo's Preliminary Statement is built on a series of hyperbolic assertions, factual misstatements, and arguments that exceed the confines of Rule 12(b)(6). As such, Plaintiffs respond briefly here to provide the necessary context before turning to the legal flaws in Diageo's motion.

*First*, contrary to Diageo's assertions, the scientific method Plaintiffs rely on—carbon isotope ratio analysis, also known as SNIF-NMR—is not speculative. As the Amended Complaint alleges, multiple peer-reviewed studies validate SNIF-NMR as an effective tool for determining whether ethanol is derived from agave. AC ¶¶ 41–45. Notably, the Mexican government's own *Centro Nacional De Metrología* or National Metrology Center ("CENAM"), which sets Mexico's scientific measurement standards, has likewise confirmed SNIF-NMR's accuracy for determining whether tequila is manufactured with 100% agave.[2] And a 2023 peer-reviewed study co-authored by a researcher at the CRT concluded that the same methodology "permits distinguishing with a great exactitude" authentic 100% agave tequila from products made with other alcohol sources.[3] Diageo's effort to sidestep these authoritative scientific

---

[2] *Proficiency Test for the Identification of Origin of Agave Beverages* ("*Ensayo de aptitud para la identificación de origen de bebidas de agave*"), attached as Ex. 1.

[3] Ex. 2 at pp. 5–6, Walter M. Warren-Vega, Rocío Fonseca-Aguiñaga, Linda V. González-Gutiérrez, Luis A. Romero-Cano, *A critical review on the assessment of the quality and authenticity of Tequila by different analytical techniques: Recent advances and perspectives*,

findings—while slipping contrary factual claims into a Rule 44.1 declaration—reveals the strategic weakness of its position.[4]

*Second*, Diageo's attempt to discredit the Additive Free Alliance ("AFA")—whose investigation helped reveal widespread adulteration—by pointing to unrelated Mexican criminal proceedings and a U.S. civil suit misses the mark. The actual record shows a coordinated effort by industry actors, including Diageo and the CRT, to silence and punish advocates of transparency in the tequila industry. As detailed in a 2024 *Wall Street Journal* article, the AFA's American leadership, Grover and Scarlet Sanschagrin, were targeted after Diageo complained that a competitor was using an AFA tequila transparency certification.[5] When the Sanschagrins relocated to Florida, the CRT sued the AFA because it asserted the AFA and a related website, Tequila Matchmaker, were infringing on its tequila trademarks by publishing information about the tequila industry.[6] The AFA responded by asserting a defense based on Florida's Anti-SLAPP ("Strategic Lawsuit Against Public Participation") Statute (Fla. Stat. § 768.295) because the CRT is attempting to stop the AFA's advocacy of tequila transparency. Answer at 12, *CRT v. AFA*,

---

Food Chemistry, Volume 408, 2023, 135223, ISSN 0308-8146, available at: https://doi.org/10.1016/j.foodchem.2022.135223.

[4] To the extent the Court considers Diageo's Rule 44.1 declaration, it may also consider CENAM's findings and the 2023 peer-reviewed study cited in the paragraph above. *See* Fed. R. Civ. P. 44.1 ("In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

[5] Saabira Chaudhuri, *Mexico Battles Americans On What Makes True Tequila*, Wall Street J. (July 1, 2024), attached as Ex. 3, available at: https://www.wsj.com/business/additive-free-tequila-matchmaker-mexico-battle-07570e99?reflink=desktopwebshare_permalink. Additionally, Diageo fails to note that the AFA's leadership includes several other individuals that are on the AFA's Board of Directors as noted in one of the AFA sources Diageo cites. Mem. at 18.

[6] *Consejo Regulador Del Tequila A.C. v. Additive Free Alliance, Inc.*, No. 25 Civ. 1129 (M.D. Fla. 2025), ECF No. 1.

Case 3:25-cv-01129-MMH-LLL (M.D. Fla. Oct. 31, 2025), ECF No. 19. Far from being a fringe or unreliable source, the AFA is widely recognized by consumers, journalists, and industry experts as one of the most credible and influential voices on tequila authenticity.

*Third*, even if the AFA were unreliable (it is not), that is not a basis for dismissal because Plaintiffs' claims do not rely on the AFA. Indeed, Plaintiffs conducted their own independent testing—which produced the same results—and the Amended Complaint incorporates additional independent testing from the California and Florida lawsuits that Diageo itself cites.[7] Those suits report adulteration of the same Diageo tequilas after conducting their own sampling and analysis.[8] The geographic breadth of these findings—from New York to California to Florida—confirms the plausibility of Plaintiffs' allegations.

Taken together, Plaintiffs' allegations are based not on "rumor and conjecture," as Diageo contends, but on detailed scientific testing, independent investigations, and extensive public reporting. Diageo's motion to dismiss should therefore be denied.

## DIAGEO'S "BACKGROUND" FACTS

I.  **DIAGEO'S RULE 44.1 DECLARATION IMPROPERLY SEEKS FACTUAL DETERMINATIONS AND CANNOT BE CONSIDERED ON A MOTION TO DISMISS**

Diageo's Rule 44.1 declaration from Hugo López Coll, of Sainz Abogados, S.C. (the "Sainz Declaration"), is an improper attempt to inject factual assertions and expert testimony into a Rule 12(b)(6) motion. Mem. at 6 n.2. Rule 44.1 allows the Court to consider materials that aid in "decid[ing] a substantive issue of foreign law, ***not to make a factual determination or apply***

---

[7] *Jackson v. Diageo N. Am. Inc.*, No. 25 Civ. 5654 (N.D. Cal. 2025) ("California Action"); *Haschemie et al. v. Diageo N. Am. et al.*, No. 25 Civ. 23367 (S.D. Fla. 2025) ("Florida Action").

[8] California Action Complaint, ECF No. 1, ¶ 56 (listing Diageo tequila laboratory results that show adulteration), attached as Ex. 4; Florida Action Complaint, ECF No. 1-1 at ¶ 50.

*the law to the facts*." *Nkansah v. Kleinbard LLC*, 2021 WL 1238892, at *4 (E.D. Pa. Apr. 1, 2021), *aff'd*, 2022 WL 843486 (3d Cir. Mar. 22, 2022) (emphasis added); *HFGL Lt. v. Alex Lyon & Son Sales Mgrs. & Auctioneers, Inc.*, 264 F.R.D. 146, 148–49 (D.N.J. 2009) ("To the extent the [Rule 44.1] report seeks to guide the Court in determining the facts of this case, it will not be considered.").

The Sainz Declaration crosses that line. It does not simply interpret the NOM. It offers *factual assertions about how the CRT purportedly operates in practice*. *See* Sainz Decl. ¶¶ 23, 27, 29, 32–33, 36. It also offers *factual assertions about Diageo's own operations*, including the claim that CRT certification confirms the authenticity of each batch. *Id.* ¶¶ 38–40. Rule 44.1 does not authorize this type of factual testimony or law-to-fact application. *See Nkansah*, 2021 WL 1238892, at *4. Even if the Sainz Declaration were proper under Rule 44.1 (it is not), it still could not be used at the pleading stage to discredit Plaintiffs' factual allegations, weigh competing evidence, or invite the Court to make "scientific assessments," as Diageo attempts to do. Mem. at 8–9, 27, 31. Because the Sainz Declaration exceeds the narrow role of Rule 44.1 and seeks to establish contested facts, it provides no basis for dismissal. *Nkansah*, 2021 WL 1238892, at *4; *HFGL Lt.*, 264 F.R.D. at 148–49.

## II.  THE COURT SHOULD DECLINE DIAGEO'S REQUEST FOR JUDICIAL NOTICE IN ITS ENTIRETY

Diageo asks the Court to take judicial notice of seven exhibits attached to the declaration of its attorney, Timothy S. Martin ("Martin Declaration"): (i) four untranslated, Spanish-language CRT certificates, Martin Decl. Exs. 1–4; (ii) two Certificates of Label Approval ("COLAs") issued by the Alcohol and Tobacco Tax and Trade Bureau ("TTB"), *id.* Exs. 5–6; and (iii) the Sushi Tokyo, Inc. drink menu, *id.* Ex. 7. *See* Mem. at 6 n.2. The request fails for three independent reasons.

First, Diageo's own attorney cannot properly authenticate these documents. Courts routinely reject judicial notice where a party offers document through counsel. *See Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 43 (S.D.N.Y. 2025) (declining judicial notice of Wayback Machine website screenshots, where they were offered by a party's attorney, rather than a "Wayback Machine representative attesting to [their] authenticity"); *Casio v. Vineyard Vines, LLC*, 2021 WL 466039, at *5 (E.D.N.Y. Feb. 9, 2021) (screenshots attached to counsel declaration insufficient for judicial notice where, as here, "[p]laintiffs have contested the authenticity"). Second, Diageo has not shown that Exhibits 1–4 are "public records." Mem. at 6 n.2. They are certificates issued by the CRT, a ***private, nonprofit organization***, not a government agency. *See* AC ¶ 32. The only case Diageo cites involved a city regulation and collective bargaining agreements and says nothing about documents created by a private organization. Mem. at 6 n.2. Diageo also concedes that Exhibit 7 is not a public record at all. *Id.* (noting "one exception" to public record argument). Third, Diageo asks the Court to judicially notice the purported "facts" in Exhibits 1–7 "for the purpose of refuting Plaintiffs' allegations," which "is ***not*** something the Court can properly do on a motion to dismiss." *Cornett v. Northrop Grumman Corp.*, 2020 WL 59794, at *6 (E.D.N.Y. Jan 6, 2020) (emphasis added).

## ARGUMENT

**I. PLAINTIFFS PLAUSIBLY ALLEGE THEY PAID A PREMIUM FOR ADULTERATED TEQUILA, ESTABLISHING ARTICLE III STANDING.**

Plaintiffs have Article III standing because they plausibly allege they paid a premium for tequila Diageo falsely labeled as "100% Agave," and would not have bought the product—or would have paid less—had they known it was adulterated. AC ¶¶ 2, 6–8, 11–29. That price-premium injury is exactly the type of concrete economic harm the Second Circuit has repeatedly recognized as sufficient for standing in mislabeling cases. *See Eidelman v. Sun Prods. Corp.*,

2022 WL 1929250, at *1 (2d. Cir. June 6, 2022) ("One method of demonstrating actual injury in the consumable goods context is by showing that the plaintiff paid a 'price premium'—that is, as a result of defendant's deception, the plaintiff paid more for a product than he otherwise would have."); *Axon v. Florida's Nat. Growers, Inc.*, 813 F. App'x 701, 703–04 (2d Cir. 2020) ("As for Article III standing, [Plaintiff] has suffered an injury-in-fact because she purchased products bearing allegedly misleading labels and sustained financial injury – paying a premium – as a result."); *see also Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (collecting cases; emphasis added) ("[A]n allegation that a plaintiff would not have purchased a product or would not have paid the same amount ***comfortably satisfies*** the injury-in-fact prong of Article III standing."). Therefore, at the pleading stage, Plaintiffs' allegations easily clear Article III's "low threshold." *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017).

### A. Plaintiffs Plausibly Allege a Concrete and Particularized Injury-In-Fact.

Plaintiffs plausibly allege they did not receive what they paid for: tequila made exclusively from Blue Weber agave. AC ¶ 7. They support that allegation with multiple independent factual sources—including laboratory analyses and widely reported accounts of systemic tequila adulteration—each of which supports the inference that Diageo's tequila is adulterated with non-agave ethanol. *Id.* ¶¶ 31–38, 40, 46–50. Courts in this Circuit consistently find injury-in-fact where, as here, plaintiffs allege they purchased a product that materially differed from what was promised. *See John*, 858 F.3d at 738 (vacating dismissal where plaintiff alleged that Whole Foods systematically overstated the weights of pre-packaged foods and overcharged customers as a result ); *Levy v. Hu Prods. LLC*, 2024 WL 897495, at *4 (S.D.N.Y. Mar. 1, 2024) (plaintiff sufficiently alleged injury in fact based on allegation that she paid more for defendants' "premium" snacks and chocolate products than she would have if she knew they contained "unsafe levels" of lead). Moreover, Plaintiffs' allegations permit the inference that

"[Diageo's tequila] sells for a higher price than a comparable product because of its use of the deceptive claim"—which is all Article III requires. *Eidelman*, 2022 WL 1929250, at *1.

### B. Plaintiffs Have Shown Widespread and Systematic Adulteration, Confirmed by Third-Party Testing and Press Reports.

The Amended Complaint and supporting materials detail widespread tequila adulteration that directly contradicts Diageo's claim of a "tightly controlled, state-of-the art manufacturing process." Mem. at 2. Indeed, Plaintiffs' scientifically validated testing corroborates what agave farmers and industry observers have publicly reported for years: Diageo's tequilas contain non-agave ethanol rather than authentic 100% Blue Weber agave. *See* AC ¶¶ 31–38, 40, 46–50. For example, as detailed in the declaration of Plaintiff Avi Pusateri ("Pusateri") and the Amended Complaint (AC ¶¶ 14, 38), Pusateri purchased Don Julio 1942 Añejo tequila on January 21, 2025, and agreed to test it after reading press reports about widespread tequila adulteration.[9] Exhibit 5. As part of that process, Pusateri poured the contents of the purchased tequila directly into a test tube labeled "A7DJ," and sent it to Eurofins—a certified laboratory—which determined that the sample's isotopic parameters were inconsistent with authentic tequila.[10] *Id.* The result of Pusateri's testing is consistent with other testing and factual allegations described in the Amended Complaint. AC ¶¶ 47–49.

Because these materials are incorporated in the Amended Complaint (AC ¶¶ 46–49), the Court may consider them at the pleading stage. *See John*, 858 F.3d at 734. The same is true of the press reports incorporated by hyperlink, *Equal Emp. Opportunity Comm'n v. 98 Starr Rd.*

---

[9] Cited at AC ¶ 32 n.31. Felisa Rogers, *Is that really tequila you're buying? Allegations of corruption raise serious questions*, Mezcalistas (Jan. 13, 2025), https://perma.cc/3JB4-HWUY.

[10] As noted in Diageo's Memorandum, it is fully aware of the Eurofins laboratory, which is certified in France by the French Accreditation Committee ("Cofrac") to provide SNIF-NMR analysis of alcoholic beverages. Mem. at 27.

*Operating Co.*, LLC, 682 F. Supp. 3d 414, 420 (D. Vt. 2023), and the "subsequent independent testing" referenced in the Amended Complaint, AC ¶ 38—testing that is no surprise to Diageo, as its own brief cites both the California and Florida actions that report additional adulterated tequila results. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (permitting consideration of documents referenced in the complaint); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) ("Pursuant to Fed. R. Evid. 201(b), we take judicial notice of the Midway complaint as a public record."). Taken together, Plaintiffs' allegations, testing, and public reporting provide a strong basis to infer widespread adulteration. *See PDV USA, Inc. v. Interamerican Consulting Inc.*, 2021 WL 2581569, at *8 (S.D.N.Y. June 22, 2021) (news reports may support allegations at the pleading stage).

Addressing similar allegations, Second Circuit courts routinely find standing where, as here, plaintiffs rely on third-party investigations or testing to show they did not receive the product they paid for.[11] *See John*, 858 F.3d at 738 (vacating dismissal where third-party investigation plausibly indicated defendants' pre-packaged products were mislabeled); *In re Nurture Baby Food Litig.*, 2025 WL 918927, at *7–8 (S.D.N.Y. Mar. 26, 2025) (Article III standing found where third-party investigation indicated that the defendant's baby food was contaminated with heavy metals; rejecting defendants' argument that "[p]laintiffs did not test their own purchases" or "meaningfully link" testing results to their purchased products); *Clinger v. Edgewell Pers. Care Brands, LLC*, 2023 WL 2477499, at *3, *6 (D. Conn. Mar. 13, 2023)

---

[11] Diageo argues that it is "equally plausible" that Plaintiffs tested none of their 73 bottles—or that they tested all of them and "cherry-picked" five unfavorable results—invoking a "Dewey defeats Truman" analogy. Mem. at 16. That argument reflects a fundamental misunderstanding of Rule 12(b)(6). At this stage, the Court does ***not*** weigh competing factual narratives or assess which reading of the allegations is "more plausible." Instead, it must accept Plaintiffs' allegations as true and "construe the complaint in favor of the complaining party," not Diageo. *See Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010).

(citing *John*, 858 F.3d at 737) (consumer protection claims relying on third-party investigation showing contamination in defendant's sunscreen were sufficient for standing, even though plaintiffs "fail[ed] to identify the name of the laboratory, the lots it tested, and whether the laboratory followed FDA required' procedures").

For example, in *Levy*, the court found standing where plaintiffs relied on a Consumer Reports investigation—which tested 2–3 chocolate bar samples with various lot codes—to allege that the dark chocolate they purchased contained lead. 2024 WL 897495, at *1. Relying on *John*, the *Levy* court rejected defendant's arguments that the plaintiff "did not personally test any of the chocolate bars that she purchased," that the Consumer Reports study did not establish that every single chocolate bar sold was contaminated, and "that the study conducted in *John* involved a larger sample than the Consumer Reports survey." *Id.* at *3–4. At the motion to dismiss stage, the court declined "to delve into the scientific validity of the study, which [defendant] will have ample opportunity to challenge at summary judgment and trial." *Id.* at *4. *John*, *Levy*, *In re Nurture Baby Food Litigation*, and *Clinger* confirm that, at the pleading stage, Plaintiffs need only plausibly allege adulteration—not prove it.

To that end, Plaintiffs do far more than rely on a "single" anomalous test, as Diageo improperly suggests. Mem. at 16. Rather, they allege multiple lab tests, conducted at different times within the past year (AC ¶ 38), and detailed reporting of systemic adulteration within the industry, including admissions from agave farmers and evidence of CRT officials "allowing some tequila corporations to mix cane or corn alcohol into tequila that's then labeled as 100 percent agave." AC ¶ 33 (quoting news report).[12] Such overlapping sources make this case far

_____

[12] Diageo argues Plaintiffs' claims are "facially implausible" because their allegations imply that hundreds of people, including farmers, are lying and complicit, Mem. at 4, but news reports

stronger than the typical mislabeling case, where courts find standing based on one study or a handful of samples.

Nevertheless, Diageo argues that Plaintiffs' "sample size" is insufficient and invokes *John* for the proposition that more testing is needed. Mem. at 17. Diageo's argument ignores a critical distinction: *John* involved variable-weight grocery items sold in multiple stores across multiple regions—products for which natural product-by-product and store-by-store variability necessitated a larger sample to detect systemic mislabeling. *John*, 858 F.3d at 736–37. By contrast, Diageo's tequila is uniform, mass-produced, and sourced from a single production stream in Mexico—precisely the type of standardized product for which a smaller sample can plausibly support an inference of adulteration at the pleading stage. And just as the Second Circuit held that "a facial attack on the pleadings is not the proper stage to determine whether the [agency's] sampling methods justified its declaration of widespread overcharging," *id.* at 737, the same principle forecloses Diageo's effort to dismiss Plaintiffs' claims based on quibbles with sample size or testing scope. At this stage, Plaintiffs' allegations must be accepted as true, and their testing results need not be definitive to establish standing. *Id.*

Diageo's reliance on a line of PFAS contamination cases—*Lurenz*, *Barnes*, *Esquibel*, *Hicks*, *Brown*, and *Onaka*—is similarly misplaced.[13] Mem. at 15–16. The complaints in those

<hr/>

of *hundreds* or *thousands* of agave farmers protesting adulterated tequila only confirms the plausibility of the claims. AC ¶¶ 31–35.

[13] Diageo's non-PFAS cases do not support dismissal for additional reasons. The two out-of-Circuit cases actually *support* standing where, as here, there is evidence of widespread defects. *See Soto v. GNC Holdings*, 2025 WL 662135, at *3 (N.D. Ill. Feb. 28, 2025) (explaining that "the named plaintiff need not necessarily purchase a product and test it to establish standing," nor attach test results to the complaint, especially where it is plausible the defect is "so widespread that it is reasonable to believe the named plaintiff bought at least one defective product"); *Pineda v. Lack Consumer Prods.*, 2024 WL 5001928, at *5 (E.D. Pa. Dec. 5, 2024) (explaining that "a nexus sufficient for particularity can be established when the contamination is *so* widespread that it could be reasonably inferred" and nothing in the opinion suggest

cases failed for reasons that have no application here: plaintiffs provided almost no testing detail (no methodology, timing, chain-of-custody, or tester identity); offered no basis to link tested products to their own purchases; and alleged no uniform manufacturing process or systemic contamination that would allow extrapolation from isolated results. *See, e.g.*, *Lurenz v. Coca-Cola Co.*, 2025 WL 2773188, at *3–6 (S.D.N.Y. Sept. 29, 2025); *Barnes v. KOS, Inc.*, 2025 WL 1928027, at *3–6 (S.D.N.Y. July 14, 2025); *Esquibel v. Colgate-Palmolive Co.*, 2025 WL 1785865, at *2–3 (S.D.N.Y. June 27, 2025); *Hicks v. L'Oréal U.S.A., Inc.*, 2024 WL 4252498, at *6–10 (S.D.N.Y. Sept. 19, 2024); *Brown v. Coty, Inc.*, 2024 WL 894965, at *2–4 (S.D.N.Y. Mar. 1, 2024); *Onaka v. Shiseido Ams. Corp.*, 2023 WL 2663877, at *2–4 (S.D.N.Y. Mar. 28, 2023). Here, by contrast, Plaintiffs plead detailed, date-specific testing; corroborating results from independent sources; allegations of uniform, NOM-regulated production; and extensive public reporting of industry-wide adulteration. *See* AC ¶¶ 31–38, 40, 46–50. These are the very factual predicates lacking in Diageo's PFAS cases, and precisely the type of allegations that courts deem sufficient to infer adulteration at the pleading stage.

Finally, Diageo's argument regarding the standing of Don Julio Blanco purchasers—Barry Wilhelm, Shannon Wilhelm, and Tracy Cole—misstates the factual allegations. Mem. at 13. Plaintiffs tested Don Julio Reposado—a product made by aging Don Julio Blanco—and found it adulterated.[14] AC ¶ 47; Mem. at 7. It is reasonable to infer that adulteration in the base

---

that each of the lacking "characteristics would be necessary to establish the requisite particularity"). And *Kell v. Lily's Sweets* is distinguishable because it involved only "anecdotal findings of *Consumer Reports* based on a limited sample of allegedly contaminated products," with no allegations of systemic contamination or any link to the plaintiff's purchases. 2024 WL 1116651, at *4–6 (S.D.N.Y. Mar. 13, 2024).

[14] Diageo also mentions Don Julio 70 Cristalino, but these three Plaintiffs all purchased Don Julio Reposado, and Cristalino is simply a distilled Añejo tequila that is aged for 18 months. As such, the same base spirit used in Don Julio Reposado would also be used for Cristalino. https://www.donjulio.com/our-tequilas/don-julio-70-cristalino-tequila.

Blanco spirit carries through to the aged product. At this stage, the Court must draw "all reasonable inferences in [Plaintiffs'] favor," *John*, 858 F.3d at 737, including the commonsense inference that adulteration in the base spirit extends to products derived from it.

### C. Plaintiffs' Claims Can Proceed Even If They Purchased Diageo Tequila After May 2025.

Diageo attacks the standing of "several Plaintiffs" by asserting they knowingly purchased adulterated tequila.[15] Mem. at 19. That argument fails. As the Second Circuit has explained, a "self-inflicted" injury defeats standing "only if the injury is so completely due to the plaintiff's own fault as to break the causal chain." *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013), *as amended* (Mar. 21, 2013). Diageo cannot meet that stringent standard.

*First*, nothing in the Amended Complaint—or anywhere else—supports the inference that any Plaintiff knowingly purchased adulterated tequila.[16] As such, Diageo's assertion that Plaintiffs intentionally injured themselves is based on pure speculation, *see, e.g.*, Mem. at 19— and speculation alone cannot defeat standing.

*Second*, to the extent Diageo believes that discovery will reveal facts suggesting that any Plaintiff "knew" the tequila was adulterated before purchase, that argument must await summary

---

[15] *Soto* and *Lurenz*—the only cases cited in support of Diageo's argument—are far afield. In *Soto*, the court did not hold that post-filing purchases defeat standing; it merely recited another court's observation that a plaintiff who buys a product after learning of a defect might be "very foolish or attempting to purchase a lawsuit." 2025 WL 662135, at *3 (quoting *Muir v. NBTY, Inc.*, 2016 WL 5234596, at *8 (N.D. Ill. Sept. 22, 2016)). In *Lurenz*, the plaintiff indisputably purchased the product nineteen months after filing suit and with full knowledge of the alleged defect—facts the court found amounted to a truly self-inflicted injury. 2025 WL 2773188, at *5.

[16] Defendant argues that plaintiff Sushi Tokyo Miami must have been aware of information that was available to Sushi Tokyo Brooklyn because they are affiliated entities. Mem. at 19. But it provides no evidence to indicate that these separate legal entities in different states were sharing information about their liquor purchases or legal proceedings.

judgment. *See Aliano v. WhistlePig, LLC*, 2015 WL 2399354, at *4 (N.D. Ill. May 18, 2015) (denying motion to dismiss based on assertion that plaintiffs were aware of falsely labeled alcohol before they made their purchases). At this stage, Plaintiffs allege they relied on Diageo's uniform "100% Agave" representations when purchasing its tequila—and those allegations must be accepted as true. *See John*, 858 F.3d at 737.

### D. Plaintiffs Have Standing to Seek Injunctive and Declaratory Relief.

Plaintiffs allege they "intend to purchase Diageo's Product again when they can do so with the assurance that the representations of Defendant's Product are accurate." AC ¶ 54. Although prior decisions are not uniform,[17] the better-reasoned cases in this Circuit hold that allegations such as these are sufficient for standing to seek injunctive and declaratory relief.[18] *See DeCoursey v. Murad, LLC*, 673 F. Supp. 3d 194, 224 (N.D.N.Y. 2023) ("[P]laintiffs have standing to seek prospective injunctive relief when they assert that they will purchase a product in the future if it is altered . . . ."); *Morales v. Kimberly-Clark Corp.*, 2020 WL 2766050, at *5 (S.D.N.Y. May 27, 2020) (holding that the plaintiff had standing where she alleged that she would buy the product at issue again "if she were assured that any purported defects were identified and eliminated"); *Campbell v. Freshbev LLC*, 322 F. Supp. 3d 330, 337–38 (E.D.N.Y.

---

[17] *See, e.g.*, *Axon*, 813 F. App'x at 703 n.1 ("Whether plaintiffs seeking injunctive relief for consumer deception have standing where they allege that they would buy the products in the future if not mislabeled is unsettled in this Circuit.").

[18] The *DeCoursey* court expressly declined to follow *Atik*—one of the cases Diageo relies on, Mem. at 21—explaining that it "finds the reasoning of *Morales*, *Campbell*, and *Davidson* cases [more] persuasive." *DeCoursey*, 673 F. Supp. 3d at 224. Consistent with *DeCoursey*, this Court should not follow *Atik*, nor should it follow the *Abidor*, *Gavilanes*, or *Davis* cases, all of which pre-date *DeCoursey*. *See, e.g.*, Mem. at 20. Diageo's reliance on *Binder* is similarly misplaced. *See id. Binder* heavily relied on a 2017 decision and followed the same "now-that-they-know" reasoning that courts like *DeCoursey*, *Morales*, and *Campbell* have expressly rejected as inconsistent with how consumer-protection statutes operate. *See Binder v. Premium Brands Opco LLC*, 2024 WL 2978506, at *4–6 (S.D.N.Y. June 11, 2024) (citing *Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 563, 565 (S.D.N.Y. 2017)).

2018) (holding that plaintiffs would have standing if they pled a future desire to buy defendant's product). These decisions reflect the well-established principle articulated by the Ninth Circuit in *Davidson v. Kimberly-Clark Corp.*, which many courts in this Circuit continue to follow, that a previously deceived consumer faces a cognizable future injury when she "would like to" buy the product but "will be unable to rely on the product's advertising or labeling in the future." 889 F.3d 956, 961 (9th Cir. 2018).

Diageo's reliance on *Berni v. Barilla S.p.A.*, 964 F.3d 141 (2d Cir. 2020) is misplaced. Mem. at 20. As a threshold matter, the *Berni* court was analyzing **class certification** under Rule 23(b)(2), not a pleadings challenge. *Berni*, 964 F.3d at 146–49. Additionally, *Berni* held that past purchasers of boxed pasta lacked standing only because, having seen the allegedly misleading box fill levels, they "will not again be under the illusion" about the amount of pasta inside. *Id.* at 148. In other words, the injury in *Berni* evaporated because the deception was ***fully self-revealing and permanently knowable*** through visual inspection.

Here, unlike in *Berni*, a tequila consumer **cannot** determine—by looking at the bottle, reading the label, or inspecting the product—whether the tequila is adulterated with non-agave ethanol. As such, if Diageo continues to sell adulterated tequila as "100% Agave," consumers will confront the exact same risk of future deception that courts have found sufficient to support injunctive relief. *See Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 543 (E.D.N.Y. 2017) (Weinstein, J.) ("Consumers are still at risk of purchasing a mislabeled product. Injunctive relief is appropriate."). Nothing in *Berni* precludes injunctive relief where, as here, the deception is ongoing, undiscoverable at the point of sale, and incapable of being dispelled through mere consumer knowledge.

In any event, this Court does not need to address Diageo's objections to injunctive (or declaratory) relief at the pleading stage. "[I]njunctive relief is a remedy, and not a cause of action." *Samele v. Zucker*, 324 F. Supp. 3d 313, 332–33 (E.D.N.Y. 2018). Thus, it is premature to address appropriate remedies at the motion to dismiss stage, which is focused on the viability of Plaintiffs' claims. *Id.*

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED CLAIMS UNDER STATE CONSUMER PROTECTION LAWS AND FOR UNJUST ENRICHMENT

### A. Plaintiffs' Amended Complaint Satisfies Rule 8's Plausibility Standard and Alleges Diageo's Tequila Is Falsely Labeled and Marketed.

Diageo claims the Amended Complaint contains "no facts" supporting the allegation that its "100% agave" labels are "false or misleading" and that it "fail[s] to provide even the most basic information" about Plaintiffs' testing. Mem. at 21–22. This straw man argument fails.

As alleged above, counsel's investigation, conducted with the AFA, a nonprofit dedicated to tequila industry transparency, uncovered significant tequila adulteration in Diageo's tequilas that "deceives consumers, undermines legitimate producers, harms agave farmers, and distorts the market for authentic tequila." AC ¶ 39. That adulteration was confirmed by AFA laboratory testing and independent testing of the tequila Plaintiffs purchased. *Id.* ¶¶ 36–38, 40, 46–47. The test results "directly contradict the prominent '100% Agave' labels on Diageo's tequila and confirm that its representations are materially false and misleading." *Id.* ¶ 48. They also corroborate public accounts from Mexican agave farmers that, "when agave prices were high, large tequila companies began mixing cane alcohol into tequila they sold as 100% agave."[19] *Id.* ¶¶ 31–35.

---

[19] Diageo speculates that it would be "impossible" for it to "sneak millions of liters of non-agave alcohol" into its 100% agave tequila manufacturing facilities "undetected." Mem. at 26 n.11 (citing *AJ Energy LLC v. Woori Bank*, 829 F. App'x 533 (2d Cir. 2020)). Plaintiffs agree. In fact, the Amended Complaint alleges that agave farmers routinely ***observed*** trucks delivering

These detailed allegations more than satisfy Rule 8 and "nudge" Plaintiffs' statutory and unjust enrichment claims "across the line from conceivable to plausible." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 95 (2d Cir. 2023) (claims based on objective, testable misrepresentations cannot be dismissed at the pleadings stage).

Diageo's reliance on *Myers*, *Santiful*, and *Turnipseed*, three virtually identical vanilla-flavor cases filed by the same firm, is misplaced. Mem. at 23. In those cases there was "no claim anywhere on the packaging that . . . vanilla [was] the predominant source of the vanilla flavor." *Myers v. Wakefern Food Corp.*, 2022 WL 603000, at *4 (S.D.N.Y. Mar. 1, 2022). In fact, the products did not even say "made with vanilla; or anything similar." *Turnipseed v. Simply Orange Juice Co.*, 2022 WL 657413, at *4 (S.D.N.Y. Mar. 4, 2022); *Santiful v. Wegmans Food Markets, Inc.*, 2022 WL 268955, at *4 (S.D.N.Y. Jan. 28, 2022) (noting that the "[p]roduct's front label makes no claims about the ingredients constituting the flavor"). Rather, the plaintiffs relied only on the word "vanilla" which they claimed misled consumers into believing that the vanilla flavor came mostly or exclusively from vanilla bean. *Myers*, 2022 WL 603000, at *3–4; *Santiful*, 2022 WL 268955, at *2; *Turnipseed*, 2022 WL 657413, at *4. Their complaints also failed to describe their testing methodology or explain how any testing showed the presence of artificial flavors. *See Myers*, 2022 WL 603000, at *4; *Santiful*, 2022 WL 268955, at *4; *Turnipseed*, 2022 WL

---

cane alcohol to distilleries purportedly producing "100% agave" tequila, and that "[t]hese practices continue today." AC ¶¶ 33, 35. These allegations—which are confirmed by multiple news reports and Plaintiffs' testing, *id.* ¶¶ 33, 36, 40, 46–50—bear no resemblance to the allegations that the *AJ Energy LLC* court found to be "frivolous and fanciful on their face in numerous ways." *See, e.g.*, *AJ Energy LLC*, 829 F. App'x at 534 (dismissing as frivolous allegations of multi-billion-euro transfers allegedly "stolen" twice, supported only by inconsistent and facially suspect exhibits).

657413, at \*4. Citing these and other "devastating" defects,[20] all three courts held that the plaintiffs' "conclusory" allegations failed to state a plausible claim. *See Myers*, 2022 WL 603000, at \*4; *Santiful*, 2022 WL 268955, at \*5; *Turnipseed*, 2022 WL 657413, at \*4.

Unlike the vanilla-flavor cases, the Amended Complaint here describes the scientific method used to detect adulteration, identifies the isotopic ranges that distinguish agave-derived ethanol from common adulterants, and pleads sample-specific results that directly contradicts Diageo's "100% agave" claim. AC ¶¶ 40–50. And unlike the vanilla-flavoring compounds at issue in *Myers*, *Santiful*, and *Turnipseed*, which can be natural or artificial depending on how they are derived, cane- and corn-derived ethanol are never permitted in a tequila labeled "100% agave." The regulatory line is binary: either the spirit contains only agave-derived ethanol or it does not. This case turns on objective, testable criteria, not on consumers' flavor inferences or ambiguous ingredient categories.

That is what makes *MacNaughton* analogous. There, the Second Circuit held that statements describing products as "therapeutic-grade" and claiming specific functional effects were actionable because they were "provable," had been questioned by independent bodies, and were not so "patently hyperbolic" as to warrant dismissal. *MacNaughton*, 67 F.4th at 95–98. The court stressed that when a label's accuracy turns on "objective" and "provable" criteria, the claim "should not be the basis for dismissal at the pleadings stage." *Id.* at 93–94. The same is true here. The falsity of Diageo's "100% agave" claim is provable, and Plaintiffs allege detailed facts showing falsity. *MacNaughton* confirms that dismissal is improper.

---

[20] As the *Santiful* court acknowledged, the "most devastating" defect in plaintiffs' claim was that "the alleged 'artificial flavors' themselves are not in fact 'artificial.'" *Santiful*, 2022 WL 268955, at \*4.

## B. Diageo's Attacks on Plaintiffs' Testing Raise Factual Disputes and Cannot Support Dismissal.

Rule 12(b)(6) requires the Court to "accept all factual allegations as true and draw every reasonable inference from those facts in the [Plaintiffs'] favor." *MacNaughton*, 67 F.4th at 95. Turning this rule on its head, Diageo asks the Court to draw three inferences ***against*** Plaintiffs: (i) that carbon isotope ratio analysis, SNIF-NMR, is not a "reliable tool for detecting tequila adulteration," Mem. at 27; (ii) that there is a "mismatch" between the SNIF-NMR studies and Plaintiffs' testing, *id.* at 24; and (iii) Plaintiffs' testing cannot be extrapolated "into a sweeping indictment of every Casamigos and Don Julio tequila." *Id.* at 28–29. These arguments fail.

### 1. Plaintiffs allege a "scientifically validated, peer-reviewed" method for detecting tequila adulteration.

As the Amended Complaint alleges, multiple, peer-reviewed studies confirm that SNIF-NMR reliably determines "whether ethanol in a tequila sample truly comes from agave." AC ¶¶ 41–45. One Eurofins study concluded that, "[w]hen applied to tequila products, [SNIF-NMR] demonstrates a unique ability to ***unambiguously differentiate authentic 100% agave tequila*** . . . from products made from a larger portion of cane or maize sugar and therefore not complying with the legal definition of tequila." *See* 2010 Eurofins Study at 11580 (emphasis added).[21] Plaintiffs allege that they used this "scientifically validated, peer-reviewed" methodology to test Diageo's products and that "[a]ll five [tests] showed that the alcohol in these products came from non-agave sources such as corn or sugarcane." AC ¶¶ 46–49. Those results "directly contradict

---

[21] Both the 2010 Eurofins Study and the 2021 Eurofins Study are incorporated into the Amended Complaint, and, therefore, may be considered in ruling on Diageo's motion. AC ¶¶ 43–44. In ruling on a 12(b)(6) motion, the Court "may consider the complaint . . . or any statements or documents incorporated in it by reference." *Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 44 n.1 (2d Cir. 2014).

the prominent '100% Agave' labels on Diageo's tequila and confirm that its representations are materially false and misleading." *Id.* ¶ 48.

Under Second Circuit precedent and this Court's prior case law, those allegations are more than enough at the pleading stage. *See John*, 858 F.3d at 737 (holding that, where a complaint is based on an investigative body's testing, plaintiff need not detail or validate the testing methods, as long as he "alleges facts that, accepted as true, make his alleged injury plausible"); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 461 (E.D.N.Y. 2013) (holding that plaintiff's scientific evidence, which involved the disputed product, was "sufficient to state a plausible claim of affirmative misrepresentation").

Despite this clear precedent, Diageo contends that Plaintiffs' methodology is not "accepted or validated" because it "has never been adopted by the tequila industry" or "endorsed by any regulator (including the CRT)." Mem. at 27. That argument asks the Court to infer that only CRT "approved testing methods" can reliably authenticate 100% agave tequila. *Id.* (citing Sainz Decl. ¶ 37). That inference is not permitted at the Rule 12(b)(6) stage, *John*, 858 F.3d at 737, and it is not supported by Diageo's overreaching Rule 44.1 declaration, *see supra* Background Facts § I. Moreover, the Eurofins 2021 Study cited in the Amended Complaint ***directly challenges the reliability of CRT's testing***—and therefore calls Diageo's inference into question—stating:

> Currently, only a few conventional parameters have been tentatively defined in the literature and Mexican norms (levels of glucose, sucrose, hydroxymethylfurfural) for agave syrup authentication, ***the values of which can be easily adjusted to comply with requirements even with high addition of exogenous sugar***. Therefore, ***further control is required***, for instance, using screening methods that can detect addition of starch-derived and sucrose inverted sugar syrups using isotopic techniques.

2021 Eurofins Study at 1316 (emphasis added). The study makes clear that CRT's testing regime cannot serve as the baseline for judging plausibility, much less for dismissing Plaintiffs' well-pled allegations.

Diageo's reliance on *Jiaherb v. MTC Industries*, 2025 WL 2555514 (D.N.J. Sept. 5, 2025), fares no better. *Jiaherb* followed a ***4-day bench trial*** and an extensive analysis of competing expert reports and testimony. *See, e.g.*, *id.* at *1, *8–14. If anything, that posture confirms that questions about the reliability of testing belong in expert discovery and at trial, not at the pleading stage. *Jiaherb* also involved ***proton*** NMR, a different technique from SNIF-NMR.[22] *Id.* at *11–12. And the claim there was defined by a specific testing method, so the label's truth depended on gas chromatography results. *Id.* at *17. Diageo's "100% agave" representation is not tied to any specific analytical method. It can be proven false by SNIF-NMR. *Jiaherb* addressed a different claim, a different testing method, and a trial record. It has no bearing on the plausibility of Plaintiffs' allegations here.

## 2. Diageo's critique of the SNIF-NMR studies goes to its weight, not plausibility, and therefore does not warrant dismissal.

Diageo accuses Plaintiffs of "cherry-pick[ing] a handful of data points" and claims that the Eurofins studies do not set "any numeric threshold for what constitutes 'authentic' tequila." Mem. at 24–26. That argument, which asks the Court to "mak[e] scientific assessments," *id.* at 27, fails for two reasons.

First, the Eurofins studies do provide quantitative benchmarks. As alleged and as the studies show, ethanol from $C_4$ sources such as corn and sugarcane consistently exhibits

---

[22] Unlike SNIF-NMR, which looks at isotopic ratios at specific positions within a molecule to authenticate its origin, proton NMR focuses on the hydrogen atoms in a molecule, providing detailed structural information. *Jiaherb*, 2025 WL 2555514, at *11.

$\delta^{13}C(CH_2)$ values below $-10.0‰$, while authentic 100% agave ethanol falls between $-7.0‰$ and $-9.0‰$. *See* AC ¶¶ 43–44; Eurofins 2010 Study at 11584; Eurofins 2021 Study at 1320. Plaintiffs' test results range from $-10.5‰$ to $-13.4‰$. AC ¶¶ 46–47. Those figures fall squarely within the adulteration range described in the studies. Accepting Plaintiffs' allegations as true and drawing reasonable inferences in their favor, Diageo cannot credibly claim that these "testing allegations are 'facially insubstantial or implausible.'" Mem. at 27.

Second, disagreements over how to read these studies are factual disputes that cannot be resolved on a Rule 12(b)(6) motion. As noted above, in *John*, the Second Circuit held that a plaintiff "need not prove the accuracy of [an investigative body's] findings or the rigor of its methodology" at the pleading stage. 858 F.3d at 738. Similarly, in *Quinn v. Walgreen Co.*, the court held that "[w]hether or not the studies support plaintiff's proposition . . . is an issue of fact the Court cannot resolve on a motion to dismiss." 958 F. Supp. 2d 533, 543–44 (S.D.N.Y. 2013) (holding that complaint plausibly stated a claim under New York consumer protection law where it cited to scientific studies tending to show that claims on product labeling were scientifically impossible). And in *Noriega v. Abbott Laboratories*, the defendant (like Diageo here) asked the court to accept its preferred reading of peer-reviewed studies and treat plaintiff's "methodological critiques" as legally insufficient. 714 F. Supp. 3d 453, 459–60 (S.D.N.Y. 2024). The *Noriega* court declined, explaining that, "[a]t the motion-to-dismiss phase, it is not the Court's province to look beneath a facially colorable methodological critique where doing so would require resolving factual disputes and/or making scientific assessments." *Id.* at 460; *see also Barton v. Pret A Manger (USA) Ltd.*, 535 F. Supp. 3d 225, 242 (S.D.N.Y. 2021) ("Defendant points to no case law that supports its extraordinary argument that the Court should not accept as true the pleaded facts unless they are supported by scientific studies. The complaint expressly

states that Defendant's products contain GMOs—the Court cannot discredit Plaintiff's allegations in the context of a motion to dismiss. Defendant is inviting the Court to err.").

Here, Diageo asks the Court to decide whether SNIF-NMR is "validated," whether the published carbon isotopic ranges are correct, and whether a particular isotopic signature proves adulteration. Mem. at 24–26. Those are "scientific assessments" for expert discovery, not a motion to dismiss. *Noriega*, 714 F. Supp. 3d at 459–60. Because Diageo's objections go to the weight of Plaintiffs' testing, not its plausibility, they cannot support dismissal at the pleading stage. *See Hughes*, 930 F. Supp. 2d at 461–62 ("Issues concerning the weight that should be given to [a] study cannot be resolved on a motion to dismiss.").

Diageo's citations to *Bermudez* and *Kardovich* do not change this result. In *Bermudez v. Colgate-Palmolive Co.*, the complaint relied on an article that identified three necessary variables, yet failed to allege any of them. 667 F. Supp. 3d 24, 37 (S.D.N.Y. 2023). Here, Plaintiffs do the opposite. They identify the isotopic markers described in the Eurofins studies, plead the $\delta^{13}C(CH_2)$ values for each sample, and apply those thresholds directly to Diageo's products. AC ¶¶ 40–49. *Bermudez* involved missing variables. Plaintiffs plead the key variables with specificity.

The same is true of *Kardovich*, which involved scientific studies that addressed different medical conditions and different products than the multivitamin claims at issue. The court found a "stark disconnect" between the cited science and the challenged representation. *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 137–40 (E.D.N.Y. 2015). Here, the Eurofins studies address the exact chemical property at issue—the botanical origin of ethanol in tequila—and supply the very $\delta^{13}C(CH_2)$ thresholds Plaintiffs apply to Diageo's products. AC ¶¶ 43–44, 47. There is no

disconnect, mismatch, or extrapolation from unrelated subject matter. The studies speak directly to the falsity of Diageo's "100% agave" claim.

Finally, Diageo's attack on Plaintiffs' estimated percentages of agave-derived ethanol does not undermine plausibility.[23] Mem. at 26. Plaintiffs' core claim is that a tequila labeled "100% agave" must contain only agave-derived ethanol. The percentage of adulteration is not the issue. Plaintiffs plausibly allege that their $\delta^{13}C(CH_2)$ results fall within the adulteration ranges identified in the Eurofins literature. AC ¶ 47. Whether those results support any particular numerical estimate is a scientific dispute reserved for experts, not a basis for dismissal. *Quinn*, 958 F. Supp. 2d at 543–44 (scientific disputes "cannot [be] resolve[d] on a motion to dismiss").

### 3. Diageo's extrapolation argument fails because Plaintiffs challenge a uniform misrepresentation, not a batch-specific defect.

Diageo recasts its failed *Esquibel* standing argument as an "extrapolation" objection. Mem. at 28–29. That effort fails. *Esquibel* recognizes that a plaintiff may plausibly infer misbranding where a "third-party investigation has revealed defects in the same line of such products" or where there is evidence of "a broad systemic fraud in a market in which plaintiffs regularly transact." *Esquibel*, 2025 WL 1785865, at *3. Plaintiffs allege both.

First, Plaintiffs allege third-party SNIF-NMR testing that detected significant adulteration across Diageo's tequila brands, "implicat[ing] all of Diageo's tequilas because they show that its entire line relies on the same adulterated base spirit."[24] AC ¶¶ 40–50. Second, Plaintiffs allege

---

[23] Far from "mathematical magic," Mem. at 26, Plaintiffs' estimated agave-derived ethanol calculations—which will be fully detailed during expert discovery—are based on the test sample's measured $\delta^{13}C(CH_2)$ value, the expected $\delta^{13}C(CH_2)$ value for 100% agave tequila, and the expected value for $C_4$ plant-derived ethanol.

[24] Diageo's claim that Plaintiffs must have additional, undisclosed test results is pure conjecture. Mem. at 29 n.12. Rule 12(b)(6) does not permit courts to draw negative inferences from facts not pled, or to assume the existence of contradictory testing that Diageo imagines

that tequila adulteration is an industry-wide problem, supported by independent investigations, agave-farmer protests, and evidence that CRT oversight has been compromised. *Id.* ¶ 31–35. *Esquibel* also confirms that disputes about test accuracy or interpretation are not grounds for dismissal, holding that "test methodology and interpretation issues need not be resolved" on a Rule 12(b)(6) motion. *Esquibel*, 2025 WL 1785865, at *5 (citing *John*, 858 F.3d at 737).

Diageo's remaining cases—*Cascio*, *Krystofiak*, and *Barton*—involved contamination theories that turned on batch- or formulation-specific variability. In *Cascio*, the court found that "[t]here was significant variability from batch to batch, even within a single brand," and the plaintiff "d[id] not provide any information about any of the batches that [she] used." *Cascio v. Johnson & Johnson*, 2024 WL 693489, at *3 (N.D. Ga. Feb. 20, 2024). In *Krystofiak*, the plaintiff tested only a few flavors with different formulations and labels and offered no basis to project those results to untested varieties. *Krystofiak v. BellRing Brands, Inc.*, 737 F. Supp. 3d 782, 793–94 (N.D. Cal. 2024). In *Barton*, the plaintiffs never tested any of the products they purchased and relied on "unidentified independent testing" of other product types. *Barton v. Procter & Gamble Co.*, 766 F. Supp. 3d 1045, 1061–62 (S.D. Cal. 2025).

### C. Plaintiffs' Allegations Satisfy Rule 9(b).

Diageo concedes that Plaintiffs' GBL claims are ***not*** subject to Rule 9(b). Mem. at 29. The remaining claims meet Rule 9(b) in any event. Plaintiffs identify the specific statements they challenge: Diageo's "Tequila 100% Agave Azul" and "100% de Agave" labels that appear on every bottle of Casamigos and Don Julio. AC ¶ 3. Plaintiffs allege that they relied on these uniform labeling claims when they purchased Casamigos and/or Don Julio tequila. *Id.* at ¶¶ 11–

---

Plaintiffs should have performed. That is precisely the kind of adversarial inference the Second Circuit forbids at the pleading stage. *John*, 858 F.3d at 737.

27, 52–53. They further allege that the statements are provably false based on Plaintiffs' own testing and independent testing conducted by the AFA. *Id.* at ¶¶ 36–38, 40, 46–50. These detailed allegations "state with particularity the circumstances constituting [Diageo's] fraud." *See MacNaughton*, 67 F.4th at 99–100. Nothing more is required at this stage. *Id.*

Diageo's cited cases do not suggest otherwise. Only two post-*MacNaughton* cases from this Circuit appear in its list, and neither helps it.[25] *See* Mem. at 29–30. In *Weinstein v. Rexall Sundown, Inc.*, the court found Rule 9(b) unsatisfied because the complaint relied on impermissible group pleading. 2024 WL 4250353, at *5–6 (E.D.N.Y. Aug. 26, 2024). That issue is not present here. In *Binder v. Michael Kors (USA), Inc.*, the court held that Rule 9(b) **was satisfied** even though the plaintiff's "investigation did not include the prices of the specific

---

[25] The *Rombach*, *Ouaknine*, *U.S. ex rel. Polansky*, *Schwartzco*, and *Welch* cases Diageo cites—all of which predate the Second Circuit's holding in *MacNaughton*—are all readily distinguishable. *See Rombach v. Chang*, 355 F.3d 164, 170–76 (2d Cir. 2004) (Rule 9(b) not satisfied in securities fraud case where plaintiffs failed to allege facts showing that "forward-looking" statements about "future performance" were false or misleading in light of subsequent statements that abated earlier optimism); *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir. 1990) (Rule 9(b) not satisfied where "amended complaint alleges no misrepresentations whatsoever by MacFarlane Development"); *U.S. ex rel. Polansky v. Pfizer, Inc.*, 2009 WL 1456582, at *5–6 (E.D.N.Y. May 22, 2009) (Rule 9(b) not satisfied in False Claims Act case where "Polansky's lawyer could not articulate in what way the claims that were filed by patients or pharmacists on behalf of patients for reimbursement were false"); *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 355 (E.D.N.Y. 2014) (Rule 9(b) not satisfied as to breach of duty of care claim where no allegations that duty was owed); *Welch v. TD Ameritrade Holding Corp.*, 2009 WL 2356131, at *6 (S.D.N.Y. July 27, 2009) (Rule 9(b) not satisfied where the allegations in the complaint were group-pled, make no reference to misstatements or omissions by certain defendants, and the claims were "based largely on the faulty premises that Defendants were obligated to provide him with unsolicited investment advice and to disclose the specific amount of profits earned from TD Ameritrade's Cash Sweep Program"). And *Tyman* actually supports plaintiffs. *Tyman v. Pfizer, Inc.*, 2017 WL 6988936, at *6 (S.D.N.Y. Dec. 27, 2017) ("Rule 9(b) does not require plaintiffs to calculate their damages 'with particularity,' and consequently does not require the dismissal of any of plaintiffs' claims."). The out-of-circuit cases Diageo relegates to a footnote, *see* Mem. at 29 n.13, are inapposite because "[i]n determining whether Plaintiffs have satisfied the Rule 9(b) pleading standard, Second Circuit law governs." *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 66 (E.D.N.Y. 2017).

merchandise that Plaintiff purchased, only included a few exemplar items, and observed the price of products on only two days during the three- or six-month time period of Plaintiffs' investigation." 2024 WL 3227943, at *10–11 (S.D.N.Y. June 28, 2024). If anything, *Binder* confirms that Plaintiffs' allegations here, which include uniform product labeling, detailed testing of the products Plaintiffs purchased, and corroborating third-party testing, more than meet Rule 9(b).

With no viable Rule 9(b) challenge available, Diageo falls back on the same Rule 8 arguments addressed above. Mem. at 30. For the reasons already explained, those arguments fail. *See supra* Argument § II(A).

### D. Diageo's Safe Harbor Defense Fails.

Diageo argues that its "100% Agave" labeling is "expressly authorized by law" and shielded by state safe harbor provisions.[26] Mem. at 30–33. That argument fails for three reasons. First, a COLA does not have the force of law and cannot create a safe harbor. Second, even if a COLA had that effect, the TTB never investigated or approved the "100% Agave" claim. Third, Diageo's theory turns on factual disputes that cannot be resolved at the pleading stage.

### 1. COLAs do not have the force of law and therefore cannot create safe harbor.

Safe harbor statutes protect only conduct that a regulator has specifically authorized through an agency action with the "force of law." *See Shalikar v. Asahi Beer U.S.A., Inc.*, 2017 WL 9362139, at *5 (C.D. Cal. Oct. 16, 2017). Whether an agency action carries such force is

---

[26] The NJCFA does not have a specific safe harbor provision. Rather, New Jersey recognizes a "limited judicial safe harbor" that exempts conduct only if a "direct and unavoidable conflict exists between application of the CFA and application of the other regulatory scheme." *Patane v. Nestle Waters N. Am., Inc.*, 761 F. Supp. 3d 424, 464 (D. Conn. 2024) (citations and internal quotations omitted).

governed by *United States v. Mead. Id.* (citing *United States v. Mead*, 533 U.S. 218, 232–34 (2001)). In *Mead*, the Supreme Court held that agency action has a legally binding effect only when it is issued through a "relatively formal administrative procedure" that reflects the "fairness and deliberation" Congress associates with rulemaking. *Mead*, 533 U.S. at 230.

COLAs do not satisfy that standard. As *Singleton v. Fifth Generation, Inc.* explains, COLAs are "**simply marked approved** by the TTB" based on the applicant's certification, not any TTB determination of truth or accuracy. 2016 WL 406295, at *8 (N.D.N.Y. Jan. 12, 2016) (emphasis added); *see also Kay v. Copper Cane, LLC*, 549 F. Supp. 3d 1014, 1022 (N.D. Cal. 2021) (the "TTB process" for issuing COLAs "'hinges on self reporting' and reflects only the representations made by the distributor, not an endorsement of those claims"). "Similarly to the agency in *Mead*, the TTB does not engage in notice-and-comment rulemaking before processing COLAs." *Kay*, 549 F. Supp. 3d at 1022. And "the 'sheer number of rulings' that the TTB issues" indicates that the "COLA examination approval process [is] not a 'formal, deliberative process.'" *Shalikar*, 2017 WL 9362139, at *6. For these reasons, "courts which have closely analyzed *Mead* have concluded COLAs are too 'informal' to be considered regulations having the force of law." *Kay*, 549 F. Supp. 3d at 1022; *Shalikar*, 2017 WL 9362139, at *5–7 (holding that "the COLA examination and approval process [is] not a 'formal, deliberative process akin to notice and comment rulemaking or an adjudicative enforcement action'" and therefore does not carry "force of law" under *Mead*); *Hofmann v. Fifth Generation, Inc.*, 2015 WL 7430801, at *6–7 (S.D. Cal. Nov. 20, 2015) (applying *Mead* and holding that "Fifth Generation has not established that TTB's COLA's issued from a formal process sufficient to trigger" safe harbor protection).

Diageo's reliance on *O'Hara*, *Pye*, *Cruz*, *Jackson*, and *Aliano v. Fifth Generation* is misplaced because those decisions rest on the flawed premise that the TTB's delegated authority

is enough to give COLAs the force of law.[27] Mem. at 32–33. Courts applying *Mead* have rejected

that view. *Mead* makes clear that congressional delegation alone does not turn routine agency

actions into binding law. *Kay*, 549 F. Supp. 3d at 1022–23; *see also Hofmann*, 2015 WL

7430801, at *6 (noting that "*Mead* illustrates that the Secretary of Treasury's delegation of

authority to TTB is not dispositive of whether TTB's COLAs have the force of federal law");

*Shalikar*, 2017 WL 9362139, at *5–7 (same).

Courts must ask whether the agency action at issue comes from a "relatively formal

administrative procedure" that reflects the "fairness and deliberation" associated with creating

law. COLAs do not meet that standard. The decisions Diageo cites give this question only

cursory treatment and never engage with *Mead*'s requirements. COLAs are issued through a

process that does not involve notice-and-comment rulemaking, does not bind third parties, and

occurs thousands of times per year. *Mead* makes clear that this type of rapid, informal decision-

making cannot carry the force of law. *Shalikar*, 2017 WL 9362139, at *6.

> **2.** **Safe harbor requires agency approval of the specific claim—which Diageo lacks.**

Even if COLAs carried legal force, Diageo would still have to show that the TTB

specifically approved the claim at issue: "100% agave." Courts applying safe harbor in the TTB

context have adopted the same rule: safe harbor applies only when the agency has (1) established

---

[27] *See, e.g.*, *O'Hara v. Diageo-Guinness, USA*, 306 F. Supp. 3d 441, 464–65 (D. Mass. 2018) ("The TTB regulations, promulgated pursuant to the FAAA, explicitly gives the TTB the authority to determine that a label is not deceptive."); *Pye v. Fifth Gen.*, 2015 WL 5634600, at *3–4 (N.D. Fla. Sept. 23, 2015) ("The Secretary of the Treasury is charged with promulgating regulations . . . the 'TTB,' enforces the regulations."); *Jackson v. Anheuser-Busch InBev SA/NV, LLC*, 2021 WL 3666312, at *14 (S.D. Fla. Aug. 18, 2021) (relying on *Pye*); *Cruz v. Anheuser-Busch, LLC*, 2015 WL 3561536, at *5 (C.D. Cal. June 3, 2015) ("[The Secretary's] delegation renders TTB's regulations with the exclusive effect of federal law"); *Aliano v. Fifth Generation, Inc.*, 2015 WL 5675423, at *4 (N.D. Ill. Sept. 24, 2015) (relying on *Cruz*'s reference to *Chevron* in determining the TTB authorized label as a "regulatory body").

criteria for the challenged term and (2) affirmatively investigated and approved the representation under those criteria. *See Singleton*, 2016 WL 406295, at *7–8; *WhistlePig*, 2015 WL 2399354, at *8. Diageo cannot meet either requirement.

First, while federal regulations define "agave spirits" as containing at least 51% agave sugars and classify tequila accordingly, 27 C.F.R. § 5.148, no U.S. regulation defines "100% agave."[28] Without a regulatory definition, the TTB has no criteria for evaluating or approving that claim.[29] *See WhistlePig*, 2015 WL 2399354, at *8 (no safe harbor where the agency has not "established criteria for evaluating the use of [the challenged] term"). Second, Diageo concedes the TTB did not investigate the "100% agave" claim at all, stating that the United States simply "defers to and adopts" the CRT's determination when issuing COLAs. Mem. at 32. That concession is fatal to its safe harbor theory. *Singleton* rejected safe harbor even where the record made it merely "unclear" whether the TTB had investigated the "handmade" claim. *Singleton*, 2016 WL 406295, at *8. Here, there is no such ambiguity. Safe harbor cannot apply where the TTB never reviewed, never tested, and never approved the challenged claim. *See Singleton*, 2016 WL 406295, at *8; *see also WhistlePig*, 2015 WL 2399354, at *8–9.

---

[28] This fact further distinguishes the *Cruz* case relied on by Diageo. Mem. at 33. In *Cruz*, unlike here, the TTB approved the label in question based on a specific TTB ruling regarding caloric and carbohydrate representations, which set the conditions for using the words "light" or "lite" on labels for malt beverages. *Cruz*, 2015 WL 3561536, at *5–6.

[29] The CFR's whisky provisions provide an illustrative contrast. For example, the CFR defines Malt Whisky as "[f]ermented mash of not less than 51% . . . malted barley," 27 C.F.R. § 5.143(c)(2), but "American single malt whisky" contains "*100 percent* malted barley." 27 CFR § 5.143(c)(15) (emphasis added). No similar distinction exists in the agave spirits provisions— "100 percent agave" is absent.

### 3. Diageo's safe harbor theory raises factual disputes that cannot be resolved at the pleading stage.

Safe harbor defenses often turn on contested facts about what a regulator reviewed, approved, or permitted. *See Banks v. Consumer Home Mortg., Inc.*, 2003 WL 21251584, at *13 (E.D.N.Y. Mar. 28, 2003) (safe harbor defense based on disputed regulatory compliance "will have to await the completion of discovery"); *Frey v. Bekins Van Lines, Inc.*, 748 F. Supp. 2d 176, 182 (E.D.N.Y. 2010) (same).

The same is true here. Whether Diageo complied with the NOM, whether the CRT correctly certified its production, whether the TTB relied on CRT certifications, and whether Diageo's products contain non-agave ethanol are all factual questions. Plaintiffs allege that Diageo adulterated its tequila with non-agave ethanol, and that CRT enforcement has been compromised. *Id.* ¶¶ 31–50. These disputes cannot be resolved at the pleading stage, especially where Diageo relies heavily on the Sainz Declaration, which attempts to establish contested facts under the guise of explaining foreign law. *Supra* Background Facts § I. At this stage, the Court must accept Plaintiffs' allegations as true and may not resolve disputed questions in Diageo's favor.

### E. Plaintiffs' Unjust Enrichment Claims Are Legally Viable and Factually Supported.

Diageo's unjust enrichment arguments fail for multiple reasons. Mem. at 34–35. *First*, Plaintiffs plausibly allege that Diageo was unjustly enriched by selling tequila falsely labeled as "100% Agave," enabling it to command a premium price at consumers' expense. AC ¶¶ 8, 11–29, 183–187. Those allegations are sufficient to state a claim for unjust enrichment. *See MacNaughton*, 67 F.4th at 100 (vacating dismissal of unjust enrichment claim); *Eidelman*, 2022 WL 1929250, at *2 (reversing "the district court's grant of summary judgment in favor of

Defendants as to [plaintiff]'s unjust enrichment claim"); *Hughes*, 930 F. Supp. 2d at 471

("[P]laintiffs clearly allege that defendants were unjustly enriched.").

 *Second*, Diageo incorrectly asserts that "Texas does not recognize standalone unjust

enrichment claims in this context." Mem. at 34. As a Texas district court recently noted, "[s]ince

the court last decided this issue, the Fifth Circuit has recognized unjust enrichment as an

independent claim [under Texas law]." *Prime Hydration LLC v. Garcia*, 2025 WL 963361, at

*11 (N.D. Tex. Mar. 31, 2025) (citing *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*,

965 F.3d 365, 380 n.11 (5th Cir. 2020)). Notably, this *Garcia* holding came after the lone Texas

case cited in Diageo's motion. *See, e.g.*, Mem. at 34.

 *Third*, Plaintiffs' unjust enrichment claims are viable even if they may "duplicate"

statutory claims. Mem. at 34. Indeed, courts regularly refuse to dismiss unjust enrichment claims

that are pleaded in the alternative, and Fed. R. Civ. P. 8(d)(3) expressly permits a party to state

"as many separate claims or defenses as it has, regardless of consistency." *See, e.g.*, *Scholder v.

Sioux Honey Ass'n Coop.*, 2022 WL 125742, at *6 (E.D.N.Y. Jan. 13, 2022) ("[A]lthough the

unjust enrichment claim may ultimately be deemed duplicative of plaintiff's other theories of

recovery, at this stage of the proceedings, plaintiff's allegations are sufficient."); *Winans v.

Ornua Foods N. Am. Inc.*, 731 F. Supp. 3d 422, 432 (E.D.N.Y. 2024) (declining to dismiss unjust

enrichment claims because "it is conceivable that [plaintiffs] might lose on [their state statutory]

claims but prevail on [their] unjust enrichment claim"); *E. Coast Advanced Plastic Surgery, LLC

v. Cigna Health & Life Ins. Co.*, 2025 WL 2371537, at *13–14 (S.D.N.Y. Aug. 14, 2025)

(allowing the "unjust enrichment claim to proceed in the alternative" even though "the

allegations on which the unjust enrichment claim is based are the same ones underlying the

[other] claims.").

*Fourth*, Diageo's argument that "Plaintiffs fail to allege the absence of an adequate legal remedy, a prerequisite for equitable relief in Florida," misses the mark. Mem. at 35. As more recent precedent indicates, Plaintiffs can allege "a claim for unjust enrichment even though their FDUTPA claim may provide an adequate legal remedy." *Zarfati v. Artsana USA, Inc.*, 2025 WL 373081, at *15 (S.D. Fla. Jan. 15, 2025).

*Finally*, Diageo's argument that Plaintiffs Sushi Tokyo Miami and David Felton lack standing to pursue unjust enrichment claims under Florida law because they purchased Diageo's tequila through retailers, rather than directly from Diageo, misstates the law. Mem. at 35. Florida courts have held that the absence of a direct transaction does not defeat unjust enrichment claims at the pleading stage. *See Zarfati*, 2025 WL 373081, at *15 (rejecting a similar argument with regard to the purchase of defective strollers and holding that whether a defendant received payments or other benefits from third-party retailers was a factual question that cannot be resolved by a motion to dismiss). Indeed, as Florida courts recognize, "a direct benefit does not necessarily mean a direct contact." *State Farm Mut. Auto. Ins. Co. v. Spine Centers of Am., Inc.*, 2025 WL 885216, at *8 (M.D. Fla. Mar. 21, 2025). Here, Plaintiffs allege that Diageo captured a price premium for its mislabeled tequila—precisely the type of economic benefit Florida courts allow to proceed beyond the pleadings. Diageo's indirect-benefit argument, therefore, provides no basis to dismiss Plaintiffs' claims.

### F.    Diageo's False Tequila Marketing and Labels Justify Tolling.

Plaintiffs' Amended Complaint provides detailed allegations about Diageo's falsely labeled tequila that prevented Plaintiffs and other consumers from learning about its widespread adulteration. AC ¶¶ 68–77. These allegations are sufficient to toll any applicable statutes of limitations. *State of New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988) (holding that fraudulent concealment tolling is available when "the defendant took affirmative

steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing").

Diageo cites *Kyszenia v. Ricoh USA, Inc.*, 583 F. Supp. 3d 350, 362 (E.D.N.Y. 2022), for the proposition that "conclusory allegation[s] of fraudulent concealment" are not enough. Mem. at 35. But the claims in *Kyszenia* were "premised on the defendant's alleged omissions" that its cameras were prone to defects. *Id.* at 359. The situation before this Court is very different. Diageo did not just *omit* material facts, it *made* false statements about its tequila products that fraudulently concealed its conduct. These allegations are sufficient to allege fraud. *See MacNaughton*, 67 F.4th at 99 (discussing fraudulently labeled therapeutic-grade oils products).

In any event, because Diageo does not assert any applicable statute of limitations defenses, there is no need to consider whether tolling is even applicable. *See Levy*, 2024 WL 897495, at *8.

## CONCLUSION

For the foregoing reasons, Diageo's motion should be denied in its entirety. In the alternative, Plaintiffs respectfully request leave to amend if the motion is granted.

DATED this 1st day of December, 2025     Respectfully submitted,

By: */s/ Nathaniel A. Tarnor*
   Nathaniel A. Tarnor (NT2797)
HAGENS BERMAN SOBOL SHAPIRO LLP
594 Dean Street, Suite 8
Brooklyn, NY 11238
Telephone: (646) 543-4992
nathant@hbsslaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
Steve W. Berman (admitted pro hac vice)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com

BARON & BUDD, P.C.
Roland Tellis (admitted pro hac vice)
David Fernandes (admitted pro hac vice)
Isaac Miller (admitted pro hac vice)
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 214.279.9915
rtellis@baronbudd.com
dfernandes@baronbudd.com
imiller@baronbudd.com

THE BERKMAN LAW OFFICE, LLC
Robert J. Tolchin
829 E. 15th Street
Brooklyn, NY 11230
Telephone: (917) 405-0426
rtolchin@berkmanlaw.com

*Attorneys for Plaintiffs and the Proposed Classes*

## CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1(c)

I hereby certify that the foregoing was prepared with a computer and comprises 11,203 words, excluding the caption, table of contents, table of authorities, signature blocks, and certificates.

/s/ Nathaniel A. Tarnor
Nathaniel A. Tarnor

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 1, 2025.

*/s/ Nathaniel A. Tarnor*
Nathaniel A. Tarnor
