# EXHIBIT B

2026 WL 880573
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

REGINA PELLEGRINO, JEANA
ANASTASI, and ZACHARIE HAPPEL,
on behalf of themselves, all others similarly
situated, and the general public, Plaintiffs,
v.
THE PROCTER & GAMBLE CO., Defendant.

No. 23-CV-10631 (KMK)
|
Filed 03/31/2026

**Attorneys and Law Firms**

Appearances:

Melanie Rae Monroe, Esq., Trevor Flynn, Esq., John Joseph Fitzgerald IV, Esq., Fitzgerald Monroe Flynn PC, San Diego, CA, Counsel for Plaintiffs

Charles E. Schaffer, Esq., Levin Sedran & Berman, Philadelphia, PA, Counsel for Plaintiffs

Joseph Lipari, Esq., Sultzer & Lipari, PLLC, Poughkeepsie, NY, Counsel for Plaintiffs

Philip John Furia, Esq., Furia Law, New York, NY, Counsel for Plaintiffs

Cortlin H. Lannin, Esq., Covington & Burling LLP, San Francisco, CA, Counsel for Defendant

Megan L. Rodgers, Esq., Covington & Burling LLP, Palo Alto, CA, Counsel for Defendant

Melanie Rae Monroe, Trevor Flynn, John Joseph Fitzgerald IV, Fitzgerald Monroe Flynn PC, San Diego, CA, Charles E. Schaffer, Levin Sedran & Berman, Philadelphia, PA, Joseph Lipari, Sultzer & Lipari, PLLC, Poughkeepsie, NY, Philip John Furia, Furia Law, New York, NY, for Plaintiff Regina Pellegrino.

Joseph Lipari, Sultzer & Lipari, PLLC, Poughkeepsie, NY, Trevor Flynn, John Joseph Fitzgerald IV, Fitzgerald Monroe Flynn PC, San Diego, CA, for Plaintiffs Jeana Anastasi, Zacharie Happel.

Cortlin H. Lannin, Covington & Burling LLP, San Francisco, CA, Megan L. Rodgers, Covington & Burling LLP, Palo Alto, CA, for Defendant.

ORDER & OPINION

KENNETH M. KARAS United States District Judge

**\*1** Plaintiffs Regina Pellegrino ("Pellegrino"), Jeana Anastasi ("Anastasi"), and Zacharie Happel ("Happel") (collectively, "Plaintiffs"), bring this Class Action against Proctor & Gamble ("Defendant"), asserting claims for unfair and deceptive business practices and false advertising under New York General Business Law §§ 349 and 350, New York Agriculture and Markets Law § 199-a and negligence per se. (*See* First Am. Compl. ("FAC") ¶¶ 105–32 (Dkt. No. 37).) Before the Court is Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint (the "Motion"). (Def.'s Notice of Mot. & Mot. to Dismiss Pls.' First Am. Compl. ("Notice of Mot.") (Dkt. 46).) For the reasons set forth below, Defendant's Motion is granted in part and denied in part.

## I. Background

### A. Factual Background
The following facts are drawn from Plaintiffs' First Amended Complaint and are assumed to be true for the purpose of resolving the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

#### 1. The Parties
Defendant is an Ohio corporation with its principal place of business in Cincinnati, Ohio. (FAC ¶ 9.) Defendant develops and sells Metamucil, a psyllium fiber supplement. (*Id.* ¶ 1.) Defendant's Metamucil products come in various forms, including "Sugar Free with Stevia, Sugar Free – Berry Flavored, Sugar Free – Orange Flavored, Sugar Free – Unflavored, Real Sugar – Orange Flavor, Real Sugar – Unflavored, No Added Sweeteners – Unflavored, and Fiber + Collagen" (collectively, the "Products"). [1] (*Id.*)

Pellegrino lives in Thornwood, New York, (*id.* ¶ 6), and purchased "Metamucil Made With Real Sugar Orange flavor"

from a CVS in Thornwood, New York from "in or around early 2020" to "approximately mid[ ] to late[ ]2022[,]" (*id.* ¶ 78.)

Anastasi lives in Amherst, New York, (*id.* ¶ 7), and "has purchased Metamucil Sugar Free and Metamucil Fiber Collagen within the past four years," (*id.* ¶ 81.) She usually made her purchases from a Rite Aid in Tonawanda, New York. (*Id.*)

Happel lives in Dutchess County, New York, (*id.* ¶ 8), and "purchased Metamucil Sugar Free in retail outlets in New York ..., including at [a] Shop Rite in Poughkeepsie, New York[,]" (*id.* ¶ 84.)

### 2. Defendant's Statements and Representations Regarding the Products

According to Plaintiffs, "[t]he labels on the Products suggest ... that [they] are generally healthy and safe for consumption and provide specific health benefits ...." [2] (*Id.* ¶ 11.) The Products' labels and packaging also contain "one or more" statements indicating that "the Products have been inspected and sealed to ensure each is safe for human consumption" and free from tampering. [3] (*Id.* ¶ 18.)

**\*2** The Products' labeling also directs consumers to Defendant's website and the Products' website for additional information. (*Id.* ¶ 23.) According to Plaintiffs, Defendant's website has a dedicated "Product Safety" section, which discusses the "rigorous safety process" Defendant uses "to analyze every ingredient" used in its products and claims to "go beyond regulatory compliance to ensure every ingredient's safety through a four-step, science-based process" used by various regulatory agencies, including "US FDA, [the] EPA, the EU, the WHO, and others." (*Id.* ¶¶ 24–25 (citation and quotation marks omitted).) Additionally, Defendant's website contains a section on "Ingredients" that "reassures consumers it 'define[s] the safe range of every ingredient' by 'apply[ing] the same science-based approach as regulatory agencies around the world.' " (*Id.* ¶ 26 (citation omitted).) Defendant's website specifically states that it does not use "[h]eavy metals" such as "[a]rsenic, [l]ead, [and] [c]hromium" as ingredients in its products. (*Id.* ¶ 27 (citation and quotation marks omitted).)

The Products' packaging instructs consumers, defined as "adults 12 years and older," to take "1 to 2 packets, rounded teaspoons, or rounded tablespoons (depending on variety),

up to 3 times per day ...." (*Id.* ¶ 32.) Defendant encourages daily use of its Products through additional statements on their packaging and website, (*see id.* ¶¶ 29–35), including promotion of the "Metamucil Two-Week Challenge, which [Defendant] says is designed to 'make Metamucil a part of [consumers'] daily health routine[s,]' " (*id.* ¶ 36 (citation omitted) (alterations adopted)).

According to Plaintiffs, Defendant's representations about the health and safety of the Products are misleading and false because "[t]he Products contain dangerous amounts of the heavy metal lead[,]" which is "introduced into the Products through "[Defendant's] uniform and deficient formulations, manufacturing processes and systems, quality control systems and procedures, and sourcing of ingredients." (*Id.* ¶¶ 46– 47.) Plaintiffs' assertions are supported by the results of "[i]ndependent laboratory testing completed in July 2023 by an ISO-accredited laboratory[,]" which "demonstrate[ ] that each of the Products contain[s] lead[,]" [4] testing "conducted on the [Metamucil Sugar Free] [P]roduct purchased by Plaintiff Happel[,]" and "further independent testing" "on the Metamucil Made with Real Sugar and Metamucil Fiber + Collagen Peptide Products" performed by "Enalytic, LLC[.]" (*Id.* ¶¶ 48–50.) Plaintiffs go on to claim that Defendant "has known that the Products contain lead since at least March 2021[,] when Consumer Lab published a report concerning the lead content of various psyllium fiber supplements, showing up to 14.6 μg of lead per serving in Metamucil Sugar Free Orange Flavored." (*Id.* ¶ 53.)

### 3. Plaintiffs' Reliance on Defendant's Representations

Plaintiffs claim to have "acted reasonably in purchasing the Products, whose labels did not disclose the presence, or risk of presence, of unsafe levels of lead, and ... conveyed to reasonable consumers that the Products are healthy and safe for consumption." (*Id.* ¶ 88.) They also claim that "[t]he Products cost more than similar products without misleading labeling and would have cost less absent [Defendant]'s false and misleading statements and omissions." (*Id.* ¶ 89.) Plaintiffs emphasize that they "paid more for the Products and would only have been willing to pay less, or unwilling to purchase them at all, absent [Defendant]'s affirmative health and safety statements, as well as its omissions regarding the [Products'] lead content." (*Id.* ¶ 90; *see also id.* ¶ 91 ("Plaintiffs would not have purchased the Products had they known they contained unsafe levels of lead ...."); *id.* ¶ 92 ("Plaintiffs would not have purchased the Products if they had

known they were misbranded pursuant to New York and FDA regulations, or that they contained unsafe levels of lead.").)

**\*3** Specifically, Plaintiffs allege that Pellegrino "read and relied on claims that suggested [Metamucil Made With Real Sugar] was healthy and safe for consumption and would provide the advertised health benefits when taken as directed, including [Defendant]'s representations that Metamucil Made With Real Sugar would promote digestive health, is doctor recommended, should be taken multiple times a day, and has been sealed for safety." (*Id.* ¶ 79.) They also state that "[w]hen purchasing Metamucil Made With Real Sugar, ... Pellegrino was looking for a healthy, safe option that provided the advertised health benefits, and believed that was what she was receiving" and "would have avoided any product she knew contained unsafe levels of toxic heavy metals, like lead." (*Id.* ¶ 80.)

Plaintiffs make similar allegations regarding Anastasi's decision to purchase the Products. They specifically allege that "Anastasi read and relied on claims that suggested [Metamucil Sugar Free and Metamucil Fiber + Collagen] were healthy and safe for consumption and would provide the advertised health benefits when taken as directed, including [Defendant]'s representations that [the Products] were doctor recommended, should be taken multiple times a day, and had been sealed for safety." (*Id.* ¶ 82.) They go on to state that "[w]hen purchasing Metamucil Sugar Free and Metamucil Fiber [+] Collagen, ... Anastasi was looking for a healthy, safe option[ ] that provided the advertised health benefits, and believed that is what she was receiving" and "would have avoided any product that she knew contained unsafe levels of toxic heavy levels, like lead." (*Id.* ¶ 83.)

Lastly, Plaintiffs allege that "[i]n purchasing Metamucil Sugar Free, ... Happel read and relied on claims that suggested it was healthy and safe for consumption and would provide the advertised health benefits when taken as directed, including [Defendant]'s representations that [Metamucil Sugar Free] is doctor recommended, should be taken multiple times a day, and has been sealed for safety." (*Id.* ¶ 85.)

#### 4. Plaintiffs' Injuries

While Plaintiffs do not allege any physical harm from use of the Products, they claim that had they known about "the presence, or risk of ... unsafe levels of toxic heavy metals in [the] Products[,]" they and "other Class Members ... would be unwilling to purchase the Products, or to pay as much for the Products as they paid." (*Id.* ¶ 71.) According to Plaintiffs, "[o]mitting material information regarding the Products' lead content while its competitors ... appropriately warned consumers of the lead content of competing psyllium fiber supplements[ ] allowed [Defendant] to charge more for the Products than it otherwise could have[ ] and further allowed [Defendant] to obtain a greater share of the market than it otherwise would have absent its omissions." (*Id.* ¶ 56.) In short, Plaintiffs allege an economic theory of injury. (*See id.* ¶ 90 ("Plaintiffs paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent [Defendant]'s affirmative health and safety statements, as well as its omissions regarding the lead content."); *id.* ¶ 91 ("Plaintiffs would not have purchased the Products had they known they contained unsafe levels of lead ...."); *id.* ¶ 92 ("Plaintiffs would not have purchased the Products had they known they were misbranded pursuant to New York and FDA regulations, or that they contained unsafe levels of lead"); *id.* ¶¶ 93–94 ("Through the misleading labeling claims and omissions, [Defendant] was able to gain a greater share of the fiber supplement market than it would have otherwise and to increase the size of the market. For these reasons, the Products were worth less than what Plaintiffs and other Class Members paid for them."); *id.* ¶ 95 ("Plaintiffs and other Class Members lost money as a result of [Defendant]'s misrepresentations, omissions, and unfair business practices in that they did not receive what they paid for when purchasing [the] Products.").)

**\*4** Based on the allegations above, Plaintiffs assert, on behalf of themselves and a putative class, the following causes of action: (1) "Unfair and Deceptive Business Practices, N.Y. Gen. Bus. L. § 349" ("GBL § 349"); (2) "False Advertising, N.Y. Gen. Bus. L. § 350 ("GBL § 350"); (3) "Violation of the New York State Agriculture & Markets Law, N.Y. Agric. & Mkts. Law §[ ] 199-a" ("AGM § 199-a"); and (4) "Negligence Per Se." (*Id.* at 36–38.)

#### B. Procedural Background

##### 1. The California Action

In September 2022, California consumer Tara Amado ("Amado") filed a class action in the Northern District of California against Defendant for misleadingly marketing Metamucil Made With Real Sugar. *See Amado v. Procter & Gamble Co.,* No. 22-CV-5427, 2023 WL 3898984, at \*1 (N.D. Cal. June 8, 2023) ("*Amado I*"). Amado asserted causes of action under various California business laws,

alleging that "varieties of Metamucil that contain added sugar, namely, Metamucil Unflavored and Orange Flavored Fiber Powders" are misleadingly marketed as healthy when, in fact, "compelling scientific evidence demonstrates that the Metamucil Powders—due to their added sugar content— actually decrease appetite control, harm blood sugar levels, and damage digestive health." *Id.* at \*1–2.

In November 2022, after Defendant moved to dismiss, Amado amended her complaint, adding Pellegrino as a named plaintiff and asserting causes of action under ⚑GBL §§ 349 and ⚑350. (*See* Dkt. No. 21 ("*Amado I* Compl.") (22-CV-5427 Dkt.).)[5] Amado and Pellegrino then filed a second amended complaint, (*see* Dkt. No. 24 (22-CV-5427 Dkt.)), which Defendant moved to dismiss, (*see* Dkt. No. 25 (22-CV-5427 Dkt.)). Judge Maxine Chesney of the Northern District of California granted Defendant's motion on June 8, 2023, concluding, among other reasons, that the plaintiffs' false advertising claims were preempted by federal law under Ninth Circuit precedent. *Amado I* at \*5–7 (citation omitted). On June 19, 2023, the *Amado I* plaintiffs voluntarily dismissed the action without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (Dkt. No. 39 (22-CV-5427 Dkt.).)

2. The New York and California Actions

On December 6, 2023, Pellegrino and Amado filed separate lawsuits against Defendant; Pellegrino filed the instant Action in this Court, (*see* Compl.), while Amado filed again in the Northern District of California, (*see* Dkt. No. 1 ("*Amado II* Compl.") (23-CV-6308 Dkt.)).[6] Although their complaints were brought under California and New York state law respectively, Amado and Pellegrino asserted nearly identical allegations about Defendant making false representations regarding the levels of lead in Metamucil products. (*Compare* Compl. ¶¶ 9–28, 41–69, *with Amado II* Compl. ¶¶ 11–69.) The original Complaint in this Action also asserted sugar-related claims similar to those in *Amado I*. (*Compare* Compl. ¶¶ 92–160 *with Amado I* Compl. ¶¶ 10–112.)

On March 7, 2025, Defendant filed a Motion to Dismiss the *Amado II* complaint. (Dkt. No. 39 (23-CV-6308 Dkt.)), which Judge Chesney granted on April 18, 2025, (Dkt. No. 45 (23-CV-6308 Dkt.)).

On March 29, 2024, Defendant filed a Motion to transfer this Action to the Northern District of California or to stay the Action pending the outcome of its Motion to Dismiss in *Amado II*. (Mot. to Transfer or Stay Case (Dkt. No. 20).) Pellegrino filed her Opposition on April 29, 2024, (*see* Pl.'s Mem. of Law in Opp'n (Dkt. No. 24); Decl. of Jack Fitzgerald in Opp'n (Dkt. No. 25)), and Defendant filed its reply on May 13, 2024, (*see* Def.'s Reply Mem. in Supp. of Mot. to Transfer or Stay (Dkt. No. 26)). On November 13, 2024, the Court held oral argument, (*see* Dkt. (minute entry for Nov. 13, 2024)), and on January 17, 2025, it denied Defendant's Motion to Transfer or Stay, *see Pellegrino v. Procter & Gamble Co.*, No. 23-CV-10631, 2025 WL 240762, at \*8–9 (S.D.N.Y. Jan. 17, 2025).

**\*5** On February 21, 2025, Pellegrino filed the First Amended Complaint in the instant Action, which added Anastasi and Happel as named Plaintiffs. (*See* FAC.) On March 6, 2025, Defendant filed a pre-motion letter requesting leave to file a Motion to Dismiss Plaintiffs' First Amended Complaint. (Letter from Cortlin H. Lannin, Esq. to Court (Mar. 6, 2025) (Dkt. No. 38).) On March 13, 2025, Plaintiffs filed a letter in response, (Letter from Philip Furia, Esq. to Court (Mar. 13, 2025) (Dkt. No. 41)), and the Court scheduled a pre-motion conference for April 23, 2025, (*see* Order (Dkt. No. 42)).

In a letter dated April 21, 2025, Defendant informed this Court of Judge Chesney's decision to dismiss the *Amado II* complaint. (*See* Letter from Cortlin H. Lannin, Esq. to Court (Apr. 21, 2025) (Dkt. No. 43).) During the April 23, 2025 pre-motion conference, the Court set a briefing schedule for Defendant's Motion to Dismiss in this Action. (*See* Dkt. (minute entry for Apr. 23, 2025); Mot. Scheduling Order (Dkt. No. 45).)

Defendant filed the instant Motion on May 30, 2025. (*See* Notice of Mot.; Def.'s Mem. of Law ("Def.'s Mem.") (Dkt. No. 46-1); Aff. of Megan L. Rogers ("Rogers Aff.") (Dkt. No. 46-2).) Plaintiffs filed their Opposition on June 30, 2025. (*See* Pls.' Mem. of Law in Opp'n ("Pls.' Mem.") (Dkt. No. 47).) On July 14, 2025, Defendant filed its Reply. (*See* Def.'s Mem. of Law in Supp. ("Def.'s Reply") (Dkt. No. 48).)

Additionally, on May 14, 2025, Amado filed an amended complaint in the *Amado II* action, (*see* Dkt. No. 51 (23-CV-6308 Dkt.)), which Defendant moved to dismiss on June 11, 2025, (Dkt. No. 54 (23-CV-6308 Dkt.)). On August 22, 2025, Judge Chesney granted Defendant's motion to dismiss Amado's first amended complaint in that case. (*See* Dkt. No. 61 (23-CV-6308 Dkt.).)

On October 3, 2025, Defendant informed the Court of supplemental authority in support of the instant Motion, (*see* Letter from Cortlin H. Lannin, Esq. to Court (Oct. 3, 2025) (Dkt. No. 49)), to which Plaintiffs responded on October 7, 2025, (*see* Letter from Jason P. Sultzer, Esq. to Court (Oct. 7, 2025) (Dkt. No. 50)). On January 14, 2026, Defendant informed the Court of additional supplemental authority in support of the instant Motion, (*see* Letter from Cortlin H. Lannin, Esq. to Court (Jan. 14, 2026) (Dkt. No. 51)), to which Plaintiffs responded on February 11, 2026, (*see* Letter from Jason P. Sultzer, Esq. to Court (Feb. 11, 2026) (Dkt. No. 52)). That same day, Plaintiffs filed a Notice of Supplemental Authority in support of their Opposition to the instant Motion, (*see* Pls.' Notice of Supp. Auth. (Dkt. No. 53)), to which Defendant responded on February 25, 2026, (*see* Letter from Cortlin H. Lannin, Esq. to Court (Feb. 25, 2026) (Dkt No. 54)). On February 27, 2026, Defendant informed the Court of additional supplemental authority in support of the instant Motion, (*see* Letter from Cortlin H. Lannin, Esq. to Court (Feb. 27, 2026) (Dkt No. 55)), to which Plaintiffs filed a response on March 5, 2026, (*see* Letter from Jason P. Sultzer, Esq. to Court (Mar. 5, 2026) (Dkt. No. 56)). On March 19, 2026, Plaintiffs filed another Notice of Supplemental Authority in support of their Opposition to the instant Motion, (*see* Pls.' Notice of Supp. Auth. (Dkt. No. 57)), to which Defendant replied on March 30, 2026, (*see* Letter from Cortlin H. Lannin, Esq. to Court (Mar. 30, 2026) (Dkt. No. 58)).

## II. Discussion

### A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.' " *Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)).

### 1. Rule 12(b)(1)

**\*6** "A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F.

Supp. 3d 233, 241 (E.D.N.Y. 2014) (citation and quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (quotation marks omitted)).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden" and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (alterations adopted) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor. *Id.* at 57. However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings, a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial. *See Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017). If the extrinsic evidence presented by the defendant is material and controverted, the Court must "make findings of fact in aid of its decision as to standing." *Carter*, 822 F.3d at 57.

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks

omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

**\*7** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B. Analysis

#### 1. Standing

"[N]ot all standing is created equal, and, historically, courts in the Second Circuit have distinguished between Article III, statutory, and class standing." *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489, 2016 WL 4367991, at \*5 (S.D.N.Y. Aug. 12, 2016); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 481 (S.D.N.Y. 2014) ("[C]ourts in this district have recognized that the Second Circuit considers the questions of Article III, statutory, and class standing as distinct."). However, "Article III standing must be decided before the merits," *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87 (2d Cir. 2006), while "class standing is often considered at the class certification stage of the litigation," *Kacocha*, 2016 WL 4367991, at \*5 (internal quotation marks omitted). Accordingly, the Court will begin by addressing Plaintiffs' Article III standing before considering any remaining arguments.

"Federal courts are courts of limited jurisdiction," *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (internal quotation marks omitted), and "their powers [are] circumscribed at their most basic level by the terms of Article III of the Constitution, which states that they may hear only 'Cases' or 'Controversies,' " *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001) (quoting U.S. Const. art. III, § 2, cl. 1). "[A]t [the] uncontroverted core [of the 'case or controversy' requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Id.* To establish that Plaintiffs' claims meet the minimum constitutional threshold, Plaintiffs must establish three things: "first, that [they] ha[ve] sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or imminent'; second, that the injury was in some sense caused by the opponent's action or omission; and finally, that a favorable resolution of the case is 'likely' to redress the injury." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"That a suit may be a class action ... adds nothing to the question of standing," because "even named plaintiffs who

represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.' " *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)); *see also Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (same). Accordingly, "the relevant legal entity for determining whether Article III standing is proper is the named plaintiff(s), not the proposed class." *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 553 (S.D.N.Y. 2016).

**\*8** Defendant argues Plaintiffs lack standing because Plaintiffs have not "allege[d] sufficient facts to make it plausible that the Products that they alleged purchased actually contain dangerous amounts of lead." (Def.'s Mem. 7 (quotation marks omitted).) Specifically, Defendant challenges Plaintiffs' reliance on independent test results, claiming Plaintiffs have failed "to plead a 'meaningful link' between their purchases and the alleged testing[,]" as required to show the Products they purchased plausibly contained lead. (*Id.* at 11). Defendant also argues that even if Plaintiffs plausibly alleged the Products contain lead, they have failed to show that that they contain a dangerous amount of lead. (*See id.* at 12.)

### a. Plaintiffs' Reliance on Independent Testing

As noted, Plaintiffs assert a price premium theory of injury, claiming they "paid more for the Products, and would have only been willing to pay less, or unwilling to purchase them at all, absent [Defendant]'s affirmative health and safety statements, as well as its omissions regarding the lead content" of the Products. (FAC ¶ 90; *see also id.* ¶ 71 ("Given the toxic effects of lead ... [and the] unsafe levels of lead in the Products[,] ... Plaintiffs and other Class Members ... would be unwilling to purchase the Products, or to pay as much for the Products as they paid [for them]."); *id.* ¶ 89 ("The Products cost more than similar products without misleading labeling and would have cost less absent [Defendant]'s false and misleading statements and omissions."); Pls.' Opp'n 3–4 (acknowledging Plaintiffs are asserting price-premium inury).)

"To validly assert an injury under a price-premium theory, a plaintiff must 'allege[ ] facts demonstrating it is at least plausible that a plaintiff purchased a misbranded product.' " *Hicks v. L'Oreal*, No. 22-CV-1989, 2024 WL 4252498, at \*9 (S.D.N.Y. Sept. 19, 2024) (quoting *Hernandez v. Wonderful Co. LLC*, No. 23-CV-1242, 2023 WL 9022844, at \*5 (S.D.N.Y. Dec. 29, 2023)). "Where, as here, the misbranding allegations are that a product contained [a contaminant] but was not labeled to reveal that presence, a plaintiff must plausibly allege that the purchased product was in fact 'misbranded, *i.e.*, that [it] contained [the contaminant]' to support a price-premium theory of injury." *Hicks*, 2024 WL 4252498, at \*9 (quoting *Onaka v. Shiseido Ams. Corp.*, No. 21-CV-10665, 2024 WL 1177976, at \*2 (S.D.N.Y. Mar. 19, 2024)); *see also Lurenz v. Coca-Cola Co.*, No. 22-CV-10941, 2024 WL 2943834, at \*3 (S.D.N.Y. June 10, 2024) ("To assert a price-premium theory of injury, [p]laintiff must plausibly allege that he purchased a [p]roduct that was misbranded, *i.e.*, that contained PFAS."); *Kell v. Lily's Sweets, LLC*, No. 23-CV-147, 2024 WL 1116651, at \*3 (S.D.N.Y. Mar. 13, 2024) ("[Plaintiff] must ... plausibly allege that she ... purchased chocolate that contained lead. Her theory of standing is that lead-contaminated chocolate is worth less than chocolate free from any amount of lead; unless she has a basis to allege that her chocolate contained lead, she has no basis to allege that she overpaid for her chocolate.").

Plaintiffs can make such a showing through testing the products they personally purchased, but "[c]aselaw in this Circuit recognizes ... that it may not always be possible to test the actual product purchased by a plaintiff." *Hicks*, 2024 WL 4252498, at \*9. *John v. Whole Foods Mktg. Grp.*, 858 F.3d 732 (2d Cir. 2017), is the seminal case on independent test results in the Second Circuit. In that case, the plaintiff claimed to have been overcharged for his monthly purchases of pre-packaged cupcakes and cheese from the defendant's grocery stores based on the results of a third-party investigation, which found the defendant's pre-packaged foods were mislabeled 89% of the time. *Id. at 736*. In holding that the plaintiff had plausibly alleged an injury-in-fact based on the results of the independent investigation, the Second Circuit noted that the samples in the independent investigation included the particular type of products that the plaintiff bought from the two store locations where he bought the products during the same time period in which the plaintiff made his purchases. *Id. at 737–38*.

**\*9** District courts applying the reasoning in *John* now require plaintiffs to "meaningfully link the results of their independent testing to the product actually purchased" when relying on independent test results to plead an injury-in-fact. *Hicks*, 2024 WL 4252498, at \*9; *see also Dunning v. Supergoop, LLC*, No. 23-CV-11242, 2025 WL 34822, at \*5 (S.D.N.Y. Jan. 6, 2025) ("Plaintiffs may establish standing by meaningfully linking [the independent testing results] to their actual [p]urchased [p]roducts, such as by showing that the mislabeling was systematic and routine." (citation and quotation marks omitted)). When a plaintiff shows a sufficient connection between the products personally purchased and the samples used in the independent testing, the court may "infer that the plaintiff purchased a specific product with a defect that had been plausibly reported by third-party tests to be widespread, systematic, routine, or uniform." *Dunning*, 2025 WL 34822, at \*5 (discussing *John*, 858 F.3d at 736–37)); *Saedi v. Coterie Baby, Inc.*, No. 24-CV-3893, 2024 WL 4388401, at \*4 (S.D.N.Y. Oct. 3, 2024) ("A plaintiff's injury will be all the more plausible where the plaintiff's allegations link the results of any independent testing to the products that the plaintiff purchased ....").

"Courts look to a variety of factors to determine whether a meaningful link exists between the results of [independent] testing and a plaintiff's actual purchases to permit such a plausible inference[,]" including temporal proximity, the number of samples tested, and the origin of the samples. *Dunning*, 2025 WL 34822, at \*5 (collecting cases). "Temporal proximity" is "[p]erhaps [the] most significant" factor, as "any testing must have occurred reasonably near in time to plaintiffs' purchases." *Hicks*, 2024 WL 4252498, at \*10 (internal citation and quotation marks omitted) (collecting cases); *see also Kell*, 2024 WL 1116651, at \*4 (rejecting testing where "the [c]omplaint lack[ed] any factual allegations about whether [the products purchased] and the samples tested ... were purchased in similar circumstances (for instance, whether [plaintiff] purchased them at a similar time and place).").

"The pleading also should disclose the number of samples tested, and the testing should involve more than a small number." *Hicks*, 2024 WL 4252498, at \*10 (collecting cases); *see also Brown v. Coty, Inc.*, No. 22-CV-2696, 2024 WL 894965, at \*4 (S.D.N.Y. Mar. 1, 2024) (noting that the "[p]laintiffs do not allege how many lots or tubes of [the products] were tested," nor how "pervasive" the mislabeling was found to be); *Lurenz*, 2024 WL 2943834, at \*4

("Unlike the plaintiff in *John*, [p]laintiff alleges that he tested only one sample."); *Kell*, 2024 WL 1116651, at \*4 (rejecting testing that was based on "just two or three samples"); *Esquibel v. Colgate-Palmolive Co.*, No. 23-CV-742, 2023 WL 7412169, at \*2 (S.D.N.Y. Nov. 9, 2023) (admonishing plaintiffs for failing to "plead facts indicating how many units of the Product were tested").

Courts have also "considered the geographic proximity of the testing to the plaintiff's purchases." *Hicks*, 2024 WL 4252498, at \*10 (collecting cases); *see also Kell*, 2024 WL 1116651, at \*4 (rejecting testing where the complaint "lack[ed] any factual allegations about whether" the products in question were purchased at a "similar ... place" as those in the study on which the plaintiff sought to rely); *Esquibel*, 2023 WL 7412169, at \*2 (noting plaintiffs did not "even plead facts indicating ... where [the tested] units were acquired, where the test took place, or what entity performed the test").

Lastly, courts have looked to whether plaintiffs provide information about the entity performing the test, such as entity's name and testing methodology. *See Brown*, 2024 WL 894965, at \*4 n.4 ("Unlike the stud[y] in *John*[,] ... the [c]ommissioned [t]est is not a wholly independent third-party investigation with public methodology; [p]laintiffs commissioned the [t]est but have disclosed few details about how conducted it and how it was conducted." (internal citation omitted)); *Esquibel*, 2023 WL 7412169, at \*2 (listing information not provided by plaintiffs, including "what entity performed the test"); *Santiful v. Wegmans Food Mkts., Inc.*, No. 20-CV-2933, 2023 WL 2457801, at \*4 (S.D.N.Y. Mar. 4, 2022) (dismissing plaintiffs' independent testing-based claims because plaintiffs "fail[ed] to include information as to the testing methodology, the date, time, or place of the testing, who conducted the testing, and what the exact product tested was is insufficient to support [p]laintiffs otherwise conclusory statements as to the ingredients of the [p]roduct." (internal citation and quotation marks omitted)).

**\*10** Taken together, this information helps courts determine "whether the presence of mislabeling in a product 'is so widespread as to render it plausible that any [p]laintiff purchased a mislabeled [p]roduct at least once.' " *Dunning*, 2025 WL 34822, at \*5 (quoting *Hicks*, 2024 WL 4252498, at \*10).

Here, Plaintiffs' allegations rest on two sets of independent test results: an unnamed laboratory's testing of all of the

Products in July 2023 (the "July 2023 test results"), (FAC ¶ 48), and Enalytic, LLC ("Enalytic")'s testing of Metamucil Made With Real Sugar and Metamucil Fiber + Collagen Products, (*id.* ¶ 50). Plaintiffs also rely on results from Enalytic's testing of the Metamucil Sugar Free Product purchased by Happel in support of their claims. (*Id.* ¶ 49.) As explained below, with the exception of the Metamucil Sugar Free Product purchased by Happel, Plaintiffs have failed to sufficiently link the independent test results to the Products they purchased to permit the Court to infer that Plaintiffs purchased mislabeled Products.

### i. July 2023 Test Results

Plaintiffs allege that "[i]ndependent laboratory testing completed in July 2023 by an ISO-accredited laboratory demonstrates that each of the Products contain lead[,]" (*id.* ¶ 48), and provide a chart detailing the lead content found in each Product, (*see id.* at 23–24).

In terms of temporal proximity, July 2023 is approximately one year after Pellegrino last purchased her Products. (*See id.* ¶ 78 ("Pellegrino ... [made] her last purchase in approximately mid- to late-2022.").) Plaintiffs do not detail the specific timing of Happel or Anastasi's purchases, saying only that Anastasi "purchased Metamucil Sugar Free and Metamucil Fiber Collagen within the past four years[,]" (*id.* ¶ 81), and Happel "purchased Metamucil Sugar Free ... during the relevant class period," (*id.* ¶ 84). Plaintiffs define the "Class Period" as "three years preceding the filing of the original Complaint." (*Id.* ¶ 10.) Since Plaintiffs filed the original Complaint in December 2023, the Court interprets Plaintiffs' assertions to mean Happel purchased his products between December 2020 and December 2023 and Anastasi purchased her Products between May 2021 and May 2025, which is four years prior to the filing of the First Amended Complaint. (*See* Dkt.) Additionally, Plaintiffs do not indicate when the tested samples were obtained by the independent laboratory. (*See* FAC ¶ 48.) While the imprecise nature of Plaintiffs' pleadings as to the timing of the named Plaintiffs' Product purchases makes it difficult to determine if they occurred reasonably near in time to when the tested samples were obtained by the independent lab, viewing the facts in the light most favorable to Plaintiffs, the July 2023 test results have sufficient temporal proximity to Plaintiffs' own purchases to allege an injury-in-fact. *See* ⚑*Clinger v. Edgewell Pers. Care Brands, LLC, No. 21-CV-1040, 2023 WL 2477499, at \*2–4 (D. Conn. Mar. 13, 2023)* (finding independent test results from 2021

had sufficient temporal proximity to the plaintiffs' purchases, which occurred in 2018, 2019, 2020, and 2021); *but see Onaka, 2024 WL 1177976, at \*3* (finding one named plaintiff failed to establish temporal proximity between her purchase and the independent testing because she did not identify "the critical piece of information—when exactly [she] purchased each particular [product] ... [that was] tested").

 **\*11**  However, the July 2023 test results do not fare as well in the other relevant categories. Although Plaintiffs detail when the testing occurred, they do not explain where the tested samples were obtained. (*See generally* FAC). Additionally, Plaintiffs do not include the number of samples tested or nor information regarding how pervasive the lead contamination was found to be. (*Id.*) Without this information, Plaintiffs have failed to allege a sufficient link between the July 2023 test results and their own purchases such that the Court could infer that Plaintiffs purchased lead-tainted Products. *See* ⚑*Hernandez, 2023 WL 9022844, at \*4–6* (declining to find a sufficient link between independent third-party testing and the plaintiff's purchased product when the plaintiff "offer[ed] no information about the independent third-party testing on the [p]roduct" such as "how many bottles of the product she purchased or from where, nor how many were tested and in what manner."); *Onaka, 2024 WL 1177976, at \*3–4* (concluding the plaintiffs failed to sufficiently link the independent third-party test results to the products they actually purchased when "the FAC fail[ed] to establish that [the] [p]laintiffs tested the [p]roducts near in time to [their] purchases" and "made no allegations regarding the frequency of their purchases.").

### ii. Enalytic's Testing of Metamucil Made With Real Sugar and Metamucil Fiber + Collagen

Plaintiffs also allege that "further independent testing conducted by Enalytic ... on the Metamucil Made with Real Sugar and Metamucil Fiber + Collagen Peptides Products also revealed the presence of lead." (FAC ¶ 50.) While Plaintiffs specify the name and location of the testing facility, (*see id.* ¶ 49 ("Testing was conducted by ISO [a]ccredited laborator[ ] Enalytic, LLC, in Syracuse, New York"), they do not specify when the testing took place, when or where the samples were obtained, the number of samples tested, or the testing methodology used, (*see generally* FAC). Without this pertinent information, the Court cannot infer from these test results that Plaintiffs purchased Products containing lead, which would afford them standing to bring this Action.

*See Dunning*, 2025 WL 34822, at *5–6 (dismissing the plaintiffs' claims for lack of standing when the amended complaint "contain[ed] no allegations of the purchase dates of the samples that were tested[,]" "d[id] not disclose the number of samples tested[,]" "what [the] [p]laintiffs' testing in fact entailed[,]" and "d[id] not allege where the [t]ested [p]roducts were purchased or any other indication that they were purchased in geographic proximity to where [the] [p]laintiffs made their purchases.").

### iii. Enalytic's Testing of Happel's Metamucil Sugar Free

Lastly, Plaintiffs rely on Enalytic's testing of the Metamucil Sugar Free Product purchased by Happel to support their claims. (*See* FAC ¶ 49 ("Happel purchased the Metamucil Sugar Free Product. Testing was conducted by ISO [a]ccreddited laboratory[ ] Enalytic, LLC, in Syracuse, New York. This testing showed that ... Happel's purchased Product contained 2.6 µg of lead per serving."). This testing differs from the other two sets of test results because Enalytic tested the actual Product purchased by Happel. "Where, as here, a plaintiff relies on testing to support allegations of misbranding, '[t]he most direct route' to establishing injury-in-fact [is] to include the actual product the plaintiff purchased in that testing[,]" *Dunning*, 2025 WL 34822, at *4 (quoting *Onaka*, 2024 WL 1177976, at *2), which is exactly what Plaintiffs did in having the Product purchased by Happel tested.

Defendant attempts to challenge whether Enalytic's testing of Happel's Product affords him standing by pointing to *Brown v. Coty, Inc*, in which testing of a particular product by a plaintiff was insufficient to support claims of widespread mislabeling because the plaintiff failed to detail how many samples were tested, how many samples were found to be contaminated, and how the testing was conducted. (*See* Def.'s Mem. 10 n.4 (citing *Brown*, 2024 WL 894965, at *4 & n.4).) However, this Court's review of relevant case law indicates that the result in *Brown* is an outlier because other district courts have found that plaintiffs testing a product they purchased and finding the product contains a contaminant is "direct proof" that offers "the cleanest and most effective way to establish" an injury-in-fact under a price-premium theory of injury. *Hicks*, 2024 WL 4252498, at *9; *see also Onaka*, 2024 WL 1177976, at *2 ("The most direct route [to establishing injury-in-fact] would be for [the] [p]laintiffs to test their own purchases for PFAS."); *Dunning*, 2025 WL 34822, at *4 (same). Accordingly, the testing of Happel's

purchased Product sufficiently alleges an injury-in-fact as to him. Indeed, the same testing helps establish standing for Anastasi, who also purchased Metamucil Sugar Free around the same time in the same geographic area. (*See* FAC ¶ 81 (alleging Anastasi "purchased Metamucil Sugar Free ... within the past four years ... in Tonawanda, New York").) However, Pellegrino cannot rely upon the test results from Happel's Product to allege an injury-in-fact because Plaintiffs do not allege that she purchased Metamucil Sugar Free, (*see generally id*), and Anastasi cannot rely upon the testing of Happel's Metamucil Sugar Free for standing as to her Metamucil Fiber + Collagen-related claims. Since "[a] plaintiff seeking to represent a class must personally have standing[,]" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (citation omitted), the Court dismisses Anastasi's Metamucil Fiber + Collagen claims and all of Pellegrino's claims for lack of standing.

### b. Plaintiffs' Allegations Regarding the Level of Lead

**\*12** Defendant also argues that even if Plaintiffs adequately allege the presence of lead in the Products, "they have not established that the amounts allegedly detected are 'dangerous,' as their theory of standing and liability requires." (Def.'s Mem. 12.) However, "[w]hat constitutes an 'unsafe level' of lead ... is a question of fact not appropriately resolved on a motion to dismiss." *Levy v. Hu Prods., LLC*, No. 23-CV-1381, 2024 WL 897495, at *4 (S.D.N.Y. Mar. 1, 2024) (quoting *Rodriguez v. Mondelez Glob. LLC*, No. 23-CV-57, 2023 WL 8115773, at *5 (S.D. Cal. Nov. 22, 2023)); *In re Lindt & Sprüngli (USA), Inc. Dark Chocolate Litig.*, No. 23-CV-1186, 2024 WL 4107244, at *3 n.3 (E.D.N.Y. Sept. 6, 2024) (same). Here, as in *Levy*, Plaintiffs have alleged that "[t]here is no level of exposure to lead that is known to be without harmful effects" and "[t]here is no known safe blood lead concentration[,]" (FAC ¶ 43 (citation and quotation marks omitted)), which is all that's required at the pleading stage. Accordingly, the Court declines to dismiss Plaintiffs' claims on this basis.

### 2. Pre-Emption

Defendant next argues that "[s]everal of the representations Plaintiffs challenge are structure/function claims that are authorized by the [Federal Food, Drug, and Cosmetics Act (the "FDCA"),]" which "expressly preempts Plaintiffs' attempt to attack these structure/function claims as deceptive

under state law." (Def.'s Mem. 13.) In support of its argument, Defendant relies on the *Amado I* court's decision that found "Pellegrino's attempt to challenge several structure/function claims that appear on Metamucil products" preempted by the FDCA under Ninth Circuit case law. (*Id.* at 13 (citing *Amado, 2023 WL 3898984, at \*4–7*).) Defendant highlights that one of the statements found to be preempted by the *Amado I* court is also challenged in Plaintiffs' First Amended Complaint in this Action. (*Id.* at 13–14.)

"The term 'structure/function' refers to an exception arising out of the FDCA's definition of the term 'drug.' " *Ackerman v. Coca-Cola Co.*, No. 09-CV-395, 2010 WL 2925955, at \*11 n.21 (E.D.N.Y. Jul. 21, 2010). Under the statute, drugs are defined "as 'articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease,' but there is a "limited exception for food products 'intended to affect the structure or function of the body,' " *id.* (citing 21 U.S.C. § 321(g)(1)), such that "food [ ]and dietary supplement[ ] labels may make claims about the effect a product has on the 'structure or function' of the body without subjecting themselves to the heightened regulations applicable to health claims[,]" *id.* (citations omitted); *see also Korolshteyn v. Costco Wholesale Corp.*, 393 F. Supp. 3d 1019, 1024–25 (S.D. Cal. 2019) ("The [FDCA] distinguishes structure/function claims from disease claims that claim to diagnose, mitigate, treat, cure, or prevent disease. The latter of which would full under the classification of a drug that rightfully necessitates more rigorous federal requirements for approval."); *United States v. Lane Labs-USA, Inc.*, 324 F. Supp. 2d 547, 564–65 (D.N.J. 2004) (explaining that the FDCA allows manufacturers of dietary supplements to make truthful and not misleading claims about how a supplement affects the structure or function of the body without having the supplement classified as a drug and subjected to more rigorous regulations under the Act).

Although the Second Circuit has not opined on whether the FDCA preempts state law actions based on structure/function claims, it has discussed the preemption provision in the FDCA, which was added to the statute through enactment of the Nutrition Labeling Education Act ("NLEA") in 1990. *See* 21 U.S.C. § 343-1. In discussing this provision, the Second Circuit has noted that "the NLEA is clear on preemption[,] stating that it shall not be construed to preempt any other provision of [s]tate law, unless such provision is *expressly preempted* under [21 U.S.C. § 343-1(a)] of the

[FDCA]." *N.Y. State Rest. Ass'n. v. N.Y.C. Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009) (emphasis and alterations in original) (citation omitted). "This provision 'has been repeatedly interpreted not to preempt requirements imposed by state law that effectively parallel or mirror the relevant sections of the NLEA.' " *Hughes v. Ester C Co.*, 99 F. Supp. 3d 278, 284 (E.D.N.Y. 2015) (quoting *Jovel v. i-Health, Inc.*, No. 12-CV-5614, 2013 WL 5437065, at \*3 (E.D.N.Y. Sept. 27, 2013) (emphasis added) (collecting cases)). While this provision of the FDCA preempts any state requirement that is different from the labeling requirements set forth in 21 U.S.C. § 343(r)(1), "there are two ways plaintiffs may escape preemption under that provision: (1) if their claims seek to impose requirements that are identical to those imposed by the FDCA; or (2) if the requirements plaintiffs seek to impose are not with respect to the sort described in [that part of the statute]." *Jovel, 2013 WL 5437065, at \*5*; *see also Ackerman, 2010 WL 2925955, at \*6* (same).

**\*13** While the First and Ninth Circuits have found that the FDCA preempts state law actions challenging structure/function claims, *see Ferrari v. Vitamin Shoppe Indus. LLC*, 70 F.4th 64, 68 (1st Cir. 2023) ("If the manufacturer's label satisfies [the FDCA's requirements for structure/function claims], consumers may not attack the structure/function claim under state law." (citation omitted)); *Greenberg v. Target*, 985 F.3d 650, 655–57 (9th Cir. 2021) (finding the FDCA's preemption provision preempts state law challenges to structure/function claims when the claims meet the three requirements for structure/function claims set out in the FDCA), the Second Circuit has yet to opine on this issue, though it has affirmed the dismissal of state law claims challenging representations governed by different parts of the FDCA, *see Jackson-Mau v. Walgreen Co.*, 115 F.4th 121, 128 (2d Cir. 2024) (acknowledging that plaintiffs can bring misbranding claims under state law to enforce violations of state laws imposing requirements identical to those contained in the FDCA, but "[i]f a dietary supplement satisfies the [S]ection 343 labeling requirements that have preemptive effect, consumers may not attack the supplement's labeling under similar state law mislabeling theories." (citations and quotation marks omitted)); *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 35–36 (2d Cir. 2020) ("[T]he FDCA preempts not only those state laws that are in conflict with it (*i.e.,* any law that is 'different from' the FDCA), but also *any* state law

that provides for labeling requirements that are not *exactly the same* as those set forth in the FDCA and its regulations (*i.e.,* any law that is 'in addition to' the FDCA) (emphases in original)). Additionally, district courts within the Second Circuit have found that the FDCA does not necessarily preempt state law challenges to structure/function claims. *See, e.g.,* Hughes, 99 F. Supp. 3d at 286–87 (holding that the FDCA did not preempt the plaintiffs' state law claims when the "[p]laintiffs have offered sufficient evidence to support [the] claim that [the structure/function claims in question], used in the context of other statements[,] ... are not merely structure/function claims, but, in fact, health or disease claims that require prior FDA authorization."); Jovel, 2013 WL 5437065, at *6 (finding the plaintiffs' state law false advertising claims not to be preempted by the FDCA because "a claim that [the defendant]'s representations are false or misleading does not impose a requirement other than those imposed by federal law").

Here, Defendant's focus on the distinction between structure/function claims and other types of claims is misplaced. Plaintiffs do not assert that Defendant failed to adhere to the labeling requirements posed by the FDCA, nor do they quarrel with the effectiveness of the Products or the primary ingredients that are in the Products. Instead, Plaintiffs claim that the representations Defendant made about the Products are false and misleading because the Products contain undisclosed amounts of lead. (*See* FAC ¶ 70 ("[Defendant]'s express statements and suggestions that [the Products] [are] healthy and safe for consumption ... are false and misleading because the Products' high lead content means the Products are, in fact, neither healthy nor safe for regular consumption."); Pls.' Opp'n 12 ("Plaintiffs do not assert that the claims as they relate to fiber are false or unsubstantiated, but rather, that the general health representations as they relate to the [P]roduct[s] as a whole are false and misleading because the [P]roducts are contaminated with lead.").) Because "Plaintiffs' argument is that the representations Defendant has made about its Products are false and misleading, ... Plaintiffs do not attempt to impose any additional requirements on Defendant other than those already imposed by the [FDCA]." *Whyble v. Nature's Bounty Co.*, No. 20-CV-3257, 2023 WL 7165934, at *5 (S.D.N.Y. Oct. 31, 2023).

Although Defendant argues "[t]here is no principled basis" for this Court "to depart from the *Amado I* court's reasoning" as to the challenged statements, (Def.'s Mem. 15), the Court

declines to follow the *Amado I* court's decision for several reasons. First, *Amado I* was decided by a district court in a different circuit and, as such, is not binding here. At best, it is persuasive authority. As explained supra, the Ninth Circuit, of which the *Amado I* court is a part, has found that the FDCA preempts state law actions challenging structure/function claims, *see* Greenberg, 985 F.3d at 654–55, but the Second Circuit has made no such decision. Additionally, the facts of *Amado I* and the instant Action are distinguishable: the *Amado I* plaintiffs allege that the defendant's statements are false or misleading because scientific evidence suggests that the "added sugar content" of the Metamucil products at issue in that case cause the products to "decrease appetite control, harm blood sugar levels, and damage digestive health[,]" *Amado*, 2023 WL 3898984, at *2, while Plaintiffs in this Action allege the statements at issue here are false or misleading because the Products are contaminated with lead, (*see generally* FAC).

**\*14** Accordingly, Plaintiffs' state law consumer protection claims are not preempted by the FDCA. *See* Bardsley v. Nonni's Foods LLC, No. 20-CV-2979, 2022 WL 814034, at *11 (S.D.N.Y. Mar. 11, 2022) (finding the plaintiff's state law consumer protection claims were not preempted by the FDCA); *Warren v. Whole Foods Mkt. Grp., Inc.*, 574 F. Supp. 3d 102, 113 (E.D.N.Y. 2021) (holding the plaintiffs' GBL §§ 349 and 350 claims were not preempted by the FDCA); *James v. iMoney Tools, LLC*, 785 F. Supp. 3d 1041, 1053 (D. Utah 2025) (finding the FDCA did not preempt the plaintiffs' state law claims because the claims focused on alleged "product contamination," not the products' labeling, so the plaintiffs were not challenging structure/function statements on the products' labeling); *Capaci v. Sports Rsch. Corp.*, 445 F. Supp. 3d 607, 621 (C.D. Cal. 2020) (finding the plaintiff's state law consumer protection claims were not preempted by the FDCA as structure/function statements because the plaintiffs were not claiming the defendant's advertising lacked substantiation but rather alleged the defendant's product's label was false and misleading because numerous studies had shown the product's active ingredients had no effect on the structure and function of the body).

### 3. GBL §§ 349 and 350

Defendant next takes aim at Plaintiffs' GBL §§ 349 and 350 claims. (*See* Def.'s Mem. 17–23.) "Section 349 [of the GBL] prohibits 'deceptive acts or practices in the conduct

of any business, trade[,] or commerce,' whereas Section 350 prohibits 'false advertising in the conduct of any business, trade[,] or commerce.' " *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL 168541, at \*2 (S.D.N.Y. Jan. 19, 2021) (alterations omitted) (quoting N.Y. Gen. Bus. L. §§ 349, 350). " 'The standard for recovery under ... § 350, while specific to false advertising, is otherwise identical to [§] 349,' and therefore the Court will merge its analysis of the two claims." *Cosgrove v. Or. Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (citation omitted) (quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195, n.1 (N.Y. 2002)); *see also Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802 (S.D.N.Y. 2021) (same); *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (noting that "courts have found that the scope of § 350 is as broad as that of § 349 ... and that its essential elements are the same" (ellipses in original) (quotation marks omitted) (collecting cases)). To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) [the] plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Wynn*, 2021 WL 168541, at \*2 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)); *see also Cosgrove*, 520 F. Supp. 3d at 575 (adopting the same standard); *Twohig v. Shop-Rite Supermkts., Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (same).

Here, Defendant appears to concede that Plaintiffs have met the first and third requirements for stating a claim under GBL §§ 349 and 350, instead focusing on the second element of Plaintiffs' GBL claims. (*See* Def.'s Mem. 17–23 (claiming Plaintiffs fail to plead an actionable misrepresentation or omission).) The second element of a GBL §§ 349 and 350 claim is determined by reference to what would mislead the reasonable consumer. *Weinstein v. eBay, Inc.*, 819 F. Supp. 2d 219, 228 (S.D.N.Y. 2011). This reasonable consumer test asks whether a "representation or omission" is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank*, 647 N.E.2d 741, 745 (N.Y. 1995); *see also id.* (explaining that the test is "objective" because it is meant to be "mindful of the potential for a tidal wave of litigation against businesses that was not intended by the [New York State] legislature"). The New York Court of Appeals has held that this test "may be determined as a matter of law or fact [ ]as individual cases require[ ]." *Id.*; *see also Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) ("It is well settled that a court may determine as a matter of law that an allegedly deceptive advertisement would not have misled a reasonable consumer." (citations omitted)). Nevertheless, at the motion to dismiss stage, district courts in the Second Circuit have tended to resolve the test against a plaintiff as a matter of law "only where ... a plaintiff's claims as to the impressions that a reasonable consumer might draw are 'patently implausible' or unrealistic." *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914, 2017 WL 4277187, at \*4 (S.D.N.Y. Sept. 25, 2017) (quoting *Stolz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at \*20 (E.D.N.Y. Sept. 22, 2015)).

### a. Plaintiffs' Theory of Misrepresentation

**\*15** Plaintiffs claim various statements on the Products' packaging "suggest to reasonable consumers that the Products are generally healthy and safe for consumption[ ] and provide specific health benefits," (FAC ¶ 11), but these "statements and suggestions ... are false and misleading because the Products' high lead content means the Products are, in fact, neither healthy nor safe for regular consumption[,]" (*id.* ¶ 70). Defendant argues that Plaintiffs' theory of misrepresentation is inactionable because the challenged statements do not explicitly say the Products are healthy and safe for consumption and "courts have rejected efforts like Plaintiffs' to 'allege[ ] that a consumer will read a true statement on a package and will then ... assume things about the products other than what the statement actually says.' " (Def.'s Mem. 18 (quoting *Van Orden v. Hikari Sales U.S.A., Inc.*, No. 22-CV-504, 2023 WL 5336813, at \*4 (N.D.N.Y. Aug. 18, 2023) (citation omitted).) Defendant urges the Court to "reject Plaintiffs' attempt to infuse the challenged [statements] ... with implied meanings that go far beyond their plain language." (*Id.*) Defendant also notes that "Plaintiffs cannot challenge any allegedly deceptive statements on [Defendant]'s website because Plaintiffs do not allege they read or relied on any of the website statements" in choosing to purchase the Products. (*Id.* n.8 (citations omitted).)

As a threshold matter, Defendant is correct that Plaintiffs cannot challenge any of the statements on Defendant's website because Plaintiffs do not allege that they read or relied on them prior to purchasing the Products. *See Brinks Glob. Servs. USA v. Bonita Pearl Inc.*, No. 22-CV-6653, 2025 WL 1666303, at \*34 (S.D.N.Y. June 12, 2025) ("[The plaintiffs] do not allege that they saw any particular depiction or description of [the defendant]'s services (on its website, in its offices, in its advertisements, or elsewhere) prior to contracting with [the defendant]. The absence of such an allegation is fatal to their GBL § 349 claim."); *Gale v. Int'l Bus. Mach. Corp.*, 781 N.Y.S.2d 45, 47 (App. Div. 2004) ("Although the plaintiff cites particular misleading statements by [the defendant] regarding the reliability of the [product], he nowhere states in his complaint that he saw any of these statements before he purchased or came into possession of his [product]. If [the] plaintiff did not see any of these statements, they could not have been the cause of his injury[.]"); *Lin v. Can. Goose US, Inc.*, 640 F. Supp. 3d 349, 360 (S.D.N.Y. 2022) ("Without allegations that [the] [p]laintiff actually saw the representations at issue, the NY GBL § 349 [claim] fails."). Accordingly, the Court will only evaluate the challenged statements that appear on the Metamucil Sugar Free Product's packaging. [7]

Although Defendant claims courts routinely dismiss challenges to misleading advertising statements that plaintiffs interpret to mean something other than what they actually say, it cites just one district court case for this proposition, (*see* Def.'s Mem. 18), leaving the Court to do the heavy lifting for it. A review of the relevant case law makes dismissal of Plaintiffs' GBL §§ 349 and 350 claims far from the foregone conclusion Defendant presents it to be.

In assessing whether a statement is materially misleading, courts asks whether the statement is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007); *see also Mantikas v. Kellogg Co.*, 910 F.3d 633, 636 (2d Cir. 2018) (same). While it is possible for courts to decide this question as a matter of law, the inquiry is generally a question of fact not suitable for evaluation at the motion to dismiss stage, *Duran*, 450 F. Supp. 3d at 346, with courts declining to dismiss except in the "rare situation where it is impossible for the plaintiff to prove that a reasonable

consumer was likely to be deceived" by the statements in question, *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 467 (S.D.N.Y. 2020) (citation and quotation marks omitted); *see also DeMarco v. DNVB, Inc.*, No. 25-CV-3076, 2026 WL 203742, at \*5 (S.D.N.Y. Jan. 26, 2026) (noting that whether an allegedly deceptive advertisement would have misled a reasonable consumer is generally a question of fact not decided at the motion to dismiss stage), or where a plaintiff's proposed reading of a defendant's label, advertisement, or other statement is "patently implausible and unrealistic," *Van Wagner v. Wellness Pet Co., Inc.*, No. 24-CV-8946, 2026 WL 621830, at \*5 (S.D.N.Y. Mar. 5, 2026) (quotation marks omitted). "Given that the reasonable consumer inquiry is, in most instances, a factual one, a party seeking to dismiss a [GBL] claim must 'extinguish ... the possibility' that a reasonable consumer could be misled" by the statements in question. *Barton v. Pret A Manger Ltd.*, 535 F. Supp. 225, 236 (S.D.N.Y. 2021) (citation omitted). Of the statements challenged in Plaintiffs' First Amended Complaint, "#1 Doctor Recommended Brand[,]" "Better Choices for Life[,]" and "Helps Support: Appetite Control\* ... [and] Digestive Health\*" and the tamper-evident instructions appear Metamucil Sugar Free's packaging, (*see* FAC 3–4; *id.* ¶ 18), so the Court will confine its analysis to those statements and representations.

### i. "#1 Doctor Recommended Brand"

 **\*16** Plaintiffs allege the statement that Metamucil is the "#1 Doctor Recommended Brand" "is material to consumers and adds credibility to the brand, including the message that the Products are healthy, safe, and effective at providing the touted health benefits ...." (FAC ¶ 14 (alteration adopted) (citation and quotation marks omitted).) Defendant counters that Plaintiffs have not alleged facts to establish the falsity of this statement, and "it is not plausible that a reasonable consumer would interpret this marketing claim about the *brand* in the hyper-technical way Plaintiffs allege ...." (Def.'s Mem. 18 (emphasis in original).)

In support of its argument, Defendant points to two cases, (*see id.* at 18–19), both of which are distinguishable. In *Amado I*, Judge Chesney dismissed GBL claims based "#1 Doctor Recommended Brand" because plaintiffs "alleged no facts plausibly establishing [the statement's] falsity[,]" *Amado*, 2023 WL 3898984, at \*9 (citation omitted). However, falsity is not required because a plaintiff can also "succeed

on a claim ... under GBL [§§] 349 and 350" by alleging that "the defendant's deceptive acts are false *or* misleading." *Wedra v. Cree, Inc.*, No. 19-CV-3162, 2022 WL 2116760, at *6 n.5 (S.D.N.Y. June 13, 2022) (emphasis added) (citations omitted). Here, Plaintiffs allege the latter, (*see* FAC ¶ 17 (claiming "reasonable consumers" are misled by the statement because they believe it "means a substantial number of doctors, after receiving 'professional education' on 'the potential uses, proven benefits, and proper administration' of the Products, endorsed them as healthy and safe at the recommended intake levels" (citation omitted)), so *Amado I*'s reasoning is inapplicable.

Next, Defendant cites *Bates v. Abbott Lab'ys*, 727 F. Supp. 3d 194 (N.D.N.Y. 2024), *aff'd*, No. 24-CV-919, 2025 WL 65668 (2d Cir. Jan. 10, 2025) (summary order), in support of its argument for dismissal. The *Bates* plaintiff alleged that the defendant's marketing of Ensure drinks as "healthy and nutritious" and as providing "certain health benefits" was misleading because the products contained added sugar. *Id.* at 212. As a result of the allegedly misleading omission about the amount of added sugar in Ensure drinks, the plaintiff also claimed that the defendant's statement that Ensure drinks were the "#1 Doctor Recommended Brand" was actionable under the GBL. *Id.* at 214. In dismissing this claim, the *Bates* court determined that "[a] consumer who agrees that any added sugar in a nutrition drink undermines its health benefits can obtain that information from the label," which listed sugar as an ingredient. *Id.* As a result, the court found that the "complained-of statements on the label [regarding the sugar content] are not materially misleading." *Id.* And, as a result of this conclusion, the court further held that because the statements about the sugar content of Ensure drinks were not misleading, the statement that Ensure was the "#1 Doctor Recommended Brand" was not misleading. *See id.* ("The [c]ourt agrees with [the] [d]efendant in this respect. [The] [p]laintiff does not allege that the statement [about the brand being doctor recommended] is false and because in a general sense the [c]ourt has found that claims about the health effects of the drinks are not materially misleading despite the presence of added sugar in the products, the [c]ourt finds that this statement is not misleading.").

Here, however, Plaintiffs are not claiming that the Products have "added" lead, or that there is more lead than is disclosed by Defendant in the Products' label, but that the Products contain lead and that Defendant *never* disclosed this fact, even though it knew about the lead content by March 2021. (FAC ¶¶ 53, 88.) In other words, the deception alleged here

is different in kind than that alleged in *Bates*, both in terms of the scope of the omission (some disclosure about the sugar versus none about the lead) and the danger presented by the ingredient at issue (lead versus sugar). *See Hernandez v. Wonderful LLC*, No. 23-CV-1242, 2024 WL 4882180, at *8 (S.D.N.Y. Nov. 25, 2024) ("Given the allegedly known serious health conditions associated with PFAS exposure— and PFAO exposure in particular—as well as the tension between various representations on the packaging of the Product and the alleged health risks posed by PFAS, Plaintiffs sufficiently allege the expectations of a reasonable consumer at this stage."); *Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199, 2016 WL 5372794, at *12 (E.D.N.Y. Sept. 26, 2016) ("Although a consumer reading the nutrition label may note that the Product contains other ingredients besides black cohosh, a consumer could nevertheless reasonably conclude that the Product does not contain lead, as the lead content—even if minimal—is not disclosed to consumers. Therefore, the Court finds that these allegations are sufficient to plead the 'materially misleading' element of Plaintiff's GBL [§§] 349 and 350 claims."). And, this difference is dispositive because the complete failure to mention the presence of a harmful substance such as lead makes any claim about the Products' brand being doctor recommended plausibly misleading since it suggests that "the Products have been evaluated and approved by doctors as healthy and safe when taken as directed." (FAC ¶ 16). *Cf. Sitt*, 2016 WL 5372794, at *12 ("Defendants' purported compliance with FDA rules regarding lead does not eliminate the possibility that reasonable consumers may be misled into believing that the Product contained only herbs and spices, and therefore did not contain any lead." (citation and quotation marks omitted)). Thus, the Court cannot say that no reasonable consumer could interpret "#1 Doctor Recommended Brand" in the way Plaintiffs allege. *See Hesse*, 463 F. Supp. 3d at 467–69 (declining to dismiss the plaintiff's consumer protection claim where a reasonable consumer could interpret the challenged phrase to have several different meanings).

Accordingly, the Court declines to dismiss Plaintiffs' GBL §§ 349 and 350 claims based on this statement.

### ii. Tamper Evident Instructions

**\*17** Plaintiffs also challenge various statements that appear on the Product regarding its tamper-evident packaging, claiming these statements mislead reasonable consumers

by "reassur[ing] [them] that a product is free from toxic adulterants like lead."[8] (FAC ¶ 19.) Defendant counters that the source Plaintiffs cite in support of its claim that "[r]esearch shows [that] reasonable consumers view such tamper-evident packaging as reassurance that a product is free from toxic adulterants like lead[,]" (*id.*), actually "confirms that a reasonable consumer understands these instructions to mean they should not use a product that appears to have been tampered with after it was manufactured and packaged —not, as Plaintiffs' theory requires, as somehow implicating the manufacturing process itself," (Def.'s Mem. 19 (citation omitted)).

The Tamper Evident Instructions are irrelevant to the instant Action because Plaintiffs allege Defendant "introduced lead into the Products through its uniform and deficient formulations, manufacturing processes and systems, quality control systems and procedures, and sourcing of ingredients[,]" (FAC ¶ 47), all of which occur prior to the Products being packaged and sealed. Accordingly, the Court dismisses Plaintiffs' GBL §§ 349 and 350 claims based on the Tamper Evident Instructions because the instructions are not materially misleading. *See Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 154 (S.D.N.Y. 2022) (dismissing the plaintiff's GBL §§ 349 and 350 claims "[b]ecause [the] [d]efendant's statements, advertisements, and practices relating to the [p]roduct are not materially misleading"); *Dashnau v. Unilever Mfg., Inc.*, 529 F. Supp. 3d 235, 247 (S.D.N.Y. 2021) (dismissing the plaintiff's GBL §§ 349 and 350 claims for failure to allege a material misrepresentation).

### iii. "Better Choices for Life"

Plaintiffs also challenge the "Better Choices for Life" statement that appears as part of the American Diabetes Association seal on the Metamucil Sugar Free Product's packaging. (*See* FAC ¶ 11; 3–4.) Defendant counters that "Plaintiffs' theory of deception strips the logo of its diabetes-specific context: without specifically explaining why the statement is deceptive, [Plaintiffs] suggest it contributes to an allegedly false impression that the Products are healthy and safe." (Def.'s Mem. 20 (citation omitted).) As explained by Defendant, the logo "helps consumers identify products and services that are suitable for people with or at risk for

diabetes" and "the [logo] indicates to consumers that any claims made by the product related to diabetes management are evaluated to ensure the claims are supported by scientific evidence." (*Id.* (citations and quotation marks omitted).)

As exhibited by Plaintiffs' photo of the Metamucil Sugar Free Product's packaging, this statement is clearly part of the logo, which proclaims the Product is a "proud partner" of the American Diabetes Association. (FAC 10.) Thus, the Court agrees with Defendant that, when viewed in context of the logo in which it appears, no reasonable consumer could read "Better Choices for Life" as anything other than an endorsement by the American Diabetes Association. *See Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) ("[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial."); *Bardsley*, 2022 WL 814034, at *7 ("In determining whether a reasonable consumer would be misled, '[c]ourts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole.' " (quoting *Pichardo v. Only What You Need, Inc.*, No. 20-CV-493, 2020 WL 6323775, at *2 (S.D.N.Y. Oct. 27, 2020)); *Delgado v. Ocwen Loan Servg., LLC*, No. 13-CV-4427, 2014 WL 4773991, at *8 (E.D.N.Y. Sept. 24, 2014) (explaining that courts must " 'view[ ] each allegedly misleading statement in light of its context' on the product label or advertisement 'as a whole.' " (quoting *Ackerman*, 2010 WL 2925955, at *15)). Accordingly, the Court dismisses Plaintiffs' GBL §§ 349 and 350 claims to the extent they rely on this statement.

### iv. "Helps Support: Appetite Control* ... [and] Digestive Health*"

**\*18** Lastly, Plaintiffs take issue with the statement that Metamucil Sugar Free "[h]elps support[ ] [a]ppetite [c]ontrol[ ] ... [and] [d]igestive [h]ealth[,]" which features prominently on the front of its packaging. (FAC 3, 10.) Plaintiffs allege this statement is misleading because it "suggest[s] to reasonable consumers that the Products are generally healthy and safe for consumption, and provide specific health benefits, such as ... appetite control[ ] and digestive health." (*Id.* ¶ 11.) Defendant counters that a "reasonable consumer" could not plausibly "interpret [this] very specific representation[ ] as conveying something about the Products' overall safety, let alone the supposed

presence of trace amounts of lead." (Def.'s Mem. 21.) In response, Plaintiffs attempt to analogize to *Hernandez, 2024 WL 4882180*, in which the court found statements that a product was "[a]ll [n]atural" and "100% pomegranate juice" were materially misleading because the product allegedly contained a toxic chemical known as PFAS, *id.* at *1–2, *8. (*See* Pls.' Opp'n 14–15.) Defendant counters that Plaintiffs' *Hernandez* analogy "falls flat" because the challenged statement refers to "the specific effects of consuming fiber" and not the Products' ingredients. (Def.'s Reply 9–10.)

Defendant is correct that the statement at issue is readily distinguishable from those in *Hernandez*, but it is less clear that a reasonable consumer would interpret the statement as relating to "the specific effects of consuming fiber," (Def.'s Reply 10), and not the health benefits of using the Products in general. Because this is a question of fact better determined at a later stage in this Action, the Court declines to dismiss Plaintiffs' claims based on this statement. *See* *Kacocha, 2016 WL 4367991, at *14, *16* ("[A]mple case law exists allowing [GBL §§ 349 and 350] claims over allegedly deceptively labeled consumer goods to progress beyond the motion[ ] to[ ] dismiss stage, largely based on the view that the question of what might deceive the reasonable customer is a question of fact"; only in " 'rare situation[s] [is] granting a motion to dismiss ... appropriate' with respect to the issue of whether a reasonable consumer would be misled by the representations about a product." (quoting *Williams v. Gerber Prods. Co., 552 F.3d 934, 939 (9th Cir. 2008)*)).

#### b. Plaintiffs' Theory of Omission

Defendant also argues that Plaintiffs fail to plead a plausible theory of omission because, in referencing the March 2021 Consumer Lab report that revealed that lead was found in various Metamucil products, Plaintiffs undermine their argument that Defendant omitted "material information" that was exclusively within Defendant's control. (Def.'s Mem. 22–23 (quoting FAC ¶ 63).)

For GBL claims based on omission liability, "[t]he [New York] Court of Appeals explained in *Oswego Laborers* that the standard for whether an omission is materially misleading ... is the same as the standard for misrepresentations: actionable omissions are 'limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances.' " *Schuman v. Visa U.S.A., Inc., 788*

F. Supp. 3d 563, 579 (S.D.N.Y. 2025) (quoting *Oswego Laborers Loc. 241 Pension Fund, 647 N.E.2d at 745*); *see also Shaughnessy v. Nespresso USA, Inc.*, No. 22-CV-6815, 2023 WL 6038009, at *5 (S.D.N.Y. Sept. 15, 2023) ("To be misleading under the [GBL], the 'act or omission must be likely to mislead a reasonable consumer acting reasonably under the circumstances.' " (quoting, inter alia, *Orlander v. Staples, Inc., 802 F.3d 289, 300 (2d Cir. 2015)*)). However, "the caselaw since *Oswego Laborers* ... has produced multiple standards for whether an omission would be likely to mislead a reasonable consumer." *Schuman, 788 F. Supp. 3d at 579*. As pointed out by Defendant, some courts have required plaintiffs to allege a defendant had "exclusive knowledge" of the omitted information or that "a consumer could not reasonably obtain" the omitted information. (Def.'s Mem. 23 (citing, inter alia, *Colangelo v. Champion Petfoods USA, Inc.*, No. 18-CV-1228, 2022 WL 991518, at *25–27 (N.D.N.Y. Mar. 31, 2022), *aff'd sub nom.* *Paradowski v. Champion Petfoods USA, Inc.*, No. 22-CV-962, 2023 WL 3829559 (2d Cir. June 6, 2023) (summary order)). *See also Dwyer, 598 F. Supp. 3d at 151* (dismissing plaintiff's claim for omission under the GBL because "[d]efendant clearly did not alone possess the allegedly omitted information, given that [p]laintiff cites to [third party reports and sources]"); *Gordon v. Target Corp.*, No. 20-CV-9589, 2022 WL 836773, at *10 (S.D.N.Y. Mar. 18, 2022) ("[A] plaintiff can only state a claim for omission under the GBL 'where the business alone possesses material information that is relevant to the consumer and fails to provide this information.' " (quoting *Dixon v. Ford Motor Co.*, No. 14-CV-6135, 2015 WL 6437612, at *8 (E.D.N.Y. Sept. 30, 2015))). However, "other courts in this [C]ircuit ... have read *Oswego Laborers* as requiring that a plaintiff must plausibly plead *either* that 'the business alone possesses material information that is relevant to the consumer and fail[ed] to provide this information *or* that plaintiffs could not 'reasonably have obtained the relevant information they now claim the defendant failed to provide.' " *Schuman, 788 F. Supp. 3d at 580* (quoting *Paradowski*, 2023 WL 3829559, at *2 (citation and quotation marks omitted) (emphases added)); *see also Bates, 2025 WL 65668, at *3 n.3* (affirming dismissal of omission-based *GBL § 349* claim "because a reasonable consumer could certainly discover and examine the [allegedly omitted adverse] health effects of added sugar on their own, including from the numerous publicly available studies and sources that [the plaintiff] cites in her complaint");

*Karabas v. TC Heartland LLC*, 770 F. Supp. 3d 454, 469 (E.D.N.Y. 2025) (same); *Boghossian v. Capella Univ., LLC*, No. 24-CV-3007, 2025 WL 934878, at *4 (S.D.N.Y. Mar. 27, 2025) ("For [GBL] claims based on an alleged omission, a plaintiff must show 'either that the business alone possessed the relevant information, or that a consumer could not reasonably obtain the information.' " (quoting *Levy*, 2024 WL 897495, at *5)). Some courts have gone so far as to interpret "[t]he pleading standard" for an omission-based claim to require plaintiffs to plausibly allege they "could not 'reasonably have obtained the [omitted] information[,]' " *Schuman*, 788 F. Supp. 3d at 581 (quoting *Paradowski*, 2023 WL 3829559, at *2), with "[o]ne example—though not the only example—of how to meet that standard is if the defendant 'alone possesses [the omitted] information[,]' " *id.* (quoting *Oswego Laborers*, 647 N.E.2d at 741)); *see also DeMarco*, 2026 WL 203742, at *5 (applying the standard as articulated in *Schuman)*.

**\*19** In light of these various standards, the Court is not persuaded by Defendant's contention that Plaintiffs have failed to plead a plausible theory of omission by alleging a reasonable consumer could not have obtained information about the lead content of the Products. *See Franklin v. Gen. Mills, Inc.*, No. 21-CV-1781, 2025 WL 2614970, at *13 (E.D.N.Y. Sept. 10, 2025) (rejecting the defendant's argument that publicly available knowledge of the risk of phthalates in its products defeats the plaintiffs' omission-based claims because dismissal would be premature "as a fully developed factual record is necessary to determine what a reasonable consumer could have discovered regarding the amount of phthalates present in the Products during the relevant time period"). Further, despite Defendant's attempt to differentiate the Consumer Lab report from the "niche" "allegedly public sources each defendant cited" at the motion to dismiss stage in the cases on which it relies, (Def.'s Reply 10), dismissing Plaintiffs' omission-based claims based on Defendant's argument that the March 2021 Consumer Lab Report made the information discoverable by a reasonable consumer would be inappropriate without development of a full factual record, *see Franklin*, 2025 WL 2614970, at *13 ("[The] [d]efendants' arguments concerning the publicly available knowledge of the risk of phthalates in the [p]roducts do not defeat [the] [p]laintiffs' omission-based claims," because dismissal would be "premature, as a fully developed factual record is necessary to determine what a reasonable consumer could have discovered regarding the amount of phthalates present in the [p]roducts during the relevant

time period."); *Levy*, 2024 WL 897495, at *6 (declining to dismiss the plaintiff's omission-based claims based on information the defendant alleged to have been in the public domain "as early as 2006" by "the FDA and other third parties" because it would be premature to do so before without the development of a full factual record).

Taking Plaintiffs' version of the facts as true, there is nothing in the First Amended Complaint that suggests that the Consumer Lab report was widely disseminated, or to put it another way, that Plaintiffs' omission theory is implausible. [9] *See In re Nurture Baby Food Litig.*, No. 21-CV-1217, 2025 WL 918927, at *14 (S.D.N.Y. Mar. 26, 2025) (declining to dismiss the plaintiffs' state law omission-based claims because "[m]uch of this information only came to light as a result of the Congressional Report, of which a reasonable consumer's knowledge is a question of fact not properly resolved on a motion to dismiss." (citations omitted)).

Therefore, Plaintiffs' claims based on "#1 Doctor Recommended Brand" and "Helps Support: Appetite Control* ... [and] Digestive Health*'" survive, but its affirmative misrepresentation claims based on the Tamper Evident Instructions and "Better for Life" statement that is part of the American Diabetes Association logo are dismissed. Additionally, Plaintiffs have pled a plausible theory of omission, so the Court declines to dismiss Plaintiffs' GBL §§ 349 and 350 claims.

4. AGM § 199-a

Defendant next argues Plaintiffs' AGM § 199-a claim should be dismissed "because the AGM does not provide a private right of action and cannot be invoked by a civil plaintiff." (Def.'s Mem. 24 (citation omitted).) Plaintiffs counter that district courts "throughout the Second Circuit '... have concluded or assumed that the A[GM] does provide a private right of action.' " (Pls.' Opp'n (quoting *Winans v. Ornua Foods N. Am. Inc.*, 731 F. Supp. 3d 422, 431 (E.D.N.Y. Apr. 23, 2024).)

Plaintiffs' argument relies on one district court's reference to a New York Court of Appeals case that, by the district court's reading, "seems to indicate that the A[GM] was designed to provide a stand-alone private remedy to consumers" of mislabeled food products. *Warner v. StarKist Co.*, No. 18-CV-406, 2019 WL 1332573, at *2 (N.D.N.Y. Mar. 25,

2019) (citation omitted). It is worth noting that *Abounader*, the Court of Appeals case *Warner* cites, involved AGM §§ 188 and 194, *see id.*, 154 N.E. at 310, which are not the provisions at issue in this Action. Likewise, *Hammer v. American Kennel Club*, 803 N.E.2d 766 (N.Y. 2003), which Defendant claims is "better authority" than the cases cited by Plaintiffs, (Def.'s Reply 11), held that no private right of action exists under AGM § 353, *id.* at 768–69, which is also not at issue in this Action. Moreover, other district courts have found no private right of action exists under different provisions of the AGM. *See, e.g., Thompson v. Schwan's Consumer Brands Inc.*, No. 24-CV-831, 2024 WL 3862104, at *4 (S.D.N.Y. Aug. 19, 2024) ("AGM § 32 makes clear that New York's Commissioner of Agriculture and Markets, not individual plaintiffs, has the sole right to investigate and bring such actions under the AGM." (citation omitted)); *Frias v. Mars Wrigley Confectionery LLC*, No. 23-CV-4422, 2024 WL 3988667, at *4 (S.D.N.Y. Aug. 28, 2024) (concluding AGM § 201 does not provide a private cause of action because "[a]lthough the AGM incorporates federal regulations 'forbidding the misbranding of food, plaintiffs receive their private rights of action for misbranding of food under consumer protection laws' such as GBL §§ 349 and 350." (quoting *Axon v. Citron World, Inc.*, 354 F. Supp. 3d 170, 181 n.9 (E.D.N.Y. 2018), *aff'd sub nom Axon v. Fla.'s Nat. Growers, Inc.*, 813 F. App'x 701 (2d Cir. 2020) (summary order))); *Steele v. Wegmans Food Mkts.*, 472 F. Supp. 3d 47, 49 (S.D.N.Y. 2020) (holding "[n]o private civil actions can be inferred" from the AGM because "the legislature created such a right of action only when it wished to" (citation omitted)).

**\*20** In light of the lack of affirmative guidance from New York courts, the Court finds the *Frias* court's decision to offer the most salient guidance because that case concerned whether the plaintiff could bring a claim under AGM § 201, which, like AGM § 199-a, concerns the misbranding of food products. In *Frias*, the court determined the plaintiffs could not bring a claim under AGM § 201 because "[a]lthough the AGM incorporates federal regulations 'forbidding the misbranding of food, plaintiffs receive their private rights of action for the misbranding of food under consumer protection laws' such as GBL §§ 349 and 350." *Id.*, 2024 WL 3988667, at *4 (quoting *Axon*, 354 F. Supp. 3d at 181 n.9). In support of its

decision, the *Frias* court also cited a prior court's decision finding that "AGM § 32 makes clear that New York's Commissioner of Agriculture and Markets, not individual plaintiffs, has the sole right to investigate and bring such actions under the AGM." *Id.* (quoting *Thompson*, 2024 WL 3862104, at *4). Other courts similarly support the idea that New York consumers have an adequate pathway to redressing their grievances that does not involve a private right of action under the AGM. *See, e.g., Wurtzburger v. Ky. Fried Chicken*, No. 16-CV-8186, 2017 WL 6416296, at *4 (S.D.N.Y. Dec. 13, 2017) ("New York law provides remedies and a private right of action for misbranding food under GBL § 349 ...."); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 280–81 (S.D.N.Y. 2014) ("New York law also provides remedies, including private rights of action, for misbranding food under consumer protection laws, such as GBL § 349[.]"); *Ackerman*, 2010 WL 2925955, at *4 ("New York ... discourage[s] the misbranding of food through the availability of remedies pursuant to [its] consumer protection laws."). Considering the ample support found in the case law, the Court dismisses Plaintiffs' AGM § 199-a claims because the statute does not provide a private cause of action. *See Cornish v. Guardian Asset Mgmt.*, No. 23-CV-1612, 2025 WL 1707627, at *11 (D. Conn. June 17, 2025) ("A court may dismiss a claim if it is based on statutes that do not provide a private right of action." (citation omitted)); *Potteti v. Educ. Credit Mgmt. Corp.*, No. 19-CV-4479, 2020 WL 5645194, at *2 (E.D.N.Y. Sept. 22, 2020) ("A claim fails as a matter of law when the statute under which the complaint is brought does not provide a private right of action to enforce." (citations omitted)); *cf. Fair v. Verizon Commc'ns Inc.*, 621 F. App'x 52, 53 (2d Cir. 2015) (summary order) ("Determinations that a federal statute does not provide a private right of action are typically subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) ... for failure to state a claim." (collecting cases)).

### 5. Negligence

Lastly, Plaintiffs allege Defendant is liable for negligence per se for violating the FDCA and AGM provisions regarding "adulterated" or "misbranded" food. (*See* FAC ¶¶ 125–32.) Defendant attacks Plaintiffs' negligence per se claim, arguing: (1) it is "barred by the economic loss doctrine" and the "special relationship exception to the economic loss rule" does not apply; (2) its "attempt[ ] to piggyback off [Defendant's] alleged AGM violations fails because the AGM does not [provide] a private cause of action"; and (3) "it is

premised on a theory that the Products are adulterated and misbranded, ... but [Plaintiffs] have failed to plausibly allege as such." (Def.'s Mem. 24–26 (citations and quotation marks omitted).)

"New York applies the economic loss doctrine to [tort] claims." *Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 590 (S.D.N.Y. 2022). The doctrine "prevents a plaintiff from recovering [for] purely economic losses in a negligence action." *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 178 (S.D.N.Y. 2012) (citation omitted); *see also IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 220 N.E.3d 646, 656 (N.Y. 2023) (explaining the economic loss doctrine "stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer ....") (citation omitted)). An exception to the doctrine exists where the plaintiff and defendant have a "special relationship that requires the defendant to protect against the risk of harm to the plaintiff." *532 Madison Ave Gourmet Foods v. Finlandia Ctr., Inc.*, 750 N.E.2d 1098, 1101 (N.Y. 2001).

Here, Plaintiffs seek to recover from Defendant for purely economic harm. (*See generally* FAC.) Plaintiffs attempt to invoke the special relationship exception to the economic loss doctrine by arguing that "Defendant owed statutory duties under the FDCA and [AGM] to protect Plaintiffs from the harm complained of ...." (Pls.' Opp'n 22 (citation omitted).) However, the cases cited by Plaintiffs in support of its argument are inapplicable because they do not involve a plaintiff seeking to recover from a defendant for purely economic injuries based on duties imposed by a statute. *See Sackin v. Transperfect Glob., Inc.*, 278 F. Supp. 3d 739, 749 (S.D.N.Y. 2017) (explaining the plaintiffs could bring a negligence suit against their defendant employer because they "faced an imminent threat of identity theft" and their "purchase[ ] [of] preventative services to mitigate the threat ... satisfy the injury requirements of negligence" and finding that the economic loss doctrine is "inapplicable" because "the [c]omplaint does not allege a products liability claim."); *In re Mission Constr. Litig.*, No. 10-CV-4262, 2013 WL 4710377, at *16–17 (S.D.N.Y. Aug. 30, 2013) (finding the economic loss doctrine did not bar the defendant's negligence per se counterclaim because it involved injury to property and "[t]he economic loss [doctrine] provides, in general terms, that negligence is not actionable in the absence of personal injury or property damage." (collecting

cases)); *Ambac Assurance Corp. v. U.S. Bank Nat'l Assoc.*, 328 F. Supp. 3d 141, 159–60 (S.D.N.Y. 2018) (finding the economic loss doctrine did not apply when the plaintiff's negligence claim was premised on breach of fiduciary duty). Accordingly, the economic loss doctrine bars Plaintiffs' negligence per se claim. *See Franklin*, 2025 WL 2614970, at *14 (dismissing the plaintiffs' negligence per se claims predicated on violations of the FDCA and AGM because "[the] [p]laintiffs have not identified any cases in the products liability context where the economic loss doctrine did not apply because of the alleged existence of certain statutory duties.").

### III. Conclusion

**\*21** For the reasons set forth above, all of Pellegrino's claims and Anastasi's Metamucil Fiber + Collagen claims are dismissed without prejudice. *See Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 280 (S.D.N.Y. 2024) ("[A] dismissal for lack of standing is, 'by definition, without prejudice.' " (quoting *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 445 (2d Cir. 2022)). Further, Plaintiffs' AGM § 199-a and negligence per se claims are dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because Plaintiffs' AGM § 199-a and negligence per se claims fail as a matter of law, they are dismissed with prejudice. *See Wilson v. Med. Unit Offs.*, No. 10-CV-1438, 2011 WL 6780934, at *4 (E.D.N.Y. Dec. 27, 2011) ("Because [the plaintiff's] negligence-based claims fail as a matter of law, amendment would be futile, and [the] plaintiff's claims are dismissed with prejudice."). Should Plaintiffs choose to file an amended complaint, they must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain all of the claims and factual allegations Plaintiffs wish the Court to consider. If Plaintiffs fail to abide by the 30-day deadline, the claims that are dismissed could be dismissed with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion at Dkt. No. 46.

SO ORDERED.

**All Citations**

Slip Copy, 2026 WL 880573

## Footnotes

1   According to Plaintiffs, "[t]he Products specifically include all flavors, sizes, and quantities of (i) Metamucil Made with Real Sugar, (ii) Metamucil on-the-go!, (iii) Metamucil Sugar Free, (iv) Metamucil No Added Sweeteners, (v) Metamucil Premium Blend, and (vi) Metamucil Fiber + Collagen Peptides." (FAC ¶ 1 n.1.)

2   Plaintiffs' First Amended Complaint contains a list of these specific statements and the Products on which they appear. (*See* FAC 3–4.)

3   Plaintiffs' First Amended Complaint also contains a list of these specific statements. (*See* FAC 6–7.)

4   Plaintiffs' First Amended Complaint contains a chart with test results for each specific Product. (*See* FAC 23–24.)

5   Citations to "(22-CV-5427 Dkt.)" are to entries on the *Amado I* docket.

6   *Amado II* was also assigned to Judge Chesney. Citations to "(23-CV-6308 Dkt.)" are to entries on the *Amado II* docket.

7   The Court will only evaluate the challenged statements that appear on Metamucil Sugar Free's labeling because, as discussed in Section 11.B, the Court dismisses Anastasi and Pellegrino's challenges to the other Products for lack of standing.

8   Plaintiffs specifically identify the following tamper-related statements as misleading: "Do Not Use If Printed Seal Is Broken Or Missing," "Do Not Use If Printed Inner Seal is Broken or Missing," "Tamper Evident: Do not use if printed seal under cap is missing or damaged," "Do Not Use If Package Is Torn," and "Individual Packets Sealed For Your Protection" (collectively the "Tamper Evident Instructions"). (FAC 6–7.)

9   It bears noting that Defendant offers no other information about the extent to which the Consumer Lab report was publicly available, though there was no legal bar to doing so. *See Jeanty v. UPS United Parcel Serv. Freight*, No. 21-CV-8311, 2021 WL 5054439, at *1 n.1 (S.D.N.Y. Nov. 1, 2021) ("Generally, courts may take judicial notice of publicly available information, including from a website." (citations omitted)); *Seidman v. Yid Info Inc.*, No. 23-CV-7071, 2024 WL 4664669, at *4 n.4 (E.D.N.Y. June 11, 2024) ("It is generally proper to take judicial notice of articles and [w]eb sites published on the [i]nternet." (quotation marks omitted) (quoting *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 443 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011)).

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.